## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| U.S. Department of Justice, | ) |
| Asset Forfeiture and Money Laundering Section | ) |
| Criminal Division | ) No. CV |
| 1400 New York Avenue, N.W. | ) VERIFIED COMPLAINT FOR |
| Washington, D.C. 20530, | ) FORFEITURE *IN REM* |
| | ) |
|     Plaintiff, | ) |
| | ) |
|       v. | ) |
| | ) |
| ONE GULFSTREAM G-V JET AIRCRAFT | ) |
| DISPLAYING TAIL NUMBER VPCES, ITS | ) |
| TOOLS AND APPURTENANCES, | ) |
| | ) |
|     Defendant. | ) |
| | ) |

## COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff United States of America, by and through the United States Department of

Justice, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C), brings this Verified Complaint

for Forfeiture in a civil action *in rem* against One Gulfstream Aerospace model G-V aircraft (the

"Defendant Aircraft") purchased by Ebony Shine International Ltd., bearing manufacturer's

serial number 669 and International Registration number VPCES (Cayman Islands), its tools and

appurtenances. As of October 12, 2011, the Defendant Aircraft was located in Equatorial Guinea

("E.G."). In support of this case, the United States states as follows:

## NATURE OF THE ACTION

1.     This is a civil action *in rem* to enforce the provisions of

18 U.S.C. §§ 981(a)(1)(A) and § 981(a)(1)(C) in order to condemn and forfeit to the exclusive

use and benefit of the United States of America the Defendant Aircraft.

2.     The Defendant Aircraft was purchased by Teodoro Nguema Obiang Mangue

("Nguema"), Minister of Forestry and Agriculture for the Republic of Equatorial Guinea and son of the President of Equatorial Guinea, for $38.5 million.

3.      The Defendant Aircraft is located outside the United States but is subject to forfeiture in the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

4.      Pursuant to 18 U.S.C. § 981(a)(1)(A), property is forfeitable to the United States when it constitutes "property, real or personal, involved in a transaction or attempted transaction in violation" of 18 U.S.C. §§  1956 or 1957,  "or any property traceable thereto."

5.      Pursuant to 18 U.S.C. § 981(a)(1)(C), property is also forfeitable to the United States when it constitutes or is derived from proceeds traceable to an offense constituting a "specified unlawful activity."  Specified unlawful activities are defined by 18 U.S.C. § 1956(c)(7), and include foreign offenses involving "extortion" and/ or the "misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official" (18 U.S.C. § 1956(c)(7)(B)(ii), (iv)).

### DEFENDANT *IN REM*

6.      The defendant is described as follows:  One Gulfstream Aerospace model G-V aircraft purchased by Ebony Shine International Ltd., bearing manufacturer's serial number 669 and International Registration number VPCES (Cayman Islands), its tools and appurtenances, previously United States Registration Number N1UB, previously N544KK.

7.      The Defendant Aircraft is believed to be located in E.G., as of October 12, 2011. Ebony Shine International, Ltd. was the purchaser of the Defendant Aircraft.

8.      The following may have an interest in the Defendant Aircraft:  Teodoro Nguema Obiang Mangue.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over this action pursuant to 28 U.S.C § 1345

(district courts have original jurisdiction of all civil cases commenced by the United States)

because it has been commenced by the United States, and 28 U.S.C. § 1355 (a) (district courts

have original jurisdiction of any action for forfeiture), because it is an action for the recovery and

enforcement of a forfeiture under an Act of Congress.

10.      Venue is proper in this District pursuant to 28 U.S.C. §1355(b)(2) which provides

in relevant part that:

> Whenever property subject to forfeiture under the laws of the United States is
> located in a foreign country, or has been detained or seized pursuant to legal
> process or competent authority of a foreign government, an action or proceeding
> for forfeiture may be brought . . . in the United States District Court for the
> District of Columbia.

The Defendant Aircraft is believed to be located in Equatorial Guinea, a foreign country.  The

Defendant Aircraft was flown on October 11, 2011 from Basel Mulhouse, France to Equatorial

Guinea.  Therefore, venue is appropriate in this District.

11.      This civil action *in rem* for forfeiture is governed by 18 U.S.C. §§ 981 and 983,

the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime

Claims and Asset Forfeiture.

## STATUTORY BACKGROUND

12.      The Defendant Aircraft is subject to forfeiture pursuant to the following:

a)  Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which

constitutes or is derived from proceeds traceable to a violation of any offense

constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)),

including but not limited to 18 U.S.C. §§ 1956(c)(7)(B)(ii) and (iv)), is subject to

forfeiture to the United States of America.

b)  Pursuant to 18 U.S.C. § Section 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of federal money laundering laws, 18 U.S.C. §§ 1956 or 1957, or traceable to such property, is subject to forfeiture to the United States of America.

## FACTS

13.  On information and belief, plaintiff alleges the following facts.

## A.  Relevant Names, Entities, and Terms

14.  The following individuals, entities, and terms are relevant to this Complaint.

***Teodoro Nguema Obiang Mangue*** is the beneficial owner of the Defendant Aircraft, son of the President of E.G., and Minister of Forestry and Agriculture in E.G.

***Teodoro Nguema Obiang Mbasogo*** is the President of E.G.

***Inner Circle***:  A small number of individuals who hold critical positions of political and economic power in E.G.

***Senate Permanent Subcommittee on Investigations Report ("PSI Report")***: Report issued in July 2004 by the United States Senate Permanent Subcommittee on Investigations ("PSI") on money laundering and foreign corruption, which focused in part on money brought to Riggs Bank in the United States from E.G. that was suspected of being proceeds of foreign corruption in E.G.

***Riggs National Bank*** is the financial institution in Washington, D.C., where the government of E.G. and members of the Inner Circle maintained depository accounts from 1995 to 2004.

## B.  Background

15.  E.G. is a West African country.  The population in 2009 was approximately 680,000, according to data compiled by the World Bank.

16.     The country was colonized by the Portuguese in the late 1600s and ceded to Spain in 1778; it gained independence in 1968.  The first President was Francisco Macías Nguema.

17.     In 1979, Macías Nguema was overthrown in a coup d'état.  His nephew, Teodoro Obiang Nguema Mbasogo, who was previously the military governor of Bioko Island and Vice-Minister of the Armed Forces, became President of E.G. (hereinafter "President Obiang").

18.     More than three decades after seizing control from his uncle Macías Nguema, President Obiang is still in power.

19.     President Obiang exercises plenary control over the Government of  E.G.  Nearly all positions of political and economic power in E.G. are held by the Inner Circle.

20.     One member of the Inner Circle is Teodoro Nguema Obiang Mangue (hereinafter "Nguema"), President Obiang's eldest son, who has been appointed by his father to various ministerial positions.  Nguema is the beneficial owner of the defendant assets.

21.     During President Obiang's more than 30-year rule, members of the Inner Circle have amassed extraordinary wealth through a variety of corrupt schemes.

**C.     Embezzlement and Misappropriation of E.G.'s Natural Resources**

22.     Under E.G. law, the nation's mineral resources and hydrocarbons belong to the public, not to individuals.  (See Ley No 8/2006, de fecha 3 de noviembre de Hidrocarburos de la Republica de Guinea Ecuatorial.)  Similarly, Equatoguinean law provides that the National Forestry Reserve is permanent, inalienable, and part of the public domain, and that the National Forests are reserved for exclusive economic extraction and development by the State.  (See Ley No 1/1997, Sobre El Uso Y Manejo De Los Bosques.)

23.     Since the commencement of large-scale extraction of its oil and gas reserves beginning in the mid-1990s, E.G. has become a major oil and gas producer.  By 2004, it was the third-largest oil and gas producer in Sub-Saharan Africa.  Over the last several years, oil and gas exports have resulted in billions of dollars in annual revenue to E.G.

24.     E.G. also derives income from natural resources other than oil and gas, primarily timber, its second major export commodity.

25.     As of 2006, the Equatoguinean economy had grown 20 times larger than it was in the mid-1990s, reflecting the massive E.G. revenues derived primarily from oil and gas production.

26.     Despite E.G. laws regarding public ownership of its natural resources, and despite an extraordinary expansion in the economy of E.G., living standards of the general population remain at a subsistence level.

27.     At the same time, over at least the past two decades, members of the Inner Circle has gained enormous wealth through violations of E.G. law, using a variety of methods.  These include extortion and misappropriation, theft, and embezzlement of public funds.  Details concerning these methods of corruption are set forth below at paragraphs 47-72.

28.     Corruption in E.G. began receiving public scrutiny in the United States in the mid-2000s, following an investigation conducted by the PSI.  The 2004 PSI Report revealed that, from at least 1995 to 2004, the Government of Equatorial Guinea directed that payments from oil companies be made into accounts at Riggs National Bank in Washington, D.C.  According to the PSI Report, aggregate deposits to Equatoguinean government accounts totaled hundreds of millions of dollars at a time and were so large that by 2003, the E.G. portfolio had become the bank's largest single customer relationship, with balances and outstanding loans that together

approached $700 million.  The PSI Report concluded that Riggs Bank "turned a blind eye to evidence [,] suggesting the bank was handling the proceeds of foreign corruption."  Riggs Bank closed the E.G. accounts in 2004, and subsequently pleaded guilty to failure to report suspicious monetary transactions by high-risk customers, in violation of Title 31, United States Code, Sections 5322 and 5318(g), and agreed to pay a $16 million fine, in addition to a $25 million civil penalty, for its handling of the E.G. and other accounts.

29.     In July 2004, after the PSI Report was issued and Riggs Bank closed the E.G. accounts, much of the money held by the government of E.G. and members of the Inner Circle was removed from the United States.  One significant exception was money brought to the United States by Nguema, much of which ultimately was used to purchase the Defendant Aircraft.

**D.     Nguema's Illicit Acquisition and Misuse of Funds**

30.     In 1991, at the age of 23, Nguema came to the United States to study English as a Second Language at Pepperdine University in Malibu, California.  He did not live on campus; instead, he shuttled between rooms at the Beverly Wilshire Hotel and a house he rented in Malibu.  After five months, he dropped out of the program.  His tuition and living expenses (including his hotel bill and the rental of the house in Malibu) were paid by an American oil company operating in Equatorial Guinea.

31.     Nguema thereafter began acquiring money under the guise of legitimate business operations.  Less than two years after Nguema left the Pepperdine program, and despite his youth and inexperience, on January 8, 1993, Nguema was awarded a 20-year concession[1] to harvest

---

[1]  A concession is the exclusive right to engage in logging in certain defined areas, for a certain period of time.  Forestry concessions in E.G. are awarded by either the President or the Minister

timber from 25,000 hectares of rainforest in E.G. (approximately 61,000 acres) by his father, President Obiang.  Nguema was 24 years old.  The actual logging was done by a Malaysian company.  The following year, Nguema created a forestry company called Sofona in E.G., to which his father granted a five-year concession to harvest timber from an additional 11,000 hectares (approximately 27,000 acres).

32.     Having granted his son Nguema the right to cut timber on 88,000 acres of National Forest lands, President Obiang then put Nguema in charge of the E.G. forestry industry. In approximately 1998, at the age of 30, Nguema was appointed by his father to the newly-created position of "Minister of Forestry and Environment," later changed to "Minister of Forestry and Agriculture" (hereinafter "Minister of Forestry"), for E.G.  Nguema continued to have sole ownership of Sofona as well as a second forestry company he created in 1998, Somagui Forestal.  He used ownership of Sofona and Somagui Forestal and his status as Minister of Forestry (and President Obiang's son) to enrich himself through corrupt schemes in the timber industry, as described below.

33.     As millions of dollars of oil and gas revenues began flowing into the E.G. government treasury in the late 1990s, the amount of money available to members of the Inner Circle, including Nguema, increased.  In March 2001, Nguema bought a new 2001 Bentley automobile in Beverly Hills, California, paying for it with a personal check for $366,0000, drawn on his Riggs Bank account.  A few months later, he bought a second 2001 Bentley, from the same dealership in Beverly Hills, for which he paid $57,500 in cash and $228,000 by personal check drawn on the same account.  In 2001, at the age of 33, he also bought a $6.5 million house on Antelo Road in Bel Air.

of Forestry, without competitive bidding.  Companies or individuals awarded a concession are permitted to harvest timber in the National Forests.

34.    Nguema's level of spending is inconsistent with his salary as a Minister.  His official salary today is approximately $6,799 per month, or less than $100,000 per year, according to official E.G. sources.

35.    In the 2000s, the rapid growth of the oil and gas sector in E.G. led to a boom in construction and other infrastructure-related activities in that country.  This provided another opportunity for the Inner Circle, including Nguema, to obtain money corruptly, as the government began awarding large construction contracts to companies owned by the Inner Circle.

36.    From 2003-2004, President Obiang changed the title of Nguema's position to "Minister of Forests and Infrastructure," and Nguema's companies began receiving funds for alleged construction activities.  One of Nguema's forestry businesses in E.G., Somagui Forestal, received two multi-million dollar government contracts for road construction in 2003 and 2004. Nguema also claimed that approximately $8 million he spent in 2004 to buy two luxury homes in Cape Town, South Africa, came from profits from another construction company he owned in E.G. called Sociedad de Carreteras de Guinea Ecuatorial ("Highway Society of Equatorial Guinea"), or SOCAGE.

37.    Whether as "Minister of Forestry and Agriculture" or "Minister of Forests and Infrastructure," Nguema continued to misappropriate the wealth of his country through various corrupt means, described below, and continued his personal spending in the United States and abroad greatly in excess of his official government salary.  For example, he spent millions of dollars to buy dozens of sports cars and luxury vehicles.  These included, among others, 24 cars with a total declared value of $9.68 million that he stored at the Petersen Automotive Museum in Los Angeles, California, until November 2010, when he shipped them, along with $400,000

worth of motorcycles, to France.  These cars included a $2 million Maserati, two Bugatti Veyron sports cars for which he paid $2 million and $1.3 million respectively, eight Ferraris, seven Rolls Royces, five Bentleys, four Mercedes, a Porsche, two Lamborghinis, and an Aston Martin.

38.    On September 28, 2011, law enforcement authorities in France seized several high-end vehicles belonging to Nguema in that country in connection with a French criminal investigation involving Nguema.

39.    In June 2005, Nguema purchased two 50-foot, high-performance racing boats in Ft. Myers, Florida, for a total of over $2 million.  Nguema initially kept both boats in California but then had one shipped to Maui, Hawaii, so he could use it during one of his visits there.  The Maui boat sank due to operator error and had to be salvaged and repaired, at a cost of approximately $400,000.  Nguema had both of these boats shipped to E.G. in 2010.

40.    Between April and June 2006, Nguema's luxury expenditures included a combined total of $68 million on just two assets:  the defendant Malibu mansion, for which the purchase price was $30 million, and the Defendant Aircraft, which cost over $38 million.  Nguema caused the $68 million used to purchase these two assets to be wire transferred directly to the sellers, with no financing or use of borrowed funds.

41.    Nguema spent large sums on designer clothing and expensive vacations.  In a single month in 2004, for example, he spent over $80,000 at Gucci and over $50,000 at Dolce and Gabbana in a shopping spree in the United States.  He also spent over $100,000 at the Grand Wailea Resort in Hawaii in August-September 2005.

42.    From June 2010 through June 2011, Nguema spent a total of approximately $3.2 million on various items of Michael Jackson memorabilia, including $275,000 for a "Bad Tour"

glove, $80,000 for a pair of crystal-covered socks, $140,000 for a jacket and shirt, and $245,000 for a basketball signed by Michael Jackson and basketball star Michael Jordan.

43.     Nguema has frequently chartered yachts for pleasure cruises, at a cost of many hundreds of thousands of dollars.  Between December 24, 2005 and January 1, 2006, Nguema paid more than $1 million to a Monte Carlo yacht broker to rent a luxury yacht in St. Barthelemy for a period of 11 days.  Nguema paid for this lease via wire transfer from an account in E.G. in the name of his timber company, Somagui Forestal.

44.     Nguema eventually took steps toward purchasing his own yacht.  In June 2008, a broker acting on behalf of Nguema contacted a German yacht-building company that is described on its website as being "famous worldwide for high-end and quality yachts," and as engaging in the design and construction of "mega-yachts," to discuss having a yacht built for him.   Nguema paid the German company approximately $290,000 for the pre-design of a mega-yacht; the sale price of the yacht itself was reported to be approximately $380 million.  After Nguema's payment for the pre-design became public, official sources within E.G. announced that he was not purchasing the yacht.

45.     These assets and expenditures, including the Malibu mansion, the Defendant Aircraft, the luxury vehicles, and the celebrity memorabilia (but not including the proposed mega-yacht), total over $100 million

46.     When opening accounts at financial institutions in the United States, Nguema provided various explanations for his source of funds.  For example, in March 2007, when opening a bank account at Comerica Bank in California, Nguema claimed that he acquired money from a "family inheritance" and from "trading expensive and custom automobiles."  In September 2006, when opening a bank account at Pacific Mercantile Bank in California,

Nguema claimed to be self-employed as an "investor," in addition to serving as Minister of Agriculture and Forestry.  As a member of the Inner Circle, Nguema derived his funds from a variety of corrupt schemes.

## E.  Illegal Corrupt Schemes Used by Nguema and the Inner Circle to Enrich Themselves

47.     The criminal code that was in force in Spain in 1968, when E.G. won its independence, continues to be the law in E.G. to this day.  This code prohibits various forms of corruption such as extortion and misappropriation of funds by public officials.

48.     Nguema and other members of the Inner Circle have engaged in various corrupt schemes to enrich themselves.  Nguema uses these corrupt schemes to supplement his legitimate income, which is his official government salary.  These schemes are illegal under the laws of E.G., but the applicable anti-corruption laws are not enforced against the Inner Circle; instead, members of the Inner Circle are allowed to keep funds obtained through corruption and to take their corruption proceeds abroad.  A summary of these schemes, and the E.G. statutes which prohibit them, are set forth below.

### a.  Extortion Schemes

49.     The simplest extortion scheme involves members of the Inner Circle, such as Nguema, demanding payments from companies doing business in E.G., in exchange for the performance of official acts.  For example, Nguema, as Minister of Forestry, is responsible for approving the export of timber logged in E.G., and refuses to sign such approvals until the exporter first pays a "tax" for Nguema's personal benefit.

50.     Similarly, in order to engage in logging in E.G.'s National Forests, timber companies must first receive a logging concession from Nguema.  Nguema demands that timber companies seeking to obtain such concessions first pay him a personal fee.

51.     Members of the Inner Circle, including Nguema, also demand that foreign companies operating in E.G. provide them with gifts and free services.  For instance, a major international civil engineering firm in E.G., which had obtained several substantial infrastructure contracts from the Government of E.G., built a mansion for Nguema in Malabo, E.G., at his request and direction.  Upon completion of that project, however, Nguema refused to pay this firm for its work.

52.     Similarly, members of the Inner Circle demanded that a South African civil engineering firm, which was awarded a government contract to construct an airfield in E.G., permit members of the Inner Circle to use — without any compensation — the firm's equipment, heavy machinery, personnel, aircraft and vehicles for their personal benefit.  When the firm complained, the government of E.G. refused to provide the firm with any further payments for its work and even detained some of the firm's personnel in an E.G. jail.

53.     In another variation of this scheme, the Inner Circle routinely demands that companies operating in E.G. contribute money to what are disguised as public service campaigns.  For example, Nguema currently is operating a program to generate funds purportedly to improve the housing conditions of the poor by changing palm roofs to metal ones. Although advertisements promoting this campaign and others claim that contributions to these programs are voluntary, companies that do not contribute face retaliation.  Moreover, the contributions are not used for their alleged purpose, but instead are largely taken by members of the Inner Circle, including Nguema, for their personal benefit.

54.     In another extortion scheme, a businessman in E.G. who owned a construction company was forced to share 50 percent of his profits with a senior E.G. public official, and to provide the official with 50 percent of the equity in the company, in order to continue to secure

government contracts in E.G.   Ultimately, the businessman was forced to leave E.G. against his will, and the senior public official took over 100 percent of his company.

55.     Extortion is illegal under E.G. law.  The 1968 Criminal Code of Spain, currently in effect in E.G., contains the following provisions, among others, which prohibit extortion: Article 196 (expropriation of assets by a public official); Article 198 (prohibiting public officials from taking advantage of their positions to involve themselves directly or indirectly in private associations or companies with the intent to profit); Article 385 (prohibiting public officials from soliciting or receiving gifts or contributions for performing their official duties); Article 386 (prohibiting public officials from soliciting or receiving gifts or contributions for carrying out an unjust act related to the duties of their position); and Article 390 (public official who receives improper gifts).

56.     The above-described corrupt schemes of obtaining extortionate payments from businesses operating in E.G., through the wrongful use of actual or threatened force, violence, or fear, or under color of official right, violate E.G.'s laws prohibiting public officials from using their position for self-enrichment, or to solicit or receive extortion payments.

**b.     Schemes to Obtain Government Funds Through Misappropriation, Embezzlement, and Theft**

57.     Another way in which members of the Inner Circle such as Nguema enrich themselves through corruption is by taking government funds through misappropriation, embezzlement, and theft.  This is accomplished either through direct diversion of funds from government bank accounts, or through schemes such as submitting inflated "bids" for government contracts, in which corruption payments are built into the contract.  This type of corruption also is in violation of the laws of E.G.

### i.     __Direct Misappropriation of Funds__

58.     Riggs Bank records show that money paid by oil companies to the government of E.G. was misappropriated by E.G. government officials and their family members.

59.     The government of E.G., as well as members of the Inner Circle, held bank accounts at Riggs Bank in Washington, D.C., beginning in 1995.  One such account, in the name of the Republic of Equatorial Guinea General Treasury, was known as the E.G. Oil Account, because virtually all of the deposits into this account were payments from foreign oil companies doing business in E.G.

60.     A withdrawal of funds from the Oil Account, according to Riggs Bank records, required only the signature of President Obiang and a second by either his son Gabriel Obiang Lima (then Deputy Mines and Hydrocarbons Minister) or his nephew Melchor Esono Edjo (Secretary of State for the Treasury).

61.     Riggs Bank records show that nearly $500,000 was sent from the Oil Account to the personal bank account of Melchor Edjo.  The records, according to the PSI Report, also show that President Obiang approved the wire transfer of nearly $35 million from the E.G. Oil Account to two companies that appeared to be connected to President Obiang, were unknown to the bank, and had accounts in jurisdictions with bank secrecy laws.  When Riggs Bank tried to obtain information about the beneficial owners of these two companies, neither the banks holding the accounts nor Equatoguinean officials would provide information, according to the PSI Report.

62.     In addition to direct transfers of money from the E.G. Oil Account, the Riggs Bank records show deposits of large amounts of cash into accounts controlled by E.G. public officials and their families.  Riggs Bank records show that President Obiang opened a money-

market account at Riggs Bank in the name of a Bahamas-registered corporation in 1999.  From 2000 to 2002, $11.5 million in cash was deposited into this account.   President Obiang's wife, according to the PSI Report, also maintained personal accounts at Riggs Bank, into which over $1.4 million in cash was deposited from 2000 to 2002.

63.     Some of the money obtained by other members of the Inner Circle has made its way to Nguema; for example, on October 21, 2002, $200,000 was transferred from a personal account at Riggs Bank belonging to a member of the Inner Circle to Nguema's personal bank account.

64.     Like other members of the Inner Circle, Nguema has also diverted E.G. public resources and monies for his personal use.  On one occasion in 2005, Nguema, who was attempting to purchase a $40 million luxury aircraft for his personal use, advised the manufacturer that he could have a United States oil company operating in E.G. assume responsibility for making the payments for his personal jet.  These payments would then be credited against balances owed by the oil company to the government of E.G.  In this roundabout manner, government funds would be used to buy the plane for Nguema without appearing to come from the E.G. Government.  In this instance, however, the oil company refused to go along with Nguema's scheme.

### ii.  Inflated Bids

65.     A more elaborate method by which members of the Inner Circle are able to divert government funds for their personal use is by submitting inflated bids for government contracts. The Inner Circle is able to manipulate the contracting process for the personal benefit of its members, while creating an apparently legitimate cover for its misappropriation of government funds.

66.     Because government contracts are awarded to companies owned by or associated with members of the Inner Circle without true competition, those companies are able to charge the E.G. Government fees that bear little, if any, rational relationship to the actual economic value of the services or products tendered to the E.G. Government.  The bids from such companies include built-in mark-ups of from 50 percent to 400 percent or more, so that members of the Inner Circle can obtain the difference.

67.     Nguema has admitted that, as a cabinet minister, he takes for himself a "sizeable part" of government contracts.  In a sworn affidavit filed with a court in South Africa, Nguema stated under oath:

> Cabinet Ministers and public servants in Equatorial Guinea are by law allowed to owe [sic] companies that, in consortium with a foreign company, can bid for government contracts and should the company be successful, then what percentage of the total cost of the contract the company gets, will depend on the terms negotiated between the parties.  But, in any event, it means that a cabinet minister ends up with a sizeable part of the contract price in his bank account.

Contrary to Nguema's recitation of the law, such self-dealing by a public official is illegal under E.G. law.  These inflated contracts are another means by which members of the Inner Circle misappropriate funds from the public treasury for their own enrichment.

### iii.     Schemes to Misappropriate State-Owned Land

68.     Following E.G.'s independence from Spain in 1968, land formerly owned by Spanish nationals became state-owned properties.  The land registration system previously used by Spain fell into disuse and, for many years, there was little to no registration activity.  However, in the early 1990s, members of the Inner Circle began to transfer and register large amounts of state-owned land into their own names.

69.     At the same time, the foreign oil and gas companies that were becoming active in E.G. in the 1990s needed to lease land for their operations.  Because the lands formerly owned

by the state now were owned in the name of members of the Inner Circle, the oil companies'

lease payments went to benefit the Inner Circle rather than the state.

70.     According to a letter to the PSI from Company A, a foreign company operating in

E.G., Company A's E.G. subsidiary paid President Obiang's wife approximately $365,000 as

rental payments in 1998-2000 to lease a 50-acre compound of offices and employee-living

facilities that she claimed she owned.  In another letter to the PSI, Company B informed the

Subcommittee that as of April 2004, it had paid members of the Inner Circle a total of nearly $1

million in building lease payments.  According to the PSI Report, "of the 28 leases [Company B]

identified for rentals in Malabo, E.G., 18 were leased from persons connected to the [E.G.]

government or the Obiang family."

71.     The Criminal Code in effect in E.G. prohibits misappropriation, theft, and

embezzlement of government funds by government officials.  *See, e.g.,* Article 394 (prohibiting

public officials from stealing public funds under their control by virtue of their duties); Article

396 (prohibiting public officials from using public funds under their control for personal use);

Article 401 (public official who has a financial stake in any business regulated by his office); and

Article 514 (prohibiting persons from taking property, with the intent to enrich themselves,

without the consent of the owner).

72.     The above-described corrupt schemes — achieved through the direct

misappropriation of funds or lands and by submitting inflated "bids" for government contracts—

violate E.G.'s laws prohibiting public officials from stealing or misappropriating public assets.

**c.  Nguema's Efforts to Conceal the Source and Ownership of His Funds**

73.     Following the issuance of the PSI Report in 2004, Nguema had difficulty finding

United States financial institutions willing to deal with him directly because of concerns that his

funds were derived from corruption in Equatorial Guinea.  In order to conceal the source and

ownership of some of the funds he brought into the United States, Nguema created companies in

various names, including "Beautiful Vision, Inc." and "Unlimited Horizon, Inc.," and opened

bank accounts in the United States in the names of those companies.  Nguema also wire

transferred funds to bank accounts controlled by intermediaries, who then used the money to pay

his personal expenses, or transferred money from those accounts to accounts in the names of the

corporations he formed, and then used the corporate accounts to pay his personal expenses.

**F.  Purchase of the Defendant Aircraft**

74.     Initially, Nguema sought to purchase a $40-million aircraft directly from United

States aircraft manufacturer Gulfstream Aerospace ("Gulfstream").  Nguema began negotiating

the purchase in late 2003 or early 2004, and sent approximately $20 million to an escrow account

associated with Gulfstream.  However, after the publication of the PSI Report in July 2004,

Gulfstream decided to return Nguema's $20 million to a United States law firm representing

him.

75.     The lawyers on both sides of the transaction were so concerned about possible

civil or criminal liability as a result of their involvement in returning Nguema's money that they

attempted to obtain assurances from the U.S. Department of Justice.

76.     On July 28, 2005, Gulfstream wire transferred $20 million, plus interest, to

Nguema's lawyers in the United States.

77.      Having been unsuccessful in his efforts to purchase an aircraft directly from

Gulfstream, Nguema sought to purchase the Defendant Aircraft, a used Gulfstream V jet, from a

private party in 2006 for $38.5 million.  For purposes of the transaction, Nguema formed, and

used, a British Virgin Islands company, Ebony Shine International Ltd., as the nominal buyer,

and a United States company, Insured Aircraft Title Services ("IATS") of Oklahoma City, Oklahoma, as the escrow agent.

78.      The seller was Blue Sapphire Services, Ltd. (also a British Virgin Islands corporation), which used McAfee & Taft, a United States company headquartered in Oklahoma City, as its escrow agent.  At the time of the attempted transaction, the Defendant Aircraft was registered with the Federal Aviation Administration in Oklahoma City, and Wells Fargo Bank Northwest served as its United States registered owner.

79.      On March 23, 2006, at Nguema's instruction, IATS wire transferred approximately $4.7 million from an account at UBS London, England, to a McAfee & Taft's escrow account at Bank of America in Oklahoma City, Oklahoma.  From April 4-7, 2006, Nguema wired a total of $10.3 from his personal account at Société Générale de Banque en Guinée Équatoriale, Malabo, E.G., to the McAfee & Taft escrow account at Bank of America in Oklahoma City, Oklahoma.

80.      Despite having received a total of $15 million toward the purchase price, McAfee & Taft was not willing to proceed with the transaction because Nguema refused to comply with that company's requirements, including a requirement that Nguema identify the source of the funds.  McAfee & Taft therefore cancelled the transaction.

81.      On April 12, 2006, McAfee & Taft returned a total of $10,299,950.00 to Nguema's personal bank account in E.G., and $4,723,262.22 to IATS's account at UBS London.

82.      Nguema ultimately was able to complete the aircraft purchase by using IATS of Oklahoma City as the escrow agent instead of McAfee & Taft, and by depositing the funds into IATS's account at UBS London.  Unlike McAfee & Taft, IATS did not require information as to the source of the $38.5 million used by Nguema to buy the Defendant Aircraft.  The funds were

provided by Nguema from his personal account in E.G.  The payments were executed via

transactions into and out of correspondent accounts in the United States before arriving at the

IATS account at UBS London.

## COUNT I

83.     All statements and averments made in paragraphs 1-82 are re-alleged and

incorporated, herein, by reference.

84.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which

constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified

unlawful activity'" is subject to forfeiture to the United States.

85.     "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(B)(ii) and (iv)

to include, among other things, an offense against a foreign nation involving "extortion," or  the

"misappropriation, theft, or embezzlement of public funds by or for the benefit of a public

official."

86.      As set forth above, the funds used to purchase the Defendant Aircraft were

derived from extortion or the misappropriation, theft, or embezzlement of public funds by or for

the benefit of a public official, in violation of the laws of E.G.

87.     The foreign offenses at issue include violations of the following provisions of the

Spanish Penal Code of 1968, which are still the law in EG:  Article 196 (expropriation of assets

by a public official); Article 198 (taking advantage of official position to exercise a profession

directly related to scope of official duties); Article 385 (public official who demands or accepts a

bribe to perform a crime); Article 386 (public official who demands or accepts a bribe to perform

an unjust act); Article 390 (public official who receives improper gifts), Article 394 (public

official who steals public funds); Article 396 (public official who embezzles funds under his

care); Article 401 (public official who has a financial stake in any business regulated by his office); and Article 514 (theft).

88.     Therefore, the Defendant Aircraft is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), on the grounds that it constitutes or is derived from proceeds traceable to a specified unlawful activity.

## COUNT II

89.     All statements and averments made in paragraphs 1-82 are re-alleged and incorporated, herein, by reference.

90.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section . . . 1957 . . . of [title 18, United States Code], or any property traceable to such property," is subject to forfeiture to the United States.

91.     18 U.S.C. § 1957 imposes a criminal penalty on any person who:

knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

92.     For purposes of Section 1957, the term "specified unlawful activity" has the same meaning as set forth in paragraph 85 above.

93.     As set forth above, the Defendant Aircraft is the subject of monetary transactions or attempted transactions involving criminally derived property of a value greater than $10,000 and, for the reasons set forth above, the funds involved in those transactions were derived from specified unlawful activity, that is, extortion or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, in violation of the laws of E.G.

94.     The foreign offenses at issue are as set forth in paragraph 87, above.

95.     Therefore, the Defendant Aircraft is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), on the grounds that  it was involved in transactions or attempted transactions in violation of 18 U.S.C. § 1957, or is traceable to such property.

## COUNT III

96.     All statements and averments made in paragraphs 1-82 are re-alleged and incorporated, herein, by reference.

97.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 . . . of [title 18, United States Code], or any property traceable to such property," is subject to forfeiture to the United States.

98.     18 U.S.C. § 1956(a)(1) imposes a criminal penalty on any person who:

knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

. . .

(B) knowing that the transaction is designed in whole or in part –

(i)     to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

99.     For purposes of Section 1956, the term "specified unlawful activity" has the same meaning as set forth in paragraph 85 above.

100.     As set forth above, the Defendant Aircraft is the subject of financial transactions or attempted financial transactions and, for the reasons set forth above, the funds involved in those transactions were derived from specified unlawful activity, that is, extortion or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, in violation of the laws of E.G.   The foreign offenses at issue are as set forth in paragraph 87, above.

101.     Also, as set forth above, the transactions were designed in whole or in part to conceal or disguise the source, ownership, or control of the proceeds of specified unlawful activity.

102.     Therefore, the Defendant Aircraft is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), on the grounds that it was involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i), or is traceable to such property.

**WHEREFORE,** the plaintiff United States of America prays that, as to the defendant property, One Gulfstream Aerospace model G-V aircraft purchased by Ebony Shine International Ltd., bearing manufacturer's serial number 669 and International Registration number VPCES (Cayman Islands), its tools and appurtenances, judgment be entered in favor of the United States and against the Defendant Aircraft; that, pursuant to law, notice be provided to all interested parties to appear and show cause why the forfeiture should not be decreed; that the Defendant Aircraft be condemned as forfeited to the United States of America; and for such other relief as this Court may deem just, necessary and proper, together with the costs and disbursements of this action.

Respectfully submitted,

DATED: October 24, 2011          JENNIFER SHASKY CALVERY, CHIEF
                                 LINDA SAMUEL, Deputy Chief (D.C. Bar No. 388970)

                                 DANIEL H. CLAMAN, Assistant Deputy Chief
                                 JANET C. HUDSON, Senior Trial Attorney
                                 ASSET FORFEITURE AND MONEY
                                   LAUNDERING SECTION, Criminal Division


                                 WOO S. LEE (D.C. Bar No. 486004)

Trial Attorney
Criminal Division
United States Department of Justice

RONALD C. MACHEN, JR. (D.C. Bar No. 447889)
United States Attorney
STEPANIE LAUREN BOOKER (D.C. Bar No. 475321)
Assistant United States Attorney
Chief,
Asset Forfeiture and Money Laundering Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## VERIFICATION

I, Robert Manzanares, hereby verify and declare under penalty of perjury that I am a Special Agent with Homeland Security Investigations, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are official files and records of the United States, publicly available files and historical information, files and records compiled by the Senate Permanent Subcommittee on Investigations, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation in this case, together with others, as a Special Agent of Homeland Security Investigations.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this _24_ day of _October_, 2011, at _6:03 pm_.

ROBERT MANZANARES
Special Agent
Homeland Security Investigations