# EXHIBIT B



**GEOTEXT**
Translations, Inc.

STATE OF CALIFORNIA )
)
)
COUNTY OF SAN FRANCISCO ) ss

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the attached Statement of Victoriano Obiang Abogo, dated April 13, 2012.

Emma Drew, Project Manager
Geotext Translations, Inc.

State of California, County of San Francisco
Subscribed and sworn to (or affirmed) before me
on this 18th day of April, 20 12,
by Emma Drew,
proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.
Signature: _____



R. L. CREIGHTON
Commission # 1930961
Notary Public - California
San Francisco County
My Comm. Expires Mar 31, 2015

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel +1.212.631.7432 fax +1.212.631.7778
San Francisco  220 Montgomery Street Ste. 438, San Francisco CA 94104 U.S.A tel +1.415.576.9500 fax +1.415.520.0525
Washington  1025 Connecticut Avenue, Suite 1000, Washington, DC 20036, U.S.A. Tel +1.202.828.1267 Fax +1.202.828.1271
London  8-11 St. John's Lane, London EC1M 4BF, United Kingdom Tel +44.20.7553.4100 Fax+44.20.7990.9909
Paris  75 Boulevard Haussmann, F- 75008 Paris, France tel +33.1.42.68.51.47 fax +33.1.77.72.90.25
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  |  www.geotext.com

## STATEMENT OF VICTORIANO OBIANG ABOGO

I, Dr. VICTORIANO OBIANG ABOGO, state as follows:

1. I make this declaration based on my experience and knowledge acquired from over twenty years of practicing law in Equatorial Guinea as an attorney, judge, prosecutor and advisor to the Parliament of Equatorial Guinea.

### PROFESSIONAL EXPERIENCE AND QUALIFICATIONS

2. I currently serve as Judge of the OHADA (Organization for the Harmonization of Business Law in Africa) Common Court of Justice and Arbitration.

3. I am an Equatorial Guinean citizen. Between 1984 and 1990, I studied at the School of Law and International Relations of the "TARAS SEVCHENKO" State University in Kiev, in the former USSR, now Ukraine, where I earned my Law degree.

4. I was admitted to the National Bar Association of Equatorial Guinea with registration number 33/90 when Dean Luis MAHO SICACHA, an illustrious and respected personage in Equatorial Guinea, was President of the Bar Association. At that time there were few lawyers in Equatorial Guinea, and as such I was the thirty-third member to be admitted to the Bar Association.

5. I started out as an intern in the chambers of the Honorable Fermín NGUEMA ESONO, then Judge of the Supreme Court of Justice and current District Judge in Valencia, Spain.

6. Under Article 39 (g) of the Constitution, which grants the Chief of State the authority to appoint and discharge members of the judiciary when there are no career Judges or Magistrates, I was appointed Judge of the Provincial Court of Bata in 1993. In 1996, I was promoted to Prosecutor of the same Court, until I was discharged in 1997.

7. After receiving some training on the teaching of law, in 1995 I applied for a teaching position at the Spanish University of Distance Learning in Equatorial Guinea, at which I taught Roman Law and Basic Legal Concepts. Among my students are numerous practicing attorneys and others who have pursued careers in the judiciary as judges and even ministers.

8. From 1997 to 2003, I practiced as a private attorney and legal advisor.

9. In 2003, I was hired by the Parliament as a legal advisor, a position in which I remained until the date I was appointed Justice of the Court in which I currently serve. As an advisor I dealt with matters of corruption, human rights violations, breach of international treaties, border commissions between neighboring countries, among others. In this position, I drafted legal texts and issued legal reports and opinions.

10. In 2009, I served as legal advisor to a Parliamentary investigative commission in the case of Enrique Mercader Costa, former Minister of Transportation, Technology, Postal Service and Telecommunications. The commission investigated allegations of corruption against the Minister which resulted in his removal from office.

11. Once my appointment as Judge of the OHADA Common Court of Justice and Arbitration was approved, I took office on June 5, 2011. The links in said organization bear no relation to the subordination of a member State, for which reason in my position I do not represent Equatorial Guinea.

12. As further professional experience, I was trained at the *Centro Atlántico de Estudios Judiciales* [Atlantic Center for Legal Studies] in Barcelona, Spain, where I received specialized intensive training for judges, magistrates and prosecutors of Equatorial Guinea in 2009. Also, in 2004, at the *Escuela Regional Superior de la Magistratura* [Regional School for Advanced Magistracy Studies] of Porto Novo, Benin, I received specialized training for judges and magistrates in commercial courts, arbitration tribunals for disputes between commercial corporations, and cassation courts. I also took part in several courses, including (1) training course for parliamentary legal advisors in Spain in 2008 and 2010, (2) training course on human rights organized by the Spanish FED in 2005 and (3) training course on human rights organized by the United Nations Human Rights Office in 1996.

**HISTORICAL AND CULTURAL BACKGROUND OF EQUATORIAL GUINEA**

13. The Republic of Equatorial Guinea, as described in Article 1 of the Constitution, is a sovereign, independent, republican, unitary, social and democratic State, and its supreme values are unity, peace, justice, liberty and equality.

14. The Republic of Equatorial Guinea was a Spanish colony until October 12, 1968, when it achieved independence from Spain. The first president was Francisco MACÍAS, who governed for 11 years until he was deposed in 1979.

15. Following independence, the Constitution of 1968 authorized the continued validity in Equatorial Guinea of Spanish laws passed prior to 1968 that were not in conflict with said Constitution.

16. In 1973, a new Constitution was adopted that completely abrogated the Constitution of 1968 and attempted to put an end to the guidelines of the Spanish legal system that filled the legal vacuum left by ordinary law. This new system created a lack of formal legislative organization in which there were no basic fundamental structures, in particular legal structures, and gave rise to a formal vacuum of applicable law.

17. After President Francisco MACÍAS was deposed, the new regime promulgated Law No. 4/1980, which restored the previous rule of law by allowing the supplemental application in Equatorial Guinea of the criminal, civil, commercial, administrative and military laws in existence in Equatorial Guinea prior to October 12, 1968, until such time as Equatorial Guinea could develop its own laws, regulations and other applicable rules. Thus, whenever a new law is promulgated, the previous Spanish law is automatically abrogated, if so ordered in its final or abrogation provision. Decree Law 4/1980 remains in effect.

18. The hierarchy of laws in effect in Equatorial Guinea is as follows: (1) the Constitution, (2) supreme decrees and (3) laws. Due to the country's short history as an independent nation, the government also recognizes oral tradition and custom in the implementation and application of the law.

-5-

19. The Parliament is currently considering a draft of a new Penal Code that will replace the existing Penal Code (which is the Spanish Penal Code of 1968). Said draft is at the debate stage.

**SOCIOECONOMIC BACKGROUND OF EQUATORIAL GUINEA**

20. At the time of independence, Equatorial Guinea was an underdeveloped country. All the land was nationalized by President Francisco MACÍAS. However, the citizens of Equatorial Guinea had the right to buy land, and could do so on credit in exchange for cultivating the land.

21. In about 1980, after President Teodoro OBIANG NGUEMA MBASOGO took office, in order to encourage foreign investment, the President granted everyone, including those Spaniards who had owned land before MACÍAS took office, the right to buy land. Spaniards who had previously been landowners had a period of approximately two years to reclaim their lands.

22. In addition to allowing citizens to buy land, the government of Equatorial Guinea has always allowed members of the government and civil servants to maintain private businesses while performing their public duties. This is primarily due to two factors: (1) in the early years, the government had very few resources with which to compensate its officials and (2) due to the colonial past in which the Spaniards were the exclusive land owners, the government wanted to prevent the private sector from being exclusively dominated by foreigners. Article 12 of Decree Law No. 1/2004 on Ethics and Dignity in Performance of Public Service codifies the custom of allowing public officials to maintain private businesses while in office, provided they play a passive role in said business.

23. All domestic or foreign companies have the right to submit bids for government contracts and receive government concessions for construction projects. Government contracts are not administered by the Ministry of Infrastructure, but rather by the office of National Projects of Equatorial Guinea ("GE Proyectos"). GE Proyectos is an independent entity that serves as an intermediary between the Ministry of Infrastructure and the executive branch. In this way, government contracts are granted, administered and supervised by GE Proyectos. No ministry, including the Ministry of Infrastructure, has its own bank account; rather all government funds are managed by the Public Treasury. The process for awarding government contracts is public and competitive.

24. Any domestic or foreign person or company may also request timber concessions. Concessions are granted by the President of the Republic by supreme decrees issued under Article 39, paragraph (c) of the Constitution.

## MATERIALS AND LAWS REVIEWED

25. The laws reviewed in the preparation of this declaration were the following:

    a. Constitution of the Republic of Equatorial Guinea

    b. Equatoguinean Penal Code (Articles 196, 198, 385, 386, 390, 394, 396, 401, 514, 113, and 200)

   c. Decree Law No. 1/2004 on Ethics and Dignity in Performance of Public Service

   d. State's Civil Servants Law No. 2/2005

   e. Decree-Law 4/1980 declaring supplemental application in Equatorial Guinea of laws in effect prior to October 12, 1968

   f. Spanish Penal Code of 1995

## DEFINITION OF MEMBER OF GOVERNMENT AND PUBLIC SERVANT UNDER EQUATORIAL GUINEAN LAW

26. Under Article 49 of the Constitution, which lists the members of the government, the "members of the government" are the Prime Minister, Vice Prime Ministers, Ministers of State, Ministers, Deputy Ministers, Vice Ministers and Secretaries of State. The Constitution therefore clearly stipulates that Ministers are members of the government.

27. Members of the government are appointed by the President of the Republic and their role is to set the nation's public policy in accordance with their duties. Therefore, under Article 50 of the Constitution, "prior to taking office, the Prime Minister and the other Members of the Government take an oath of allegiance before the President of the Republic, to the President himself and this Constitution."

28. Moreover, in order to enter the public administration, public servants must meet the necessary requirements for the position in question, including "overcoming selective tests as determined," as provided by Article 50 of the State's Civil Servants Law.

29. The laws, including the Penal Code, which are inferior to the Constitution, also make the distinction between members of government and civil servants.

30. First of all, Article 2 of the State's Civil Servants Law No. 2/2005, which applies to civil servants of the central administration, clearly specifies that "excluded from its scope of application are: a) Members of the Government, General Secretaries… b) Officials serving the Administration of Justice, who shall be governed by their special provisions. c) Officials of Autonomous Bodies, who shall be governed by their Statutes…" Thus, the State's Civil Servants Law No. 2/2005, confirms that members of the government are not civil servants.

31. Another example is found in Article 5 of Decree Law No.1/2004 on Ethics and Dignity in Performance of Public Service, which establishes that certain persons "must submit a full sworn declaration of their assets." Article 6 lists the persons to whom said obligation applies. These are (1) Members of the Executive Branch, (2) Representatives of the Chamber of People's Representatives and (3) Civil Servants or employees who work in centralized or decentralized public administration… and other agencies in the public sector." As such, Decree-Law No. 1/2004 on Ethics and Dignity in Public Office distinguishes between members of the executive branch, that is, members of government under the Constitution, and public servants who serve in the public administration.

32. Thirdly, the Penal Code itself contains articles that apply to public servants while others apply only to Ministers. For example, Article 200 establishes that "The Minister who orders payment of a tax that is not authorized by law shall be punished with total disqualification and a fine of 10,000 to 500,000 pesetas." Therefore, since the Code specifically refers to "Ministers" when referencing a crime applicable to them, when it uses the term civil servant, the crime is not applicable to Ministers. In other words, the two terms are not interchangeable.

33. Moreover, Article 119 of the Penal Code defines a civil servant as "[a]nyone who by immediate provision of the Law, or by election or appointment by a competent Authority, participates in the exercise of public duties" A Minister of the government exercises his duties by the appointment of the President of the Republic, who is classified as the "Chief of State" and not as an Authority under the Penal Code.

34. Therefore, based on the foregoing analysis, it is clear that Articles 196, 198, 385, 386, 390, 394, 396 and 401 of the Penal Code prohibit and punish actions committed by civil servants, but do not apply to members of the government. Therefore, prosecutors could not use them to file criminal charges against a member of the government.

## EXTORTION

35. I have been asked to analyze whether extortion is criminalized under Equatorial Guinean law.

36. The Equatoguinean Penal Code does not recognize extortion as a crime. Consequently, no person can be criminally charged for a crime that does not exist or that has not been codified. Article 13, paragraph (s) of the Constitution, establishes that ("no one may be punished for an act or omission that at the time it was committed was not defined or punished as a criminal offense, nor can any penalty not provided for by law be applied. When in doubt, the Penal law shall be applied in the way most favorable to the accused").

37. There is no other law in the Equatorial Guinean body of law that recognizes extortion as a crime.

38. As a point of comparison and with the understanding that it is not applicable in Equatorial Guinea, I have reviewed the Spanish Penal Code of 1995, which does contain the crime of "extortion" in Article 243 of said code. This crime is introduced into the Spanish Penal Code under a new chapter of the same name, "Extortion," Chapter III of Title XIII, which deals with crimes against property and the socioeconomic order, which in the Penal Code of 1968 was called crimes against property. Article 243 and the conduct it criminalizes do not exist in the Equatoguinean Penal Code. Unlike the Spanish Penal Code, the Equatoguinean Penal Code has not been revised or updated to incorporate said crime. The fact that a new chapter was created in the Spanish Penal Code to incorporate the crime of extortion,

Article 243, suggests that said change was not a mere revision of a crime that already existed in the previous Penal Code, but rather the creation of a new crime.

39. Articles 196, 198, 385, 386 and 390 are not recognized as extortion.

40. Article 196 criminalizes expropriation. For a defendant to be convicted of violating Article 196, it must be proved that (1) being a civil servant, (2) he expropriated assets belonging to other persons, (3) domestic or foreign (4) that the expropriation was done outside the cases permitted by law and (5) the expropriation was done without meeting the legal requirements.

41. Article 198 refers to conflicts of interests in cases in which (1) an authority or civil servant, (2) took advantage of his office to practice either (a) a profession directly related to the sphere of his official duties or (b) participate directly or indirectly in for profit private enterprises or associations.

42. Articles 385, 386 and 390 are portions of Chapter IX that deal with bribery offenses. For a person to be convicted of violating Article 385, it must be proved that (1) being a civil servant, (2) (a) he requested or received, either personally or through an intermediary, a gift or present, or (b) accepted an offer or promise, (3) to perform some act related to his position, and (4) the act performed constitutes a crime.

43. Article 386 requires that it be proven that the accused (1) being a civil servant, (2) (a) requested or received, either personally or through an intermediary, a gift or present, or (b) accepted an offer or promise, (3) to perform some act related to his position, and (4) the act performed is a wrongful act that does not constitute a crime.

44. In turn, the elements required to convict a person of a crime under Article 390 include that (1) being a civil servant (2) he accepted gifts offered to him; (3) said gifts were

offered (a) in consideration of his office or (b) to perform legal action that should not be paid for.

45. Article 385 calls for a minor prison term, that is, six months and one day to six years, in addition to a fine. Article 386 calls for a prison term of one month and one day to six years, depending on whether the unlawful act was actually perpetrated, plus a fine. Articles 196, 198 and 390 do not contemplate imprisonment as a possible punishment, but only suspension or special disqualification or fine.

### MISAPPRORIATION, THEFT AND EMBEZZLEMENT

46. Articles 394, 396 and 401 of the Equatoguinean Penal Code are included in the section of the Penal Code that deals with crimes committed by civil servants in the performance of their duties.

47. Article 394 penalizes the theft of public funds. For a person to be convicted of violating Article 394, it must be proved that the accused (1) being a civil servant (2) stole or allowed others to steal public revenue or public assets (3) that were under his supervision or at his disposal and (4) that the revenue or assets were at his disposal due to his duties as a civil servant.

48. Article 396 refers to the crime of misappropriation of public funds. Convicting a person under Article 396 requires the following elements: (1) being a civil servant (2) he misappropriated revenue or assets (3) that were under his care (4) for his own use or that of third parties.

49. Article 401 deals with conflicts of interest. For a person to be convicted of violating Article 401, it must be proved that (1) being a civil servant (2) he directly or

indirectly acquired (a) becomes interested in a contract or (b) a transaction in which (3) he must participate by reason of his office.

50. Under Title XIII, dealing with crimes against property, in the Chapter on Theft, Article 514 criminalizes theft. For a person to be convicted of violating Article 514 it must be proved that the accused (1) for profit and (2) without violence or intimidation (3) took the property belonging to another (4) without the owner's permission.

51. Article 394 calls for a prison term that depends on the amount of the theft, ranging from one month and one day to twenty years and total disqualification. Article 514 also calls for a prison term that depends on the value of the property stolen, ranging between one month and one day and six years. Articles 396 and 401 do not contemplate imprisonment as a possible punishment, but rather suspension or special disqualification and fine.

## CRIMINAL PROCEDURE AND THE PARLIAMENTARY QUESTION PROCESS IN CORRUPTION CASES IN EQUATORIAL GUINEA

52. As stated above, the articles of the Penal Code that refer to civil servants, including Articles 196, 198, 385, 386, 390, 394, 396 and 401, do not apply to members of the government. This does not mean, however, that if members of the government commit crimes their actions are immune to any repercussions, just that the process by which they must answer for their actions is different.

53. Under Article 64, paragraph (j) of the Constitution of Equatorial Guinea, the Chamber of People's Representatives' duties include to "question Members of the Government on areas of their responsibility and summon them to appear before the Chamber to provide explanations on their general policies or a specific matter for which they are

responsible." Therefore, Parliament can investigate any unlawful act allegedly committed by a member of the government, and can, if it deems necessary, require their resignation.

54. An example of the Chamber of People's Representatives questioning a member of the government was the case of Enrique Mercader Costa, former Transportation, Technology, Postal System and Telecommunications Minister. In 2009, the Parliament created a commission to investigate the Minister for alleged misappropriation of funds from the Public Treasury. I served as legal advisor to the commission that conducted the investigation. At the close of the investigation, the commission concluded that Minister Mercader Costa attempted to misappropriate funds. The Chamber of People's Representatives asked the Council of Ministers to depose the Minister and he was removed from office.

55. This Parliamentary question process is, therefore, distinct from the criminal procedure that would be applicable to a civil servant under the Equatoguinean Penal Code.

56. The opinions expressed herein are based on my knowledge, professional experience and analysis of the laws and materials reviewed.

-15-

## ATTESTATION

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Signed on April 13, 2012

_____<br>**Victoriano Obiang Abogo**