**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:    11-1874 (RC) |
| | : | |
| v. | : | Re Document No.:   12 |
| | : | |
| ONE GULFSTREAM G-V JET AIRCRAFT, | : | |
| Displaying tail number VPCES, its tools and | : | |
| Appurtenances, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**GRANTING THE CLAIMANTS' MOTION TO DISMISS WITHOUT PREJUDICE;
GRANTING LEAVE TO AMEND**

**I. INTRODUCTION**

The United States brings this forfeiture action against a $38.5 million dollar jet purchased by Teodoro Nguema Obiang Mangue ("Nguema"), Equatorial Guinea's Minister of Forestry and Agriculture[1] and the son of Equatorial Guinea's president.  The government alleges that Nguema purchased the jet with funds derived from extortion, misappropriation, theft, and embezzlement.  Although the government describes a disconcerting pattern of corruption in Equatorial Guinea, the complaint does not link the jet to any specific illicit acts.  Accordingly, the court grants the claimants' motion to dismiss.

---

[1]      Since this litigation commenced, Nguema appears to have been promoted to Equatorial Guinea's Vice President in charge of National Defense and State Security.  *See Equatorial Guinea Leader Promotes Son in Reshuffle*, REUTERS (May 22, 2012), *available at* http://www.reuters.com/article/2012/05/22/us-guinea-equatorial-idUSBRE84L0ZC20120522.

## II. LEGAL & FACTUAL BACKGROUND

### A. Legal Framework

Forfeiture is an ancient penalty; its origins can be traced to biblical times.  *See Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 681 n.17 (1974) (citing *Exodus* 21:28) ("If an ox gore a man or a woman, and they die, he shall be stoned and his flesh shall not be eaten"). Based on the legal fiction that "the thing is primarily considered the offender," *Goldsmith-Grant Co. v. United States*, 254 U.S. 505, 511 (1921), forfeiture law allows suit to be brought against an inanimate object rather than a person.  *See, e.g.*, *Various Items of Personal Property v. United States*, 282 U.S. 577, 581 (1931) ("[I]t is the property which is proceeded against, and, by resort to a legal fiction, held guilty and condemned as though it were conscious instead of inanimate and insentient.").  Commentators and judicial decisions have primarily understood the rationale for this peculiar concept to be a means of punishment for a wrongdoer.  *See, e.g.*, *Austin v. United States*, 509 U.S. 602, 611–14 (1993); *Calero-Toledo*, 416 U.S. at 681.

The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. §§ 981 *et seq.*, establishes several procedural and substantive rules governing forfeiture actions.  The government may initiate a suit *in rem*[2] by filing a complaint within sixty days of the item's seizure.  *Id.* § 983(a)(1)(A)(i).  Any person claiming an interest in the seized property—referred to as a "claimant"—may intervene after the seizure is effected.  *Id.* § 983(a)(2)(A).  The claimant may then contest the government's action.  *United States v. $515,060.42*, 152 F.3d 491, 497 (6th Cir. 1998).

Here, the government brings suit under two of CAFRA's substantive provisions: 18 U.S.C. § 981(a)(1)(A) and § 981(a)(1)(C).  Under 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real

---

[2]      Latin for "against a thing."

or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States. "Specified unlawful activity" may include offenses against a foreign nation involving "extortion," or the "misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official." 18 U.S.C. § 1956(c)(7)(B)(ii), (iv). Under 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1957], or any property traceable to such property," is subject to forfeiture to the United States. 18 U.S.C. § 1957 imposes a criminal penalty on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." The term "specified unlawful activity" is again defined to include offenses against a foreign nation involving "extortion," or the "misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official." 18 U.S.C. § 1956(c)(7)(B)(ii), (iv). To summarize both counts: the government alleges that the Gulfstream Jet is subject to forfeiture because it is either derived from or traceable to extortion, misappropriation, theft, or embezzlement of public funds by a public official.

### B. Factual Allegations and Procedural History

Teodoro Nguema Obiang Mangue is the son of Equatorial Guinea's President. *Id.* ¶ 14. At the time the government filed suit, he was Equatorial Guinea's Minister of Forestry and Agriculture. *Id.* Despite his modest government salary, *id.* ¶ 34, Nguema has managed to acquire many of life's luxuries. Some of his recent purchases include a $6.5 million Bel Air mansion, *id.* ¶ 33, nearly $10 million in luxury cars (including eight Ferraris, seven Rolls Royces, five Bentleys, two Lamborghinis, and other top-notch acquisitions), *id.* ¶ 37, $3.2 million worth of Michael Jackson memorabilia, *id.* ¶ 42, a $30 million dollar Malibu mansion,

*id.* ¶ 40, and the aircraft at the heart of this case—a $38.5 million Gulfstream Jet. *Id.* The government claims these lavish purchases were made possible by a number of illicit and lucrative schemes. *Id.* ¶ 48.

The government alleges that Nguema is a member of Equatorial Guinea's "Inner Circle," a coterie of powerful individuals who have ties to Equatorial Guinea's ruling family. The government alleges that members of the Inner Circle demand extortionate payments from oil companies seeking to do business in the country. *Id.* ¶ 49 ("For example, Nguema, as Minister of Forestry, is responsible for approving the export of timber logged in E.G., and refuses to sign such approvals until the exporter first pays a 'tax' for Nguema's personal benefit."). The government also alleges that members of the Inner Circle misappropriate government funds into a slush fund created for their personal use. *Id.* ¶¶ 58–62 ("Riggs Bank records show that money paid by oil companies to the government of E.G. was misappropriated by E.G. government officials and their family members."). Members of the Inner Circle allegedly steer government contracts to companies in which they have a financial interest. *Id.* ¶ 66 ("Because government contracts are awarded to companies owned by or associated with members of the Inner Circle without true competition, those companies are able to charge the E.G. Government fees that bear little, if any, rational relationship to the actual economic value of the services or products tendered to the E.G. Government. The bids from such companies include built-in mark-ups of from 50 percent to 400 percent or more, so that members of the Inner Circle can obtain the difference."). Finally, members of the Inner Circle have allegedly misappropriated valuable state-owned land. *Id.* ¶¶ 68–69 ("[I]n the early 1990s, members of the Inner Circle began to transfer and register large amounts of state-owned land into their own names. . . . At the same time, the foreign oil and gas companies that were becoming active in E.G. in the 1990s needed to

lease land for their operations.  Because the lands formerly owned by the state now were owned in the name of members of the Inner Circle, the oil companies' lease payments went to benefit the Inner Circle rather than the state.").  The government alleges that these schemes provided the funds with which Nguema bought the Gulfstream Jet.

After some initial difficulties, Nguema purchased the jet from a private party via a nominal buyer known as Ebony Shine International, Ltd., a British Virgin Islands company.  *Id.* ¶ 77.  After the government initiated this case, Nguema and Ebony Shine International, Ltd., filed claims to the defendant jet, and they subsequently filed a motion to dismiss.  The court will now grant their motion without prejudice to the government's ability to file an amended complaint.

## III. ANALYSIS

### A. The Court Denies the Claimants' Motion to Dismiss for Lack of Jurisdiction

#### 1. Legal Standard for a Motion to Dismiss for Lack of Jurisdiction[3]

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Accordingly, a federal court should first determine that it has jurisdiction over a case before ruling on the merits.  *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317–18 (D.C. Cir. 2012). On a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  When considering a motion under Rule 12(b)(1), the court may look

---

[3]     The question of standing implicates the court's subject-matter jurisdiction, and the court will therefore construe the claimants' standing argument as if it had been brought under Rule 12(b)(1) and Supplemental Rule G(8)(b)(i).

beyond the allegations set forth in the complaint and "may consider materials outside the pleadings." *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### 2. The Court Has Jurisdiction Notwithstanding the Equatoguinean Government's Avowed Refusal to Comply With This Court's Orders

The claimants argue that the government lacks Article III standing because its alleged injury cannot be redressed. Claimants' Mot. at 15. The claimants note that the jet is currently located in Equatorial Guinea, and the Equatoguinean government has emphatically stated that it will not comply with a forfeiture order issued by this court. Opp'n at 16. Due to Equatorial Guinea's intransigence, the claimants conclude that the government's claim cannot be redressed. *Id.*[4] The government maintains that the claimants put the cart before the horse, arguing that the Equatoguinean government's decision to comply does not impair the court's jurisdiction to issue the order in the first place. Govt.'s Opp'n at 8–11.

The language of 28 U.S.C. § 1355(b)(2) makes clear: "Wherever property subject to forfeiture under the laws of the United States is located in a foreign country . . . an action or proceeding for forfeiture may be brought in . . . the United States District Court for the District of Columbia." Courts interpreting this provision have concluded that "Congress intended the District Court for the District of Columbia . . . to have jurisdiction to order the forfeiture of property located in foreign countries." *United States v. All Funds in Account in Banco Espanol de Credito*, 295 F.3d 23, 27 (D.C. Cir. 2002). Whether or not a foreign government will

---

[4] The claimants also argue that absent Article III standing, any opinion rendered by this court would be "advisory." Of course, this merely restates the premise, as these closely related doctrines are simply two sides of the same coin. *See Rainbow/PUSH Coalition v. FCC*, 396 F.3d 1235, 1247 (D.C. Cir. 2005) ("[T]he standing requirement simply ensures that the petitioner has a defined and personal stake in the outcome of the litigation and that the court does not render an advisory opinion.") (citation and internal quotation omitted). Because the claimants' "advisory opinion" argument is merely a different way of arguing that the government lacks standing, the court's analysis is unaffected.

ultimately choose to comply with a judicial forfeiture order "determines only the effectiveness of the forfeiture order of the district courts, *not their jurisdiction to issue those orders.*"  *Id.* at 26 (emphasis added);[5] *see also United States v. Approximately $1.67 Million (US) in Cash*, 513 F.3d 991, 998 (9th Cir. 2008) ("The plain language and legislative history of [28 U.S.C. § 1355] makes clear that Congress intended § 1355 to lodge jurisdiction in the district courts without reference to constructive or actual control of the res."); *Contents of Account Number 03001288 v. United States*, 344 F.3d 399, 405 (3d Cir. 2003) (noting that the foreign country's "compliance and cooperation with this forfeiture determines only the effectiveness of the District Court's order, not its jurisdiction to issue that order").[6]  Thus, the court has jurisdiction to issue a forfeiture order, regardless of whether the Equatoguinean government sees fit to comply.  *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 772 F. Supp. 2d 205, 211 (D.D.C. 2011) (rejecting the claimant's notion that a foreign government's potential refusal to obey a court-issued forfeiture order diminishes the government's Article III standing).[7]

---

[5]  The claimants concede that this court is bound by the Circuit's ruling in *Banco Espanol*, but submit that the Circuit has adopted faulty reasoning and should not be followed in the present case.  Of course, judicial review is a one-way street, and this court has no power to reverse the Circuit.

[6]  In support of their contrary argument, the claimants cite to the Second Circuit's decision in *United States v. All Funds On Deposit in Any Accounts Maintained in the Names of Meza*, 63 F.3d 148, 152–53 (2d Cir.1995).  But *Meza*'s reasoning was squarely rejected by this Circuit in *Banco Espanol*.  *See* 295 F.3d at 26–27.

[7]  The government also alleges that a number of treaty obligations make it likely that the Equatoguinean government will feel bound to comply with an order issued by this court.  Whether or not this is true, *Banco Espanol* implicitly rejected this as a factor affecting the court's jurisdiction.  There, the district court concluded that Spain was bound by a number of treaties and that there was a substantial likelihood that it would comply with its order.  *United States v. All Funds in Account Nos. 747.034/278*, 141 F. Supp. 2d 548, 551–52 (D.D.C. 2001).  The Circuit affirmed but applied a different standard, concluding that jurisdiction existed regardless of Spain's likelihood of compliance.  *See* 295 F.3d at 27.

**B. The Court Grants the Claimants' Motion to Dismiss, But Grants the Government Leave to File an Amended Complaint**

**1. International Comity**

The claimants argue that the complaint should be dismissed on the basis of international comity. Claimants' Mot. at 19. Because adjudicating this case might require the court to pass judgment over Equatorial Guinea's application of its own laws, the claimants maintain that the court should decline to hear this case. *Id.* The government counters that the doctrine of international comity counsels U.S. courts to defer only to final judgments rendered by impartial foreign tribunals. Here, no such decision exists. Govt.'s Opp'n at 12–13. In addition, the government maintains that the doctrine of comity cannot be used to trump the United States' prerogative to enforce its own anti-money laundering statutes. *Id.* at 14.

International comity is a doctrine of deference based on respect for the decisions of foreign sovereigns. *United States v. Kashamu*, 656 F.3d 679, 683 (7th Cir. 2011) (Posner, J.); *see Hilton v. Guyot*, 159 U.S. 113, 164 (1895) (noting that comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation"). This doctrine provides that a U.S. court should give full effect to a foreign judgment that has been rendered with impartiality and due process. *Hilton v. Guyot*, 159 U.S. at 163, 202–03; *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 64 (D.C. Cir. 2011). The purpose underlying the rule is to foster international cooperation and encourage reciprocal recognition of U.S. judgments in foreign courts. *Oetjen v. Central Leather Co.*, 246 U.S. 297, 304 (1918) ("To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations."); *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) (stating that "the decisions of foreign tribunals should be given effect in

domestic courts, since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations."). Thus, the doctrine is accurately described as a "golden rule among nations—that each must give the respect to the laws, policies and interests of others that it would have others give to its own in the same or similar circumstances." *Mich. Community Servs., Inc. v. NLRB*, 309 F.3d 348, 567 (6th Cir. 2002).[8]

The doctrine of comity has no single definition, as the doctrine "summarizes in a brief word a complex and elusive concept." *Laker Airways*, 731 F.2d at 937; *see also United States v. Nippon Paper Indus.*, 109 F.3d 1, 8 (1st Cir. 1997) ("Comity is more an aspiration than a fixed rule, more a matter of grace than a matter of obligation.").[9] A timeless characterization of the doctrine urges U.S. courts to recognize a foreign judgment if:

> there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment.

---

[8] *See also JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 423 (2d Cir. 2005) ("Whatever its precise contours, international comity is clearly concerned with maintaining amicable working relationships between nations, a 'shorthand for good neighbourliness, common courtesy and mutual respect between those who labour in adjoining judicial vineyards.'") (quoting *British Airways Bd. v. Laker Airways Ltd.*, [1984] E.C.C. 36, 41 (Eng. C.A.)).

[9] One scholar has described the doctrine as "an amorphous never-never land whose borders are marked by fuzzy lines of politics, courtesy, and good faith." Harold G. Maier, *Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and Private International Law*, 76 AM. J. INT'L L. 280, 281 (1982).

*Hilton v. Guyot*, 159 U.S. 113, 202 (1895).  If anything is clear, however, it is that the doctrine of international comity will not impede a judicial proceeding when no foreign judgment exists.  A defendant invoking the doctrine of comity must either point to a valid legal proceeding to which the court must defer; or at the very least, the defendant must demonstrate that some alternate forum would be adequate.  *E.g.*, *Doe v. Exxon Mobil Corp.*, 654 F.3d at 65 ("In order to invoke this doctrine, Exxon must either point to a legal proceeding in Indonesia involving these particular plaintiffs to which the court must defer or at least the availability of effective and non-futile local remedies."); *cf. Turner Entertainment Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518–21 (11th Cir. 1994) (deferring to German litigation where a German court had reached judgment on merits of same issue).

A foreign state's statutory remedies may also warrant deference, provided that they provide plaintiffs with an adequate remedy.  *Compare Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1239 (11th Cir. 2004) (indicating that Germany had provided an adequate forum to compensate plaintiffs for Nazi-era crimes) *and Bi v. Union Carbide Chems. & Plastics Co.*, 984 F.2d 582, 586 (2d Cir. 1993) (determining that India had provided an adequate and comprehensive statutory remedy to victims of the Union Carbide disaster) *with Cruz v. United States*, 387 F. Supp. 2d 1057, 1070 (N.D. Cal. 2005) (determining that the Mexican Congress's creation of a special commission to investigate the plaintiffs' claims did not provide a sufficient basis for this Court to dismiss on comity grounds because the Mexican commission did not provide an adequate remedy).  In addition, courts rarely abstain on the basis of comity if the court is not assured that foreign courts would accomplish the aim of the litigation.  *United States v. Lazarenko*, 504 F. Supp. 2d 791, 802 (N.D. Cal. 2007) ("The Court also finds it inappropriate to disturb the criminal forfeiture based on comity principles.  This Court has few assurances that

proceedings in Antiguan courts would accomplish the aims of criminal forfeiture—punishment of Lazarenko by seizure of his assets associated with the criminal activity for which he was convicted.").

Here, the claimants have not identified any foreign proceeding to which this court should lend its deference.  Instead, the claimants note that Nguema "is a sitting public official in good standing and has not been investigated or prosecuted for any wrongdoing, much less convicted of such."  Claimants' Mot. at 21–22.  But invoking the doctrine of international comity would be inappropriate under these circumstances, as there is no foreign adjudication of rights to which this court might defer.  *See Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 130 (E.D.N.Y. 2000) (choosing not to abstain on comity grounds in part because "[t]here is no pending litigation in France, nor is the Court aware of any current law or policy of the French government which could either supplant or fully redress plaintiffs' claims").  In addition, the claimants have not put forth evidence to suggest that Equatorial Guinea would be an adequate forum for the U.S. government to pursue its interests.  *See Lazarenko*, 504 F. Supp. 2d at 802.

Two additional factors counsel against invoking the doctrine of comity here.  First, the claimants believe that courts should decline to exercise its jurisdiction whenever a case touches upon the realm of foreign affairs.  But it would be erroneous "to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."  *Baker v. Carr*, 369 U.S. 186, 211 (1962).  Thus, few cases view international comity as a doctrine of preemption that would require courts to decline jurisdiction merely because foreign affairs are at play.  *United States v. Portrait of Wally, A Painting By Egon Schiele*, 2002 WL 553532, at *10 (S.D.N.Y. 2002) (noting that "the principle of comity does not operate as a pre-emption doctrine,

barring this court from hearing a valid forfeiture action merely because there are foreign laws that might also apply").

Second, dismissal would not be appropriate when doing so "would be contrary to the policies or prejudicial to the interests of the United States." *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997); *see Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 522 (2d Cir. 1985); *Laker Airways*, 731 F.2d at 937 ("No nation is under unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum."). Thus, if the government viewed dismissal as necessary to protect its relationships with foreign countries, the doctrine would apply with greater force. *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 69–74 (2d Cir. 2005); *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237 (11th Cir. 2004). But here, the government brings suit to enforce its anti-money laundering laws and to prevent the United States from being a haven for the proceeds of illegal activity committed abroad. *United States v. All Assets Held At Julius Baer & Co.*, 571 F. Supp. 2d 1, 12 (D.D.C. 2008); *United States v. Portrait of Wally*, 2002 WL 553532, at *6 (noting that the United states "has a strong interest in enforcing its own laws as applied to conduct on its own soil . . . . United States courts will not yield in the name of comity if doing so conflicts with the law or policy of the United States"). Thus, the Executive Branch's decision to bring this case could be viewed as evidence of its judgment that the delicate balance of foreign affairs would not be disturbed by the lawsuit. *United States v. Baker Hughes Inc.*, 731 F. Supp. 3, 6 n.5 (D.D.C. 1990) (noting that it is "not the Court's role to second-guess the executive branch's judgment as to the proper role of comity concerns" when "the United States has decided to go ahead with the case"). Because the executive "has already done the balancing in deciding to bring the case in the first place," *United*

12

*States v. Brodie*, 174 F. Supp. 2d 294, 306 (E.D. Pa. 2001), the doctrine of international comity does not bar this lawsuit.

### 2. The Act of State Doctrine

The claimants also argue that the complaint should be dismissed due to the "act of state" doctrine. Claimants' Mot. at 19. They maintain that the doctrine is "based on notions of sovereign respect and intergovernmental comity," and that the court should be "reluctan[t] to complicate foreign affairs by validating or invalidating the actions of foreign sovereigns." *Id.* (citations and quotations omitted). The government counters that "Nguema's reliance on the Act of State Doctrine is . . . unavailing," as the complaint does not impugn any official acts. Govt.'s Opp'n at 16. Instead, the government maintains that all relevant acts were perpetrated for Nguema's personal benefit. Govt.'s Opp'n at 16.

The act of state doctrine precludes domestic courts from inquiring into the validity of the public acts that a recognized foreign sovereign power committed within its own territory. *McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 491 (D.C. Cir. 2008); *see Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) ("Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its territory."); *see also* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 443 (1987). The doctrine applies when the relief sought or the defense interposed would require a court in the United States to declare invalid the official act of a foreign sovereign performed within its boundaries. *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405 (1990). The policies underlying the doctrine include international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive

Branch in its conduct of foreign relations.  *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002).

The doctrine is not a principle of abstention, however—that is to say, a defendant may not raise the act of state doctrine as a complete bar to suit whenever the case touches upon the realm of foreign affairs.  *W.S. Kirkpatrick*, 493 U.S. at 409 (noting that "[t]he Act of State doctrine does not establish an exception for cases and controversies that may embarrass foreign governments").  Rather, it serves as "a rule of decision for the courts of this country," *id.* at 405 (quoting *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 310 (1918)), which requires that "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid," *id.*  Application of the doctrine requires a fact-sensitive "balance of the relevant considerations," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964), and this analysis "must always be tempered by common sense," *Allied Bank Intern. v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 521 (2d Cir. 1985); *see also Sabbatino*, 376 U.S. at 428 (declining to announce "an inflexible and all-encompassing rule" to govern the doctrine).

There are two reasons why the doctrine does not bar this lawsuit.  First: the applicability of this doctrine is weakened when the Executive Branch of the United States is the party that brings suit.  One of the major concerns underlying the act of state doctrine is "the strong sense of the judicial branch that its engagement in the task of passing on the validity of foreign acts of a state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere."  *Sabbatino*, 376 U.S. at 423; *cf. United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) ("The Executive Branch is "the sole organ of the federal government in the field of international relations.").  When the Executive Brank brings suit, therefore, the doctrine's rationale no longer applies.  *United States*

*v. One Etched Ivory Tusk of African Elephant*, 2012 WL 1802026 (E.D.N.Y. May 17, 2012) ("where the United States Government has brought suit, clearly the court need not worry that it will intrude into an area that the executive branch does not want it, or that the court's action will hinder its administration of its foreign affairs power"); *United States v. Lazarenko*, 504 F. Supp. 2d at 802 (concluding that the act of state did not apply where the government brought suit, as a judicial consideration of the matter would not "embarrass or hinder the executive in the realm of foreign relations" (citing *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 452 (2d Cir. 2000))); *United States v. Giffen*, 326 F. Supp. 2d 497, 502 (S.D.N.Y. 2004) ("The major underpinning of the act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch of our Government in the conduct of our foreign relations . . . . Where the Executive Branch files an action, however, courts are reluctant to invoke the act of state doctrine on this rationale.").

Second: even if the doctrine applied, its invocation would be premature at this stage because several factual disputes exist. In particular, the party invoking the doctrine must establish that the act was an exercise of its sovereign power. *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1369 (9th Cir. 1988) (for the doctrine to apply, "the acts in question must have involved public acts of the sovereign"); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1115 n.15 (5th Cir. 1985) (the doctrine only applies when the acts were "invested with the sovereign authority of the state."). Aside from vague allegations that this lawsuit would "interfere with . . . Equatorial Guinea's right to administer its domestic laws within its borders," the claimants do not identify what acts, if any, were taken on behalf of the sovereign. Claimants' Mot. at 21. In fact, the claimants argue that Nguema purchased the jet with private funds obtained independently of his

office.  Thus, it is not clear whether any relevant acts were taken with the imprimatur of the

Equatoguinean government.  *See Alfred Dunhill*, 425 U.S. at 695 (requiring the party invoking

the act of state doctrine to produce some "statute, decree, order, or resolution" to show that the

government's act was vested with sovereign authority).  Accordingly, the act of state doctrine

poses no bar to this suit.

### 3. Equitable Estoppel

The claimants argue that the government should be equitably estopped from filing this

suit because the claimants relied on a 2005 letter from the Department of Justice stating that it

had no basis for believing that the purchase would violate the federal anti-money laundering

laws.  Claimants' Mot. at 22.  The government responds that the doctrine of equitable estoppel

only applies in sparing circumstances and is not warranted here.  Govt.'s Opp'n at 16.

Estoppel is an equitable doctrine invoked to avoid injustice by precluding a litigant from

asserting an otherwise available claim or defense against a party who has detrimentally relied on

that litigant's conduct.  *See Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51,

59 (1984).  "To apply equitable estoppel against the government, a party must show that (1) there

was a definite representation to the party claiming estoppel, (2) the party relied on its adversary's

conduct in such a manner as to change his position for the worse, (3) the party's reliance was

reasonable, and (4) the government 'engaged in affirmative misconduct.'"  *Morris Commc'ns,*

*Inc. v. FCC*, 566 F.3d 184, 191 (D.C. Cir. 2009).  The doctrine applies only if the government's

conduct can be characterized as "misrepresentation or concealment" such that it will cause an

"egregiously unfair result."  *GAO v. Gen. Accounting Office Pers. Appeals Bd.*, 698 F.2d 516,

526 (D.C. Cir. 1983); *Heckler*, 467 U.S. at 60 (noting that "the Government may not be estopped

on the same terms as any other litigant").  For if the government "is unable to enforce the law

16

because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Id.* Thus, the doctrine's application to government conduct "must be rigid and sparing," and the evidence in favor of its application must be "compelling." *ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988); *see Int'l Union v. Clark*, 2006 WL 2598046, at *12 (D.D.C. 2006) ("There is a clear presumption in this Circuit against invoking the doctrine against government actors in any but the most extreme circumstances."). Although the court has its doubts as to whether the claimants can successfully invoke this doctrine, it is unnecessary to weigh in on the matter at this stage in time. For the reasons explained below, the court will dismiss the government's complaint for failure to allege sufficient facts in support of its claim. And if an amended complaint is filed and proceeds to discovery, the parties can fully explore the factual underpinnings for an estoppel argument, which can be raised again in a summary judgment motion.

### 4. The Court Grants the Claimants' Motion to Dismiss for Failure to State a Claim

#### a. Legal Standard for Failure to State a Forfeiture Claim

The pleading requirements in a civil forfeiture action are simultaneously governed by the Federal Rules of Civil Procedure and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. 18 U.S.C. § 983(a)(3)(A). Although the Supplemental Rules govern, the normal set of rules may help to clarify any ambiguity. *See* SUPP. R. A; *United States v. $22,173.00 in U.S. Currency*, 2010 WL 1328953, at *2 (S.D.N.Y. Apr. 5, 2010); *United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 149 (3d Cir. 2003) ("Parties to civil forfeiture proceedings are the servants of two procedural masters: the Supplemental Rules specially devised for admiralty and in rem proceedings, and the generally applicable Federal Rules of

Civil Procedure . . . .   The balance between the two is struck in favor of the Supplemental Rules .

. . .").

Supplemental Rule E(2)(a) requires that the government set forth its claims "with such

particularity that the defendant will be able, without moving for a more definite statement, to

commence an investigation of the facts and to frame a responsive pleading."  Supplemental Rule

G(2)(f) requires that the government "state sufficiently detailed facts to support a reasonable

belief that the government will be able to meet its burden of proof at trial."  Read in conjunction,

these rules require the government to allege enough facts such that the court may infer that the

property is subject to forfeiture.  *United States v. $22,173.00 in U.S. Currency*, 2010 WL

1328953, at *2 (S.D.N.Y. Apr. 5, 2010); *see* SUPP. RULE G, Advisory Committee Notes, (noting

that the "reasonable belief" standard in Rule G(2)(f) mirrors the sufficiency standard that was

previously codified in Rule E(2)).

The standards set forth in Supplemental Rules G and E impose a pleading that is

somewhat more exacting than the liberal notice pleading standard contemplated by Rule 8(a)(2).

*See United States v. All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d 1, 16–17

(D.D.C. 2008) ("Rule G (and its predecessor Rule E(2)) creates a heightened burden for pleading

on the plaintiff."); *cf.* FED. R. CIV. P. 8(a)(2) (requiring only a short and plain statement of the

claim in order to give the defendant fair notice of what the claim is and the grounds upon which

it rests).  This heightened particularity requirement is designed to guard against the improper use

of seizure proceedings and to protect property owners against the threat of seizure upon

conclusory allegations.  *See United States v. Mondragon*, 313 F.3d 862, 865 (4th Cir. 2002); *see*

*also* 12 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3242 (2d ed. 1997) (noting

that the supplemental rules "require[] a more particularized complaint than is demanded in civil

actions generally," and that "added specifics is thought appropriate because of the drastic nature of those remedies").

At the pleading stage, it suffices for the government to simply allege enough facts so that the claimant may understand the theory of forfeiture, file a responsive pleading, and undertake an adequate investigation. *Mondragon*, 313 F.3d at 864; *United States v. $22,173.00 in U.S. Currency*, 2010 WL 1328953, at *2 (S.D.N.Y. Apr. 5, 2010). And a court may not dismiss the complaint "on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." SUPP. R. 8(b)(ii); 18 U.S.C. § 983(a)(3)(D).

A claimant in an *in rem* proceeding may move to dismiss in the same form provided by Rule 12(b). SUPP. R. G(8)(b)(i). As is the case under Rule 12(b), the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor. *United States v. Seventy-Nine Thousand Three Hundred Twenty-One Dollars*, 522 F. Supp. 2d 64, 68 (D.D.C. 2007). Likewise, the plaintiff must be afforded every favorable inference that may be drawn from the allegations of fact set forth in the complaint. *Id*; *accord United States v. 829,422.42 in U.S. Currency Seized from Account No. 202252771 at Citibank, N.A.*, 2009 WL 1743753, at *5 (D. Conn. June 18, 2009) ("When evaluating a motion to dismiss an *in rem* forfeiture complaint pursuant to Rule 12(b)(6), the Court still must accept as true all factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff.").

### b. The Government Fails to Allege that the Jet Is Derived From or Traceable to Illicit Activity

The government alleges that the Gulfstream Jet was purchased with funds that can be traced to or derived from illegal activity. The claimants counter that the complaint "merely states in a conclusory fashion that Minister Nguema and other members of the Equatoguinean

government have amassed extraordinary wealth through 'corrupt schemes' and that because Minster Nguema's 'level of spending is inconsistent with his salary as a Minister,' the Aircraft must be derived from unlawful activity."  Claimants' Mot. at 31.

The government alleges that a group of Equatoguinean individuals—dubbed the Inner Circle—has amassed great wealth by siphoning funds from the public fisc.  *See* Compl. ¶ 27. The government alleges that the Inner Circle committed a number of violations of Equatoguinean law, including "extortion and misappropriation, theft, and embezzlement of public funds."  *Id.*  The complaint describes a general process by which the Inner Circle took advantage of Equatorial Guinea's natural resources—yet careful scrutiny of the complaint reveals that Nguema is often implicated by association only.  *See id.* ¶ 32 ("[Nguema] used ownership of Sofona and Somagui Forestal and his status as Minister of Forestry (and President Obiang's son) to enrich himself through corrupt schemes in the timber industry, as described below."); *id.* ¶ 35 ("In the 2000s, the rapid growth of the oil and gas sector in E.G. led to a boom in construction and other infrastructure-related activities in that country.  This provided another opportunity for the Inner Circle, *including Nguema*, to obtain money corruptly, as the government began awarding large construction contracts to companies owned by the Inner Circle.") (emphasis added).

To illustrate: under the heading "Illegal Corrupt Schemes Used by Nguema and the Inner Circle to Enrich Themselves," the government alleges that "members of the Inner Circle, such as Nguema, demand[ed] payments from companies doing business in E.G., in exchange for the performance of official acts."  *Id.* ¶ 49.  But the government does not allege what companies were victim to this scheme, or when this occurred, or which members of the Inner Circle were behind the acts.  In the same vein, the government claims that "in order to engage in logging in

E.G.'s National Forests, timber companies must first receive a logging concession from Nguema. Nguema demands that timber companies seeking to obtain such concessions first pay him a personal fee." *Id.* ¶ 50.  Again, the government does not provide enough detail for the court to infer the contours of the illicit scheme.

Many of the complaint's allegations do not even give rise to an inference of illegal activity. *See, e.g.*, *id.* ¶ 51 ("For instance, a major international civil engineering firm in E.G., which had obtained several substantial infrastructure contracts from the Government of E.G., built a mansion for Nguema in Malabo, E.G., at his request and direction.  Upon completion of that project, however, Nguema refused to pay this firm for its work."); *see also id.* ¶ 63 ("Some of the money obtained by other members of the Inner Circle has made its way to Nguema; for example, on October 21, 2002, $200,000 was transferred from a personal account at Riggs Bank belonging to a member of the Inner Circle to Nguema's personal bank account.").

Other allegations make no mention of Nguema whatsoever.  *See id.* ¶ 54 ("In another extortion scheme, a businessman in E.G. who owned a construction company was forced to share 50 percent of his profits with a senior E.G. public official, and to provide the official with 50 percent of the equity in the company, in order to continue to secure government contracts in E.G. Ultimately, the businessman was forced to leave E.G. against his will, and the senior public official took over 100 percent of his company.").

A recurring theme in the government's complaint is the allegation that Nguema's outlandish wealth raises suspicions about the lawfulness of his income.  *Id.* ¶ 34 ("Nguema's level of spending is inconsistent with his salary as a Minister.  His official salary today is approximately $6,799 per month, or less than $100,000 per year, according to official E.G. sources.").  When viewed in tandem with other details suggesting illegal behavior, Nguema's

wealth might allow an inference of illegal activity—but standing alone, it does not.  *See*

*Mondragon*, 313 F.3d at 864 ("The presence of that much cash [half a million dollars], oddly

packaged, could raise a suspicion that someone was up to no good, but without more it does not

suggest a connection to drug trafficking."); *cf. United States v. $22,173.00 in U.S. Currency*,

2010 WL 1328953, at *2 (S.D.N.Y. Apr. 5, 2010) (deeming certain allegations "troubling" and

noting that "a great deal more" would be necessary to survive summary judgment, but

concluding that unusually large sums of cash could give rise to an inference of illegal activity

when viewed in conjunction with other specific allegations "suggesting a pattern of drug

trafficking").

      The government itself has alleged that Ngema owns or controls a number of companies.

Yet nothing is known about what income Nguema derives from them.  Thus, without knowing

what Nguema's means are, the court is hard-pressed to infer that he lives beyond them.  Absent

other details, the court cannot infer how Nguema's wealth may have been derived, nor from what

sources, nor the legality of those sources.  Although the government alleges that Nguema lives

far beyond his means, the court cannot leap to the conclusion that his largesse is evidence of

criminal activity.

      Faced with this complaint, the claimants would find it difficult to know where to begin

their investigation, what individuals to interview, or what documents to review.  *Cf. Mondragon*,

313 F.3d at 864.  To be sure, the government paints a troubling picture of endemic corruption in

Equatorial Guinea.  But the government has done so with brushstrokes that are much too broad.

The government cannot proceed by casting general allegations of lawlessness in the country in

which the relevant transactions took place.  *United States v. $1,399,313.74 in U.S. Currency*, 592

F. Supp. 2d 495, 499 (S.D.N.Y. 2008) ("The principal new allegation in support of the narcotics-

trafficking theory is that many of the funds were sent from Latvia, which the Government asserts is a notorious money laundering haven.  This does not raise the right to relief above a speculative level.").  Absent some specific indication that the Jet is derived from or traceable to illicit activity, the complaint must be dismissed.  *Id.*  The court has little doubt that the government could cure these deficiencies by filing an amended complaint that alleges additional facts.  Thus, the court will dismiss the complaint without prejudice and grant leave to amend the complaint.

## IV. CONCLUSION

For the foregoing reasons, the court grants the claimants' motion to dismiss.  But the government is granted leave to amend the complaint.  An order consistent with this memorandum opinion is separately and contemporaneously issued this 19th day of April, 2013.

RUDOLPH CONTRERAS
United States District Judge