# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>U.S. Department of Justice,<br>Asset Forfeiture and Money Laundering Section<br>Criminal Division<br>1400 New York Avenue, N.W.<br>Washington, D.C. 20530,<br><br>        Plaintiff,<br><br>        v.<br><br>ONE GULFSTREAM G-V JET AIRCRAFT<br>DISPLAYING TAIL NUMBER VPCES, ITS<br>TOOLS AND APPURTENANCES,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.: 11-1874 (RC)<br><br>**VERIFIED FIRST AMENDED<br>COMPLAINT FOR FORFEITURE<br>*IN REM*** |

## VERIFIED FIRST AMENDED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff United States of America, by and through its undersigned attorneys, in a case of

forfeiture *in rem*, alleges as follows:

### NATURE OF THE ACTION

1.      This is a civil action *in rem* to forfeit a Gulfstream Aerospace model G-V aircraft

held for the benefit of Teodoro Nguema Obiang Mangue ("Nguema"), Second Vice President of

the Republic of Equatorial Guinea ("E.G.") and son of the President of E.G. The Gulfstream

aircraft was acquired through transactions and other conduct in the United States with the

proceeds of extortion and public corruption occurring in E.G. As property derived from or

traceable to proceeds of "specified unlawful activity" and property involved in money laundering

violations of 18 U.S.C. §§ 1956 and 1957, the Gulfstream aircraft is subject to forfeiture

pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 981(a)(1)(A).

2.      As alleged herein, Nguema exacted millions of dollars in personal payments while

serving as E.G.'s Minister of Forestry by soliciting and accepting bribes and extorting forestry companies working in E.G. Nguema took these personal payments in exchange for, among other things, timber export licenses, rights to import equipment into E.G., unfettered and unregulated access to E.G.'s forests, and the ability to continue doing business in E.G.

3.      Additionally, as the cabinet minister responsible for forestry and infrastructure, Nguema misappropriated, embezzled, and stole hundreds of millions of dollars of E.G. public funds by: (i) directing E.G. companies to submit fraudulently inflated "bids" and invoices for government infrastructure contracts that included subcontract payments to Nguema's shell companies for work that was not performed; (ii) obtaining multi-million dollar contracts and payments directly from the E.G. government for work that his shell companies never performed; and (iii) diverting funds from the E.G. government for his personal benefit.

4.      Nguema also used a web of shell companies to carry out and conceal his involvement in corruption and to mask the true sources of his wealth. Although Nguema represented that his shell companies generated hundreds of millions of dollars in revenue, they did not, in fact, conduct legitimate business and had no commercial footprint in E.G. To the contrary, they served as receptacles for the proceeds of Nguema's corruption.

5.      As a result, despite earning less than $100,000 per year as a public official, Nguema acquired a vast fortune of more than $300 million in assets through these and other acts of corruption. His accumulation of assets outpaced not only his official salary, but also outstripped even the income he falsely attributed to his shell companies.

6.      In or around 2004, at a time when he was receiving millions of dollars of corruption proceeds, Nguema repeatedly attempted to purchase an aircraft in the United States. In June 2006, Nguema acquired the Gulfstream aircraft identified below for $38.5 million which

is subject to forfeiture as explained herein.

## THE DEFENDANT *IN REM*

7.      The defendant *in rem* is One Gulfstream Aerospace model G-V aircraft purchased by Ebony Shine International Ltd. ("Ebony Shine"), its tools and appurtenances (collectively, the "Defendant Aircraft"). The Defendant Aircraft bears manufacturer's serial number 669 and possessed International Registration number VPCES (Cayman Islands) as of October 24, 2011. Its previous United States Registration Number was N1UB, and prior to that, N544KK.

8.      The Defendant Aircraft has a 6,500-nautical-mile range and was described by its manufacturer as "set[ting] the standard for executive travel" with electronic engine operations, heated cabin windows, a three-zone cabin environmental control system, and a vacuum lavatory.

9.      The Defendant Aircraft is a highly moveable asset. As of the date of filing this Verified First Amended Complaint, the Defendant Aircraft is believed to be located outside of the United States.

10.     Nguema and/or the company Ebony Shine may have an interest in the Defendant Aircraft.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over this action pursuant to 28 U.S.C § 1345 and 28 U.S.C. § 1355(a).

12.     Venue is proper in this District because the Defendant Aircraft is believed to be located in a foreign country. In accordance with 28 U.S.C. § 1355(b)(2), property subject to forfeiture under the laws of the United States that is located in a foreign country may be the subject of a forfeiture action in the United States District Court for the District of Columbia.

13.     This civil action *in rem* for forfeiture is governed by 18 U.S.C. §§ 981 and 983,

3

the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime

Claims and Asset Forfeiture.

## STATUTORY BASIS FOR FORFEITURE

14.     The Defendant Aircraft is subject to forfeiture pursuant to 18 U.S.C. §

981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of an

offense constituting "specified unlawful activity." Specified unlawful activity is defined in 18

U.S.C. § 1956(c)(7) and includes foreign offenses involving "extortion" or "bribery of a public

official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a

public official." *See* 18 U.S.C. §§ 1956(c)(7)(B)(ii), 1956(c)(7)(B)(iv), and 1956(c)(7)(A).

15.      The Defendant Aircraft is also subject to forfeiture under 18 U.S.C. §

981(a)(1)(A), because it constitutes property involved in a transaction or an attempted

transaction in violation of 18 U.S.C. § 1957, or is property traceable to such assets.  Section 1957

prohibits the conducting of a monetary transaction with property valued at over $10,000 that is

known to be criminally derived and which constitutes the proceeds of "specified unlawful

activity," including foreign offenses involving "extortion" or "bribery of a public official, or the

misappropriation, theft, or embezzlement of public funds by or for the benefit of a public

official." *See* 18 U.S.C. §§ 1956(c)(7)(B)(ii), 1956(c)(7)(B)(iv), and 1957.

16.     Additionally, the Defendant Aircraft is subject to forfeiture pursuant to 18 U.S.C.

§ 981(a)(1)(A) because it constitutes property involved in a transaction or an attempted

transaction in violation of 18 U.S.C. § 1956(a)(1)(B), or is property traceable to such assets.

Section 1956(a)(1)(B) prohibits the conducting of a financial transaction with property known to

be the proceeds of unlawful activity with the intent to conceal the nature, location, source,

ownership, or control of proceeds of a specified unlawful activity, including foreign offenses

4

involving "extortion" or "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, or a foreign offense involving bribery of a public official. *See* 18 U.S.C. §§ 1956(a)(1)(B), 1956(c)(7)(B)(ii), and 1956(c)(7)(B)(iv).

17.    The foreign offenses listed above are criminalized under E.G. law pursuant to the following provisions of the Spanish Penal Code in force in 1968, which remain in effect as the current criminal law in E.G.:  Article 131 (abuse of public office);  Article 196 (expropriation of assets by a public official); Article 198 (taking advantage of official position to exercise a profession or involve oneself in a business directly related to scope of official duties); Articles 200 & 202 (collection of illegal taxes); Article 385 (prohibiting public officials from demanding or accepting bribes to perform a crime); Article 386 (prohibiting public officials from demanding or accepting bribes to perform an unjust act); Article 387 (prohibiting public officials from soliciting improper gifts); Article 390 (prohibiting public officials from receiving improper gifts); Article 394 (prohibiting public officials from stealing public funds); Article 396 (prohibiting public officials from embezzling funds under his care); Article 400 (prohibiting public officials from defrauding the state); Article 401 (criminal conflict of interest by a public official); Article 404 (prohibiting public officials from taking part in for-profit transactions within the limits of their jurisdiction); Article 493 (criminal threats); Article 496 (unlawful compulsion); Article 503 (forcibly requiring someone to sign, grant or quit claim a public instrument or document); Article 514 (theft); and Articles 528 and 533 (fraud).  English translations of these provisions are set forth in Attachment A.

## FACTS

18.     On knowledge, information, and belief, the United States alleges the following facts.

### A.     Relevant Names, Entities, and Terms

19.     The following individuals, entities, and terms are relevant to this complaint.

***Teodoro Nguema Obiang Mangue ("Nguema")*** is the beneficial owner of the Defendant Aircraft, son of the President of E.G., and the Second Vice President of E.G. in charge of National Defense and State Security.  Since at least 1998, Nguema has served as a cabinet-level public official in his father's government, including as E.G.'s (i) Minister of Forestry and Agriculture and (ii) Minister of Forestry and Infrastructure.  On May 21, 2012, Nguema was appointed by his father to be E.G.'s Second Vice President.

***Teodoro Nguema Obiang Mbasogo*** has been the President of E.G. since 1979 and is the father of Nguema.

***The Inner Circle***:  A small number of individuals who hold critical positions of political and economic power in E.G.  Nguema and his father, the President of E.G., are members of the Inner Circle.

***Senate Permanent Subcommittee on Investigations Report ("PSI Report")***: A report issued in July 2004 by the United States Senate Permanent Subcommittee on Investigations ("PSI") on money laundering and foreign corruption.  The PSI Report focused, in part, on money brought to Riggs Bank in the United States from E.G. that was suspected of being proceeds of foreign corruption in E.G.

***Societe Madeira Guinea ("Somagui")*** is a subsidiary of ***Grupo Sofona ("Sofona")***.  Both entities are E.G. companies owned by Nguema through which Nguema has siphoned money from the E.G. government and received illegal payments and bribes.  Nguema used accounts in various E.G. banks in the name of Somagui to purchase and maintain assets all over the world.

***Sociedad de Carreteras de Guinea Equatoria ("Socage")*** is another E.G. shell company owned by Nguema and incorporated in 2003.

**B.**   **Background**

20.   Equatorial Guinea is an oil and gas-rich country in West Africa.  The population in 2009 was approximately 680,000.

21.   In 1979, the country's first president, Francisco Macías Nguema was overthrown in a coup d'état by his nephew, Brigadier General Teodoro Obiang Nguema Mbasogo. Thereafter, Teodoro Obiang became President of Equatorial Guinea (hereinafter "President Obiang").

22.   More than three decades after seizing control from his uncle, President Obiang is still in power.

23.   President Obiang exercises plenary control over the government of E.G.  Nearly all positions of political and economic power in E.G. are held by the Inner Circle, many of whom are relatives of the President.

24.   One member of the Inner Circle is Nguema, President Obiang's eldest son, who has been appointed by his father to various positions within the government, including Second Vice President for National Defense and State Security (May 21, 2012 to Present) and Minister of Forestry and Agriculture (1998-2012) (at times, this position was titled Minister of Forestry and Infrastructure).

25.   During President Obiang's more than 30-year rule, members of the Inner Circle, including Nguema, have amassed extraordinary wealth through a variety of corrupt schemes.

26.   As explained in a report issued by the U.S. Department of State's Bureau of Democracy, Human Rights, and Labor for 2006 – the same year that Nguema purchased the Defendant Aircraft – "All branches of government [in E.G.] are dominated by President

7

[Obiang] and his inner circle" and "[o]fficial corruption in all branches of the government remained a serious problem."

27.    More recently, in May 2012, the U.S. Department of State issued a public report concluding that, for the year 2011:

> Laws [in E.G.] provide severe criminal penalties for official corruption; however, the government did not implement these laws effectively, and officials frequently engaged in corrupt practices with impunity. Corruption continued to be a severe problem. The presidency and prime minister's office were the lead agencies for anticorruption efforts. The president and members of his inner circle continued to amass personal profits from the oil windfall.

28.    Under E.G. law, the nation's mineral resources and hydrocarbons belong to the public, not to individuals. *See* Ley No 8/2006, de fecha 3 de Noviembre de Hidrocarburos de la Republica de Guinea Ecuatorial. Similarly, the law provides that the National Forestry Reserve is permanent, inalienable, and part of the public domain, and that the National Forests are reserved for exclusive economic extraction and development by the State. *See* Ley No 1/1997, Sobre El Uso Y Manejo De Los Bosques ("Forestry Law").

29.    Since the commencement of large-scale extraction of its oil reserves beginning in the mid-1990s, E.G. has become a major oil and gas producer. By 2004, it was the third-largest oil and gas producer in Sub-Saharan Africa. Over the last several years, oil and gas exports have resulted in billions of dollars in annual revenue.

30.    Equatorial Guinea also derives income from natural resources other than oil and gas, primarily timber, its second major export commodity. As of 2006, the Equatoguinean economy had grown 20 times larger than it was in the mid-1990s, reflecting the massive revenues derived principally from oil and gas production.

31.     A significant portion of these revenues were deposited into the U.S. financial system, including into accounts held at Washington, D.C.-based Riggs National Bank ("Riggs Bank"). By 2003, the E.G. portfolio had become the bank's largest single customer relationship, with balances and outstanding loans that together approached $700 million. The government of E.G., Nguema, Constancia Mangue (Nguema's mother), President Obiang, and other members of the Inner Circle maintained bank accounts at Riggs Bank.

32.     Riggs Bank's involvement with E.G. led to an investigation conducted by the U.S. Senate's Permanent Subcommittee on Investigations ("PSI"). In 2004, the PSI Report concluded that Riggs Bank "turned a blind eye to evidence suggesting the bank was handling the proceeds of foreign corruption."

33.     For example, as the 2004 PSI Report explained, one account, in the name of the Republic of Equatorial Guinea General Treasury, was known as the E.G. Oil Account because virtually all of the deposits were payments from foreign oil companies doing business in E.G. Riggs Bank records showed that President Obiang approved the wire transfer of nearly $35 million from the E.G. Oil Account to two companies, Apexside and Kalunga, which appeared to be connected to President Obiang, were unknown to the bank, and had accounts in jurisdictions with stringent bank secrecy laws. When Riggs Bank tried to obtain information about the beneficial owners of these two companies from President Obiang at a meeting in Washington, D.C. on February 23, 2004, neither he nor another member of the Inner Circle would provide Riggs Bank with further information. That same day, Riggs Bank determined that the E.G. accounts should be closed.

34.     Riggs Bank's involvement with E.G.'s inner circle also resulted in the criminal prosecution of the bank. After closing the E.G. accounts, Riggs Bank pleaded guilty to failure to

report suspicious monetary transactions by high-risk customers, in violation of 31 U.S.C. §§ 5322 and 5318(g).  Riggs Bank agreed to pay a $16 million criminal fine and a $25 million civil penalty for its handling of the E.G. and other accounts.

35.     Despite the extraordinary expansion in the E.G. economy and E.G.'s laws regarding public ownership of the country's natural resources, living standards of the general population remain at a subsistence level.  Meanwhile, Nguema has used his position as a cabinet minister in his father's government to extract enormous personal wealth from the people of E.G. and companies operating in E.G. through extortion, bribery and the misappropriation, theft, and embezzlement of public funds, all in violation of E.G. law.

C.     **Nguema's Acquisition of Political and Economic Power and Influence in E.G.**

36.     In 1991, at the age of 23, Nguema came to the United States to study English as a Second Language at Pepperdine University in Malibu, California.  He did not live on campus; instead, he shuttled between rooms at the Beverly Wilshire Hotel and a house he rented in Malibu.  After five months, Nguema dropped out of the program.  His tuition and living expenses (including his hotel bill and the rental of the house in Malibu) were paid by Walter Oil and Gas Corporation, an American oil company operating in E.G.

37.     On January 8, 1993, less than two years after he dropped out of the Pepperdine program, Nguema was awarded a 20-year concession[1] to harvest timber from 25,000 hectares (approximately 61,000 acres) of rainforest in E.G. by his father, President Obiang.  Nguema was 24 years old.

---

[1]   A concession is the exclusive right to engage in logging in certain defined areas, for a certain period of time.  Forestry concessions in E.G. are awarded by either the President or the Minister of Forestry without competitive bidding.  Companies or individuals awarded a concession are permitted to harvest timber in the concession.  They are obliged, however, to pay the E.G. government for any timber actually extracted from the concession.

38.     As described below in additional detail, Nguema acquired a timber company in or around 1994 that had been operating in E.G.  After liquidating all of the company's hard assets, Nguema re-named the company Grupo Sofona ("Sofona").  Two years later, in 1996, Nguema acquired another timber company in E.G.  After selling all of that company's hard assets, Nguema re-named it Somagui.  In 1998, Nguema informed Riggs Bank in Washington, D.C. that Somagui was a subsidiary of Sofona.

39.     Nguema maintains personal bank accounts and accounts for his shell companies, Somagui and Sofona, at Société Générale De Banques En Guinee Equatoriale ("Société Générale of E.G.") and Caisse Commune d'Epargne et d'Investissement ("CCEI Bank").

40.     On or around May 5, 1994, Nguema's father granted Sofona a five-year concession to harvest timber from 11,000 hectares (approximately 27,000 acres).

41.     In addition to granting his son the right to cut timber on 88,000 acres of national forest lands, President Obiang put Nguema in charge of regulating E.G.'s entire forestry industry.  In approximately 1998, at the age of 30, Nguema was appointed by his father to the newly created position of "Minister of Forestry and Environment," later changed to "Minister of Forestry and Agriculture" (hereinafter "Minister of Forestry").

42.     In the 2000s, the rapid growth of the oil and gas sector in E.G. led to a boom in construction and other infrastructure-related activities.  In or around 2003, President Obiang added "infrastructure" to Nguema's cabinet portfolio, appointing Nguema to be E.G.'s first "Minister of Forests and Infrastructure."

43.     As an E.G. cabinet minister, Nguema's official salary was approximately $6,799 per month, or less than $100,000 per year, according to official E.G. sources.

**D.     Nguema's Utilization of Corrupt Schemes to Enrich Himself**

44.     Nguema used his status as a cabinet minister and as President Obiang's son to enrich himself through the corrupt schemes described below. As set forth herein, although these schemes are illegal under the laws of E.G., the applicable anti-corruption laws are not enforced against members of the Inner Circle, including Nguema. Instead, members of the Inner Circle are allowed to keep funds obtained through corruption and to take the proceeds of their corruption abroad.

**1.     Extortion and Bribery Schemes**

45.     Beginning in the 1990s, after he dropped out of Pepperdine and returned to E.G., Nguema began demanding that businesses in E.G. – especially those located in or around the City of Bata, the largest city and port in Rio Muni (E.G.'s mainland), where Nguema resided – pay him personal fees to be able to operate. Nguema abused his authority and influence within the E.G. government, both as a member of the cabinet and as President Obiang's son, to make these demands and to retaliate against those who refused to meet them.

**a.     Nguema Required Timber Companies in E.G. to Pay Him Personal Fees to Obtain Timber Export Licenses**

46.     Timber was E.G.'s second largest export commodity and the forestry sector was supervised and regulated by Nguema's Forestry Ministry.

47.     In order to export timber from E.G., companies were required to, among other things, apply for and obtain timber export licenses from a division of the Forestry Ministry called the Office of Supervision, Information and Promotion of Forest Species ("OCIPEF").

48.     At least as early as 1998, these licenses required Nguema's personal signature. Nguema demanded that timber companies, such as Tromad Forestal, an E.G. company, pay him personally in or around ten percent of the value of the wood harvested for export. Nguema

12

refused to sign timber export licenses unless applicants first paid him these personal fees. The payments were demanded by Nguema or his associates even after all other formal taxes had been paid on the timber.

49.     Between approximately 1998 and 2003, Germán Pedro Tomo, the owner of Tromad Forestal and an E.G. national, regularly paid personal fees to Nguema, either in suitcases of cash or with personal checks that Tomo deposited directly into a bank account in the name of Somagui at CCEI Bank. Tromad Forestal paid Nguema in or around the equivalent of $700,000 in CFA Francs ("CFAs") per year between 1998 and 2003 in order to export its products.

50.     Nguema required other timber companies in E.G. to pay him or his shell company Somagui in or around 15,000 CFAs (approximately $30) per cubic meter for unprocessed wood and 13,000 CFAs (approximately $26) per cubic meter for processed wood that the company wished to export. These personal fees were calculated by technicians on the staff of Nguema's Forestry Ministry.

51.     Companies that refused to pay Nguema were prevented from exporting their timber from the Port of Bata, where nearly all of E.G.'s timber originated, and incurred additional operational expenses of up to $5,000 per day for delays leaving port.

### b. Nguema Required Timber Companies in E.G. to Pay Him Personal Fees to Import Goods and Equipment

52.     In addition to demanding and collecting personal fees on exports, Nguema levied a personal fee on imports arriving through the Port of Bata.

53.     Companies seeking to bring goods and equipment into E.G. through the Port of Bata were charged an official import tax by the general revenue service of the Equatoguinean government. Between at least 2003 and 2007, certain companies were also required to pay a second, personal fee to Nguema through his agents.

54.     In at least one case, an importer was also forced to pay monthly wages of $3000 to the very agents Nguema had charged with collecting his illegal import fees.

### c.     Nguema Required Timber Companies in E.G. to Pay Him Personally to Gain Access to E.G.'s National Forests

55.     Nguema also required timber companies to pay him a personal fee in order to gain access to E.G.'s forests.

56.     To harvest timber in E.G., companies were required to obtain either a logging concession or a special permit from the E.G. Forestry Ministry.  Nguema used his authority as Forestry Minister to demand and collect personal fees from companies, such as Isoroy (a French company), ABM (a Spanish company), and Agroforestal (an Italian company), for the issuance of such concessions and permits.  All of these companies' E.G. operations were based in or around Bata.

57.     For example, in 1993, Nguema demanded that Isoroy pay him personally 15 million CFAs (approximately $21,000) to engage in logging in E.G.  Isoroy obtained a concession to harvest timber from 57,053 hectares of wilderness in E.G. on September 3, 1995.

58.     Similarly, between in or around 1998 and 2003, Shimmer International Guinea Equatorial Ltd. ("Shimmer"), the E.G. subsidiary of a Malaysian company, was permitted by Nguema to harvest timber anywhere it wished in E.G.'s mainland forests, including national forest reserves protected under E.G.'s Forestry Law from industrial logging.  Nguema demanded, and Shimmer's E.G. general manager agreed, that in exchange for paying Nguema 30,000 CFAs (approximately $50) per cubic meter of timber Shimmer harvested in E.G., Shimmer would receive unfettered access to E.G.'s forests, including protected national forests, and would not be required to adhere to E.G.'s Forestry Law or its environmental and forest management regulations.

14

59.     Other timber companies had comparable arrangements with Nguema and his
Forestry Ministry.  E.G.'s Forestry Law places strict controls on the manner in which timber is
harvested.  Among other things, E.G.'s laws regulate the quantity of timber that a company may
extract from the forest; restricts timber companies from cutting down certain types of trees; and
even requires loggers to replant areas that have been cut down.  In exchange for paying personal
fees to Nguema, companies like Shimmer were permitted to harvest timber from E.G.'s forests
without complying with these or other forestry laws.

### d.     Nguema Required Companies in E.G. to Pay Him Personally on an On-Going Basis to Continue to Operate in E.G.

60.     Nguema further demanded that timber companies make regular payments to him
personally or through his shell companies while they maintained active operations in E.G.  These
companies included Isoroy, ABM, Agroforestal, and a fourth company operated by Filipino
nationals.

61.     For example, between 1993 and 1996, Isoroy paid Nguema in or around the
equivalent of $104,000 every one or two months in order to continue operating in E.G.  This fee
was calculated based upon the weight of the timber harvested by Isoroy during that time period.

62.     In or around May 1996, Nguema demanded that all foreign timber companies
then-operating in E.G. pay him a retroactive fee that he called a "tax."  Nguema levied this
illegal fee without authorization from E.G.'s Parliament (*La Camara de Los Representantes*) or
Inter-Ministerial Council (*el Consejo Interministerial*), as would be required under E.G. law for a
true tax.  This new so-called "tax" required all foreign timber companies to pay Nguema
personally a one-time retroactive fee of 6,400 CFAs (approximately $10) per cubic meter of
timber that had ever been harvested by that entity in E.G.

63.     For instance, Nguema demanded that ABM, which began active logging operations in E.G. in the 1970s, pay him the equivalent of approximately $1,560,000 within four days of this new so-called "tax" being levied.

64.     Nguema required foreign timber companies who refused to pay these so-called "taxes," including Isoroy and ABM, to leave E.G. Other timber companies, including one based in the Philippines and another in Morocco, were permitted to continue to operate in E.G. after they paid Nguema his so-called retroactive "taxes."

65.     Nguema also threatened and retaliated against timber companies, including Isoroy and ABM, who refused to submit to his demands for payment. In or around May 1996, Isoroy refused to make any further payments to Nguema. As a result, Nguema forced the company to cease its timber operations in E.G. and seized control of Isoroy's assets in the country, including its heavy machinery, two Caterpillar D7G bulldozers, two Mercedes Benz 1622 construction trucks, a Mercedes Benz 1922/28 construction truck, a Mercedes Benz 1522 dump truck, three Toyota utility vehicles, two Mitsubishi L200 vans, a Suzuki vehicle, an Opel Corsa mini, and a Pajero vehicle.

66.     Only after Isoroy paid Nguema a monetary ransom did Nguema allow Isoroy's logistics personnel in Gabon to retrieve company's equipment.

67.     During this same time period in 1996, Nguema personally threatened one senior Isoroy employee in Bata. Nguema promised that he would make this Isoroy employee "suffer" because of the company's refusal to pay Nguema money. Soon thereafter, the employee was arrested and detained in jail. After being released, an E.G. national familiar with Nguema, advised the employee to leave E.G. immediately if he did not want his children in Europe to become orphans.

68.     In or about 1994, Nguema took over the Italian company, Siem S.P.A.  Siem
S.P.A. had worked in the E.G. timber industry for seven years harvesting timber and training
E.G. nationals how to do the same.  After expropriating for his own use the company's assets and
then liquidating them, Nguema changed its name to Sofona.  Thereafter, Nguema used Sofona as
a shell company to receive the proceeds of his corrupt acts.

69.     Nguema acquired another of his shell companies in a similar manner.  In or
around May 1996, when ABM refused to pay Nguema his so-called retroactive "tax," E.G.
authorities entered ABM's offices near Bata, forcibly removed ABM personnel from the
premises, and expelled them from E.G.  Nguema then required ABM's owner, a Spanish
national, to transfer ownership of ABM to Nguema for in or around one-third of its actual fair
market value in a transaction that Nguema called a "sale."

70.     After acquiring ABM, Nguema had the company's former owner arrested in Bata
and accused of fraud for charging Nguema an inflated price for the company.  ABM's former
owner was convicted and released only after paying Nguema the equivalent of $3 million in so-
called civil penalties.  ABM's assets, including its heavy machinery and timber logging
equipment, were also expropriated by Nguema without further compensation.  Nguema required
that Shimmer purchase ABM's logging equipment from him at significantly inflated prices.

71.     Nguema then changed ABM's name to Somagui.  Somagui did not engage in any
actual business activity; rather, it served as a receptacle for the proceeds of Nguema's corrupt
acts.

72.     Even outside of the forestry sector, Nguema used his position as a government
official in his father's cabinet to demand that companies operating in E.G. pay him money and
provide him with gifts of cash and other luxury products.  For instance, in or around 2003 when

"infrastructure" was first added to Nguema's cabinet portfolio, Nguema demanded that Tromad SA Constructions Y Obras ("Tromad"), an E.G. company retained by the E.G. government to build roads, pay him personally fifteen percent of the value of its government contract to build a highway. When Tromad refused to pay Nguema, the E.G. government stopped making payments to the company and its contract with the E.G. government was terminated.

73.     Between 2004 and 2007, Nguema's Forestry Ministry demanded that Global Santa Fe Corp. ("GSF"), a U.S.-based oil and gas services company, provide Nguema with gifts and money. Nguema's ministry staff made these types of requests of GSF personnel one or two times per year. When a manager at GSF's Malabo office refused to make payments, he was threatened by Nguema's staff and shown a document detailing numerous gifts and payments other foreign companies had made to Nguema.

74.     The above-described corrupt schemes violate the following provisions of E.G. law, which are adopted from the 1968 Criminal Code of Spain: Article 131 (abuse of public office); Article 196 (expropriation of assets by a public official); Article 198 (taking advantage of official position to exercise a profession or involve oneself in a business directly related to scope of official duties); Articles 200 & 202 (collection of illegal taxes); Article 385 (prohibiting public officials from demanding or accepting bribes to perform a crime); Article 386 (prohibiting public officials from demanding or accepting bribes to perform an unjust act); Article 387 (prohibiting public officials from soliciting improper gifts); Article 390 (prohibiting public officials from receiving improper gifts); Article 394 (prohibiting public officials from stealing public funds); Article 396 (prohibiting public officials from embezzling funds under his care); Article 400 (prohibiting public officials from defrauding the state); Article 401 (criminal conflict of interest by a public official); Article 404 (prohibiting public officials from taking part in for-

18

profit transactions within the limits of their jurisdiction); Article 493 (criminal threats); Article 496 (unlawful compulsion); Article 503 (forcibly requiring someone to sign, grant or quit claim a public instrument or document); Article 514 (theft); and Articles 528 and 533 (fraud).  *See* Attachment A.

> **2.    Schemes to Obtain Public Funds Through Misappropriation, Embezzlement, and Theft**

75.    Nguema misappropriated, embezzled, and stole public funds and resources in violation of E.G. law.  He did so by: (i) using E.G. companies to submit fraudulently inflated "bids" and invoices for government contracts in which corruption payments to his shell companies were built in as payments to subcontractors; (ii) using his shell companies to receive and retain hundreds of millions of dollars in payments from the E.G. government in connection with infrastructure contracts that those shell companies never performed; and (iii) directly diverting public funds from the E.G. government.

> **a.   Nguema Misappropriated E.G. Public Funds By Receiving Payment for Fraudulently Inflated Public Construction Contracts**

76.    Nguema has misappropriated funds from the E.G. government by receiving tens of millions of dollars in payments under fraudulently inflated construction contracts.

77.    The process of awarding government contracts in E.G. is sensitive, secretive, and controlled by Nguema and his family, including his father, President Obiang.  Government contracts are often awarded to companies owned by or associated with members of the Inner Circle without true competition.  One result is that those companies are able to charge the E.G. government fees that bear little, if any, rational relationship to the actual economic value of the services or products tendered to the E.G. government.  The bids from such companies include

built-in mark-ups of 50 to 1000 percent or more, so that members of the Inner Circle can obtain the difference.

78.    Nguema has admitted that, as a cabinet minister, he takes for himself a "sizeable part" of government contracts.  In 2004, for instance, Nguema claimed that he purchased real estate in Cape Town, South Africa, worth approximately $8 million with money obtained through government construction contracts awarded to Socage, a company he owns in E.G. Specifically, in a sworn affidavit filed by Nguema with a court in South Africa, Nguema explained:

> Cabinet Ministers and public servants in Equatorial Guinea are by law allowed to owe [sic] companies that, in consortium with a foreign company, can bid for government contracts and should the company be successful, then what percentage of the total cost of the contract the company gets, will depend on the terms negotiated between the parties.  But, in any event, it means that a cabinet minister ends up with a sizeable part of the contract price in his bank account.

This is how, according to Nguema, he acquired in or around $8 million to purchase his properties in South Africa.

79.    Contrary to Nguema's recitation of the law, such self-dealing by a public official is illegal in E.G.  These fraudulently inflated contracts are another means by which he, and other members of the Inner Circle, have misappropriated funds from the public treasury for their own enrichment.

80.    Between 2003 and 2007, for instance, Nguema demanded that executives at General Work S.A. ("General Work"), one of the largest construction companies in E.G., submit fraudulently inflated construction bids and contracts to G.E. Proyectos, an agency of the E.G. government in charge of awarding public construction contracts.  Nguema would direct General Work executives to inflate contract bids by as much as 500 percent.  A portion of the money paid

by the government of E.G. to General Work would be transferred to Nguema and/or one of his

shell companies. Executives at General Work believed that if they had not acquiesced to

Nguema's demands, their company would have been expelled from E.G.

81.    Specifically, General Work fraudulently inflated certain line items in several

different construction bids tendered by the company to G.E. Proyectos. After G.E. Proyectos

awarded the contract to General Work, the Banque des Etats de l'Afrique Centrale ("E.G.'s

central bank"), wired a portion of the inflated contract amount to General Work's account at

CCEI Bank. General Work would then provide Nguema or one of his associates with a blank

check or a bearer check as a kickback. These checks were deposited into CCEI accounts held in

the name of Somagui or Socage. Hundreds of these payments were made by General Work to

Nguema or for his direct benefit in or around the time period that Nguema acquired the

Defendant Aircraft.

82.    Nguema also asked that his companies, Somagui and Socage, either (i) be listed

as a subcontractor on certain of General Work's bids, so that G.E. Proyectos would know that

Nguema was associated with the bid, or (ii) sign a subcontract with General Work. These

subcontracts were created solely to justify the issuance of illicit payments from General Work to

Nguema and/or his shell companies. The work and services described in these subcontracts were

performed and paid for by General Work, and not Somagui, Sofona, or Socage. Nguema's

companies, which existed only on paper, had no significant commercial operations and were

merely vehicles through which Nguema could receive payments from companies such as General

Work.

### b.  Nguema Misappropriated E.G. Public Funds By Receiving Payment for Public Construction Contracts that His Companies Never Performed

83.    Nguema misappropriated funds from the E.G. government by receiving and retaining hundreds of millions of dollars in payments for infrastructure contracts that his companies never performed.

84.    Nguema's company, Somagui, was given a highway-construction contract by the E.G. government on or about November 13, 2004.  Under that contract, Somagui was tasked with building a 45-mile highway connecting the Equatoguinean border towns of Mongomo and Ebebiyin (the "Ebebiyin-Mongomo Highway").  The contract had a three-year term and the work was to be completed in or about November 2007.

85.    Initially valued at $137 million, the E.G. government later raised the value of the contract to $200 million and then made initial payment(s) to Somagui in the amount of $182 million.  At the time, this was the largest government contract ever given to Somagui.

86.    Because Somagui existed only on paper and performed no commercial functions, Nguema subcontracted the work to General Work – one of the largest construction companies in E.G.  Although the government of E.G. had paid Somagui $182 million of the total $200 million value of the contract, General Work agreed to build the highway for $44 million; $156 million less than the value of the contract and $138 million less than Somagui had already been paid by the E.G. government.  Nevertheless, Somagui only paid General Work $15 million toward the completion of the highway-construction project and the company was forced to stop work for lack of funds.

87.    Thereafter, the government of E.G. cancelled the contract with Somagui for failing to complete the project.  The E.G. government did not recoup the $182 million that it had already paid to Nguema through his shell company Somagui.

88.     The government of E.G. then re-awarded the Ebebiyin-Mongomo Highway contract to the China Road and Bridge Corporation ("China Road and Bridge"), a civil engineering company based in Beijing, China.  That contract was valued at $96 million.  In order to assume the contract, however, China Road and Bridge, entered into a separate contract with Somagui.  Under that contract, which was signed by Nguema on behalf of Somagui, China Road and Bridge agreed to pay a fee to Somagui of 20 percent (approximately $19 million) of the total contract award.

89.     Beginning in or around January 2009, China Road and Bridge paid the $19 million fee in installments to Somagui's bank account at Société Générale of E.G. – the same E.G. bank where Nguema maintained the accounts that he used to purchase the Defendant Aircraft.

90.     By the time that China Road and Bridge began work on the Ebebiyin-Mongomo Highway, Nguema, through his shell company Somagui, had reaped a personal profit of $186 million dollars despite his company's failure to perform under the contract.

91.     Somagui had been given a similar contract on or about November 18, 2003, valued at approximately $23.4 million.  The project was to be completed in 16 months and involved resurfacing two stretches of highway in E.G.  As of September 2010, the project had not been completed and another construction company had taken over some or all of the contract.

           c.     **Nguema Directly Diverted Public Funds to Bank Accounts Under His Direct Control**

92.     Nguema diverted E.G. public resources and monies for his personal use.  Since at least as early as 2005, Nguema has maintained public funds and revenue collected by his Forestry Ministry in a separate account (the "Forestry Account") at a private commercial bank in E.G.  This is in contrast with the management of other E.G. public funds, which are maintained

by E.G.'s Treasurer at EG's central bank.  No E.G. public official or agency, including E.G.'s

Parliament, its Ministry of Finance, and its Treasury, regulate or inspect how the funds in the

Forestry Account are used.

93.    Other than Nguema's Forestry Ministry, no other E.G. state agency or institution

maintains an account like this one.

94.    This Forestry Account is used by Nguema to maintain millions of dollars

collected as state revenue by E.G.'s Forestry Ministry from timber companies operating in E.G.

The funds in this account include surface taxes paid by all persons who hold forestry concessions

in E.G., fees charged to timber companies who harvested logs from such concessions, and

official timber export duties collected by the Forestry Ministry.  Instead of depositing this

revenue into EG's central bank like other public agencies, Nguema diverted and maintained

these public funds in his Forestry Account.

95.    At the time that Nguema purchased the Defendant Aircraft, he was the sole

signatory on the Forestry Account, possessing exclusive authority and control over how the

funds were used and disbursed.

96.    In 2006, economists and auditors from a United Nations financial agency were

permitted to access and review information and records relating to the E.G. government's

financial and fiscal management policies.  When United Nations personnel requested that they be

permitted to also review and access data and records relating to the Forestry Account, their

requests were denied.

97.    The above-described corrupt schemes violate the following provisions of E.G.

law, which are adopted from the 1968 Criminal Code of Spain:  Article 131 (abuse of public

office);  Article 196 (expropriation of assets by a public official); Article 198 (taking advantage

of official position to exercise a profession directly related to scope of official duties); Article

394 (prohibiting public officials from stealing public funds); Article 396 (prohibiting public

officials from embezzling funds under his care); Article 400 (prohibiting public officials from

defrauding the state); Article 401 (criminal conflict of interest by a public official); Article 404

(prohibiting public officials from taking part in for-profit transactions within the limits of their

jurisdiction); Article 514 (theft); and Articles 528 and 533 (fraud). *See* Attachment A.

**E.**     **Nguema Uses Shell Companies to Conceal His Criminal Conduct and to Mask the**
          **True Source of His Illicitly Acquired Wealth**

98.     While acquiring millions of dollars in criminal proceeds from the corrupt schemes

described above, Nguema used shell companies in E.G. to disguise his criminal conduct, conceal

the source of his income, and to claim falsely to financial institutions and foreign governments

that his income was derived from legitimate commercial activity in E.G.

99.     Beginning in the 1990s, Nguema claimed falsely to numerous American and

European financial institutions (at which he opened bank accounts to funnel and shelter his

criminal proceeds) that his companies Sofona and Somagui generated hundreds of millions of

dollars in commercial profits.  These companies, according to Nguema, exported and marketed

hundreds of thousands of cubic meters of timber every year on international markets; were

singlehandedly responsible for 69 percent of E.G.'s gross domestic timber production in 2001;

and were singlehandedly responsible for 73 percent of E.G.'s construction-related gross domestic

product in 2004, building and paving more than 200 kilometers of highway in E.G.  In fact, as

discussed below, these representations are false, and Sofona and Somagui exist only on paper.

100.    Neither Sofona nor Somagui engaged in any significant business operations in

E.G.  They had few, if any, employees and earned no legitimate revenue, let alone on the

exceptional scale Nguema has claimed.  These companies served solely as receptacles for

Nguema's ill-gotten gains.

      101.    Despite efforts to verify the existence of Sofona and Somagui, financial

institutions in multiple jurisdictions could not confirm Nguema's claims that his companies

performed actual operations and had legitimate sources of revenue:

        (i)    In 2002, J. P. Morgan, where Nguema maintained a bank account, sought to

            obtain more information about Sofona and Somagui.  Despite researching local

            trade directories and reference books, and making numerous inquiries about both

            companies in E.G., including with the local chamber of commerce, businesses,

            banks, and authorities, J. P. Morgan personnel in both the United States and the

            United Kingdom could not confirm that Sofona or Somagui existed, let alone

            engaged in commercial operations of any kind.  Although J. P. Morgan identified

            a phone number in E.G. associated with Sofona, J. P. Morgan reported that its

            calls were never answered.  In contrast with Nguema's contention that by 2001

            these companies singlehandedly controlled nearly 70 percent of E.G.'s timber

            industry, E.G.'s second-highest revenue generating export, J. P. Morgan

            personnel concluded that both Sofona and Somagui were "unknown in the local

            market."

      (ii)    Likewise, in 2004, at a time in which Nguema claimed that Sofona and Somagui

            were even larger and more dominant in the E.G. economy, Riggs Bank, where

            Nguema, his parents, and other Inner Circle members opened several bank

            accounts, sought to investigate and confirm Nguema's representations about his

            companies.  Relying on various bank resources and almost two dozen electronic

databases and search engines, a fraud investigator with Riggs Bank in

Washington, D.C. concluded that no evidence of Sofona's or Somagui's existence

in E.G. could be ascertained.

102.    Similarly, individuals that lived or worked in E.G. between 2000 and 2007 who

were knowledgeable about the forestry and/or infrastructure industries in E.G. reported that

neither Sofona nor Somagui were known in E.G. as commercial businesses with actual legitimate

operations.  These individuals include international development workers in E.G., commercial

business persons, E.G. nationals and residents, and employees of non-governmental

organizations ("NGOs"), including a major U.S.-based environmental NGO active in E.G.'s

forestry sector.  For instance:

(i)     An American forestry expert employed by an NGO in Bata from 2005 to 2009
        worked closely with Nguema's Forestry Ministry on conservation and forest-
        management issues.  Yet, he could not confirm that either Sofona or Somagui
        existed, nor could he say whether either was active in E.G.'s timber or
        construction industries.

(ii)    Germán Pedro Tomo is an E.G. national who served as a member of E.G.'s
        Parliament and owned the E.G. timber company Tromad Forestal until 2003.  He
        explained that Somagui had no more than one or two employees; had an office in
        Bata that was rarely open; and had no function other than to open bank accounts
        and receive illegal payments during the time period Tomo operated his timber
        company in E.G. (1998-2003).

(iii)   An E.G. lawyer and former civil servant who worked on the staff of a former E.G.
        cabinet member states that Somagui and Sofona are merely shell companies with

"no real business." The lawyer did not know of any companies or businesses owned by Nguema that engage in genuine commercial or business operations.

(iv)     An individual who served as a senior financial advisor to the E.G. Finance Minister in or around the same time that Nguema purchased the Defendant Aircraft and who had access to the E.G. government's infrastructure expenditures and revenue had never heard of Sofona and could provide no specific information about Somagui.

(v)      A U.S. Department of Agriculture forestry expert, who visited Bata and various E.G. forests in 2004 to consult on technical assistance matters and survey forest management issues in E.G., also never heard of Sofona or Somagui.

(vi)     An American who worked for Afriam, a company that obtained a 25,000 hectare forestry concession in E.G. in 1994 and operated in or around Bata during the 1990s, also reported that he never heard of Sofona or Somagui.

(vii)    A senior accountant and lawyer who worked in a Big Four accounting firm's E.G. office between 2004 and 2007, the same time period in which Nguema acquired the Defendant Aircraft, recalled that although s/he observed a significant amount of infrastructure-related construction in E.G., most of that work was performed by Chinese and Middle Eastern construction companies. This individual had never heard of Somagui or Sofona.

(viii)   Several contractors employed by U.S. AID, an agency of the United States Government, who resided in E.G. between 2005 and 2009, were focused specifically on issues of economic and social development in E.G., and worked closely with the staff of E.G.'s Ministry of Planning, Economic Development and Public Investment, its Ministry of Finance, and its Ministry of Fishing and the

Environment. These individuals reported that they had never heard of Sofona or Somagui.

(ix)    A finance manager who worked for a major oil and gas services logistics company in Bata, E.G., also had never heard of Somagui despite being in business in E.G. in or around the same time period that Nguema purchased the Defendant Aircraft and being a close neighbor of Nguema.

(x)    The Chinese civil engineering company, China Road and Bridge Corporation claims that it, not Somagui, built the Ebebiyin-Mongomo Highway in E.G.

## F.   Nguema Does Not Have Legitimate Income Sufficient to Account for His Hundreds of Millions of Dollars in Personal Purchases and Expenditures

103.    From 2000 to 2011, Nguema spent more than $300 million acquiring assets and property on four continents – North America, South America, Europe, and Africa. In the United States alone, Nguema spent $68 million during a period of less than three months in 2006 on two assets: the Defendant Aircraft, which cost over $38 million, and a $30 million mansion located in Malibu, California overlooking the Pacific Ocean.

104.    For every year between 1999 and 2006, Nguema's enormous personal expenditures vastly outpaced and were inconsistent with **both** (i) his public official salary of less than $100,000 per year, and (ii) the income he reported having been generated from Sofona and Somagui, a subsidiary of Sofona. Although Nguema provided to Riggs Bank copies of Sofona's financial statements for 1999, 2000 and 2001, he did not provide separate statements for Somagui.

(i)    In 1999, Sofona's financial statements reported that that the company incurred losses of 828,238,750 CFAs (approximately $1,129,930) and that the

29

shareholders, managers and directors of the company received no compensation from the company.

(ii)     In 2000, Sofona's financial statements reported that the company incurred 236,005,058 CFAs (approximately $321,971) in losses.  Like the prior year, these statements again indicate that the company provided no compensation or income to its shareholders, directors and managers.  Yet, Nguema spent and/or wire transferred approximately $13,451,964 into the United States and throughout the world.  Nguema, for instance, spent approximately $857,000 acquiring luxury automobiles in France, including an Aston Martin and a Ferrari, with no financing or use of borrowed funds.  In the United States, Nguema's account at Riggs Bank received two wires from Somagui's account at CCEI Bank in E.G. for (a) $1,099,980 on March 13, 2000, and (b) $999,980 on April 11, 2000, even though the company's financial statements that year reported that Somagui had losses of almost six times that amount.  Nguema's Riggs Bank account also received additional wires from accounts in his own name at (a) Citibank for $5 million on February 22, 2000, and (b) CCF Banque Privee Internationale, a French bank, for $5.495 million on March 3, 2000.

(iii)     In 2001, Nguema reported in Sofona's financial statements that the company generated 2,245,980,864 CFAs ($3,064,093) in net income.  Yet, that year Nguema spent and wired into the United States in or around $11,109,082.  Nguema spent $8,009,210 in California alone, including purchasing a $6,500,000 property on Antelo Road in Bel Air, California and a Bentley vehicle for $651,500.  In addition, Nguema's Riggs Bank account received three wires from Somagui's account at CCEI Bank in E.G. for (a) $999,932 on March 26, 2001, (b) $999,980 on May 1, 2001, and (c) $999,980 on August 16, 2001.  Nguema's account at Chase Manhattan received an additional wire from Somagui's CCEI

account in E.G. for $99,980 on November 7, 2001. These expenses amounted to more than 250 percent of Sofona's purported total net income.

(iv)  In 2002, Nguema wire transferred in or around $3,326,650 into accounts in the United States from E.G. Specifically, Nguema's Riggs Bank account received two wires from Somagui's account at CCEI Bank in E.G. for (a) $266,439 on May 24, 2002, and (b) $1,499,980 on June 28, 2002. In addition, Nguema's Riggs Bank account received additional wires from accounts in his own name at (a) Chase Manhattan Bank for $209,548 on April 25, 2002, and (b) National Financial Services Corp. for $734,225 on July 8, 2002. In addition, Nguema's account at City National Bank in Los Angeles in the name of TNO Entertainment received three additional wires from Somagui's E.G. bank account: (a) a wire for $199,950 on January 22, 2002, (b) a wire for $59,980 on June 13, 2002, and (c) $149,980 on June 19, 2002.

(v)  In 2003, Nguema spent and wired more than $6,735,216 throughout the world. Specifically, Nguema's account at Riggs Bank received five wires from Somagui's CCEI account for (a) $299,980 on March 19, 2003; (b) $1,499,975 on July 11, 2003; (c) $2,599,985 on July 17, 2003; (d) $671,679 on August 11, 2003; and (e) $999,975 on September 17, 2003. Additionally, Nguema spent $663,622 on a Maybach 62 automobile in Paris.

(vi)  In 2004, Nguema spent more than $88 million to acquire numerous personal assets around the world, including a property valued at approximately $80 million in Paris on Avenue Foch, and two properties in Cape Town, South Africa for $8 million. The value of these three assets alone equaled almost 43 percent of the total *gross* construction income Somagui had purportedly generated at that time throughout its entire existence.

31

(vii)    In 2005, Nguema spent more than $11 million on assets and expenditures, including acquiring (a) two 50-foot, high-performance racing boats in Ft. Myers, Florida, for over $2 million; (b) $1 million on a ten-day yacht cruise around St. Barthelemy in December; (c) a Rolls Royce for €381,000; (d) a Maserati for €82,000; (e) €1.8 million on renovations and decorations to his Paris home; and (f) almost €3 million in jewelry and art, including three Piaget baguette diamond-studded watches for €777,400 (approximately $1,010,620) each.  Nguema's expenses for 2004 and 2005 combined ($99 million) amounted to more than 48 percent of the total *gross* income Somagui had supposedly generated from construction projects at that time throughout its entire existence.

(viii)   In 2006, Nguema spent more than $88 million on assets and expenditures, including (a) the ocean-front Malibu mansion for $30 million; (b) a $38.5 million Gulfstream G-V jet aircraft (the Defendant Aircraft); (c) €7.34 million in renovations and decorations to his Paris home; (d) €2.296 million on two Bugatti automobiles; and (e) €1,291,680 in jewelry and art, including a diamond-studded Vacherin Constantin watch for €586,040 (approximately $761,852).  Nguema's expenditures for the period 2004-2006 combined (approximately $187 million) equaled almost 91 percent of the total *gross* income Somagui had supposedly generated from its construction projects at that time throughout its entire existence.

105.    Even after his acquisition of the Defendant Aircraft for $38.5 million in 2006, Nguema's expenditures continued to outstrip his official income and that of his companies Sofona and Somagui.  From 2007 through 2011, Nguema's known expenditures exceeded $130 million at a time that he was making less than $100,000 per year as a public servant and the purported gross construction income awarded to Somagui and Sofona was $60.3 million.

Among other transactions, Nguema spent more than $2.2 million in costs and maintenance

services for the Defendant Aircraft.

**G.     Nguema Has Given Vague and Inconsistent Explanations as to the Source of His Wealth and Has Sought to Conceal His Relationship to Funds Transferred into the United States**

106.    In early 2004, City National Bank ("City National") in California closed a

personal bank account that Nguema had just opened because Nguema had provided the bank

with an incorrect Social Security number.  Before returning the funds, the bank requested that

Nguema identify the source of the monies held in the account.  Nguema provided no details other

than to state that they were from one of two E.G. companies he owned – Somagui or Sofona.

When City National refused to return Nguema's funds to him, citing concerns raised by the PSI

Report on the Inner Circle's accounts at Riggs Bank, Nguema sued City National in California

Superior Court on or about October 14, 2004.  Even then, Nguema was still not able to provide

any details or financial data relating to his purported commercial activities and the source of his

wealth.

107.    In 2007, when asked by Comerica Bank in Los Angeles, Nguema's then-business

manager advised the bank that Nguema was unemployed and that his income was derived from

trading expensive automobiles and a family inheritance.

108.    Two years later in 2009, Nguema told officials at the United States Embassy in

E.G. that other than his income as a public official, the source of his wealth was commercial

logging operations performed by a Malaysian company in E.G.

109.    Also in 2009, the staff of the Senate's PSI contacted Nguema to obtain details as

to the source of his income and wealth in connection with their 2010 report on foreign

corruption. Despite being promised by Nguema's attorney that this information would be provided, the PSI received no such information.

110.    That same year, Nguema also claimed falsely to Anton K. Smith, the United States Embassy's deputy chief of mission in E.G., that some of his wealth was due to a purported 100 percent increase in the value of his Malibu mansion since he acquired it for $30 million in 2006. In fact, there is no evidence that the property was ever valued at anything close to $60 million between 2006 and 2009, as Nguema claimed.

111.    Two years after that in 2011, Nguema changed his explanation yet again, claiming to Ambassador Alberto Fernandez, the United States' then Ambassador to E.G., that his personal wealth was derived from government infrastructure contracts.

112.    Likewise, Nguema has refused to provide information regarding the source of his wealth to law enforcement authorities in France. At present, Nguema is under criminal investigation for money laundering, misappropriation and embezzlement of public funds, and misappropriation and embezzlement of corporate funds. On September 28, 2011, French judges in Paris ordered the seizure of eleven high-end automobiles from Nguema's home on Avenue Foch in connection with their investigation. In February 2012, French judges authorized French police to enter and seize the contents of Nguema's Paris home. Shortly thereafter, in April 2012, Nguema was ordered to appear before Judges Roger Le Loire and Rene Grouman of the Tribunal de Grande Instance de Paris. The French judges sought to question Nguema regarding the source of his wealth and acquisition of his $80 million Paris home and several luxury automobiles. Rather than comply with the court order, Nguema left France. In or around April 2012, the French court issued a warrant for Nguema's arrest and as of the date of filing this First Amended Complaint, Nguema has yet to appear before the French tribunal.

113.    Nguema has also taken steps to conceal the source of monies that he brought into the United States.  Beginning in at least 2004, Nguema orchestrated and implemented a scheme fraudulently to open and use bank accounts at financial institutions in California in order to funnel millions of dollars into the United States from E.G., while concealing his association with the accounts, the source of funds, and his status as an E.G. minister and the son of E.G.'s President.

114.    As part of this scheme, Nguema and at least two lawyers, Michael J. Berger and George Nagler, created numerous companies in California for Nguema in order to defraud U.S. financial institutions regarding Nguema's relationship to accounts opened, property acquired, and the source and ownership of funds he brought into the United States.  Between approximately 2004 and 2008, six banks had closed thirteen accounts opened in the name of these shell corporations upon learning of Nguema's association with them.

115.    In addition, Nguema wire transferred funds to bank accounts controlled by intermediaries, including the attorney client trust accounts of Berger and Nagler, who – unbeknownst to the banks – then conducted transactions with monies transferred by Nguema to pay for, among other things, Nguema's personal expenses and upkeep on his $30 million estate in Malibu, California.

116.    Similarly, Nguema has concealed his identity in other transactions occurring in the United States.  In October 2010, for example, Nguema's assistant in the United States successfully bid on various auction items for Nguema, including numerous items of Michael Jackson memorabilia.  When Nguema's assistant received the invoices from the auction house totaling $1,398,062.50, she instructed the auction house to revise the invoices to indicate that the purchases were being billed to "Amadeo Oluy, Malabo, Guinea Equatorial."  The intermediary

further advised the auction house by e-mail to "Please make sure that [Nguema's] name does not appear anywhere, he should be invisible."

## H.    Nguema Purchased the Defendant Aircraft With the Proceeds of Corruption

117.    In or around 2004, Nguema attempted to purchase a Gulfstream jet in the United States. As set forth below, his initial attempts were rejected by the manufacturer, as well as by an aircraft settlement corporation. Nguema did, however, successfully acquire the Defendant Aircraft in or around June 2006 for $38.5 million. At least $33.8 million, or approximately 90 percent of the purchase price, was wire transferred from Nguema's account at Société Générale of E.G. – the same bank at which Nguema's shell companies, including Somagui, maintained their corporate accounts.

118.    Initially, Nguema sought to divert millions of dollars in E.G. public funds to acquire and pay for a private aircraft. In or around February 2004 for example, Nguema contacted an executive at Ocean Energy, a U.S.-based energy company, and requested that Ocean Energy purchase a C-130 Hercules military transport aircraft from Lockheed Martin for his personal use. A C-130 Hercules transport can cost up to $65 million. Nguema proposed that Ocean Energy purchase the aircraft on his behalf, and that Ocean Energy, in turn, would be paid by the E.G. government. Specifically, Nguema advised Ocean Energy that GE Petrol, E.G.'s state-owned oil company, would compensate Ocean Energy for this transaction. Ocean Energy refused to go along with Nguema's scheme.

119.    During this same time frame, Nguema began negotiating the purchase of a custom-designed Gulfstream G550 with the aircraft's U.S.-based manufacturer, Gulfstream Aerospace Corporation ("Gulfstream"). The list price of the aircraft was approximately $47

million depending on the options; Nguema required an on-board shower at an additional cost of $750,000.

120.    During the negotiations, Nguema advised an executive at Gulfstream that he could and would have Ocean Energy assume responsibility for making payments on a $40 million personal jet that Ocean Energy would acquire on his behalf.  These funds would then be credited against balances owed by Ocean Energy to the Government of E.G.  In this manner, Nguema again represented that he intended to use E.G. public funds to acquire a $40 million personal asset.  Gulfstream refused to go along with Nguema's scheme to use state resources to acquire personal assets.

121.    In early March 2004, Nguema provided a $500,000 check to Gulfstream as a down payment on the plane.  The check, drawn on Nguema's personal account at Riggs Bank, was returned for insufficient funds.  Nguema explained to the Gulfstream representative that unbeknownst to him, Riggs Bank had closed all of its Equatoguinean accounts due to suspicions of embezzlement.

122.    In the months that followed, Nguema wire transferred approximately $20 million from his account at Société Générale of E.G. to an escrow account associated with Gulfstream.

123.    After the publication of the PSI Report in July 2004, however, Gulfstream decided to return Nguema's $20 million.  In fact, the lawyers on both sides of the transaction were so concerned about possible civil or criminal liability as a result of their involvement in returning Nguema's money that they attempted to obtain assurances from the U.S. Department of Justice before doing so.

124.    On July 28, 2005, Gulfstream wire transferred $20 million, plus interest, to Nguema's lawyers in the United States.

125.    Having been unsuccessful in his efforts to purchase a private jet directly from Gulfstream, Nguema sought to purchase the Defendant Aircraft, a used Gulfstream G-V jet, from a private party in early 2006 for $38.5 million.  At the time, the Defendant Aircraft was registered with the Federal Aviation Administration in Oklahoma City.  Wells Fargo Bank Northwest ("Wells Fargo") in Salt Lake City, Utah, served as its United States registered owner.

126.    The seller was Blue Sapphire Services, Ltd. (a British Virgin Islands corporation), which used McAfee & Taft, a United States company headquartered in Oklahoma City, as its escrow agent.

127.    For purposes of the transaction, Nguema formed and used Ebony Shine International Ltd., a company incorporated in either the Cayman Islands or the British Virgin Islands, as the nominal buyer.  Nguema used a United States company, Insured Aircraft Title Services ("IATS") of Oklahoma City, Oklahoma, as an intermediary for a portion of the transaction.

128.    On March 23, 2006, at Nguema's instruction, IATS wire transferred approximately $4.7 million from an account at UBS London, England, to McAfee & Taft's escrow account at Bank of America in Oklahoma City, Oklahoma.  From April 4-7, 2006, Nguema wired a total of $10.3 million from his account at Société Générale of E.G., to the McAfee & Taft escrow account at Bank of America in Oklahoma City, Oklahoma.

129.    Despite having received a total of $15 million toward the purchase price, McAfee & Taft terminated the transaction because Nguema refused to comply with that company's requirements, including a requirement that Nguema identify the source of the funds, provide incorporation documents for Ebony Shine, and list its corporate officers and principals.

38

130.     On April 12, 2006, McAfee & Taft returned a total of $10,299,950.00 to Nguema's personal bank account in E.G., and $4,723,262.22 to IATS's account at UBS London.

131.     Nguema ultimately was able to complete the aircraft purchase by using IATS of Oklahoma City as the escrow agent instead of McAfee & Taft.  Unlike McAfee & Taft, IATS did not require information as to the source of the $38.5 million used by Nguema to buy the Defendant Aircraft.

132.     Between May 9 and June 19, 2006, Nguema wire transferred $33.8 million from his bank account at Société Générale of E.G. to IATS's account at UBS London.  The payments were executed via transactions into and out of correspondent accounts in the United States before arriving at the IATS account at UBS London.  These monies, combined with the $4.7 million in funds that McAfee & Taft returned to IATS, were used to pay the $38.5 million purchase price of the Defendant Aircraft.  Upon payment, Wells Fargo in Salt Lake City transferred its right, title, and interest in the Defendant Aircraft to Ebony Shine.  IATS then divided the $38.5 million among five parties, utilizing various United States bank accounts in the process.

133.     Not only did the Defendant Aircraft cost Nguema almost 400 times his annual salary as an Equatoguinean public servant, but the transaction took place in or around the time that he was reaping a personal windfall by extorting companies doing business in E.G., accepting bribes, and using the E.G. public fisc for his personal benefit by embezzling and misappropriating public funds.  At the same time, Nguema was using shell companies to conceal his conduct and mask the true source of his illicitly acquired assets.  Among these shell companies was Somagui which, among other things, treated Nguema to a personal profit of $186 million between late 2004 and mid-2006 for its role in the Ebebiyin-Mongomo Highway project.

## FIRST CLAIM FOR FORFEITURE

134.    All statements and averments made in paragraphs 1 through 133 are re-alleged and incorporated, herein, by reference.

135.    Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States.

136.    "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(B)(ii) and (iv) to include, among other things, an offense against a foreign nation involving "extortion," or the "misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official."

137.    At all times relevant to this complaint, extortion, bribery of a public official, and misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, as set forth in 18 U.S.C. §§ 1956(c)(7)(B(ii) and (iv), constituted violations of E.G. law, including, but not limited to, the following provisions of the Spanish Penal Code of 1968, which remain in effect in E.G.: Article 196 (expropriation of assets by a public official); Article 198 (taking advantage of official position to exercise a profession directly related to scope of official duties); Article 385 (public official who demands or accepts a bribe to perform a crime); Article 386 (public official who demands or accepts a bribe to perform an unjust act); Article 390 (public official who receives improper gifts), Article 394 (public official who steals public funds); Article 396 (public official who embezzles funds under his care); Article 401 (public official who has a financial stake in any business regulated by his office); and Article 514 (theft).

138.    As set forth above, the funds used to purchase the Defendant Aircraft were derived from or are traceable to extortion, bribery of a public official, or the misappropriation,

theft, or embezzlement of public funds by or for the benefit of a public official, in violation of the laws of E.G.

139.    Therefore, the Defendant Aircraft is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), on the grounds that it constitutes or is derived from proceeds traceable to a specified unlawful activity.

## SECOND CLAIM FOR FORFEITURE

140.    All statements and averments made in paragraphs 1 through 133 are re-alleged and incorporated, herein, by reference.

141.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section . . . 1957 . . . of [title 18, United States Code], or any property traceable to such property," is subject to forfeiture to the United States.

142.    18 U.S.C. § 1957 imposes a criminal penalty on any person who:

> knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

143.    For purposes of Section 1957, the term "specified unlawful activity" has the same meaning as set forth in paragraphs 136 through 137 above.

144.    The Defendant Aircraft is the subject of or traceable to monetary transactions or attempted transactions affecting interstate or foreign commerce involving property of a value greater than $10,000 derived from "specified unlawful activity" that is, extortion, bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, in violation of the laws of E.G., as set forth above.

145.    Such transactions or attempted transactions were conducted with the knowledge that the property involved was criminally derived.

146.    Therefore, the Defendant Aircraft is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), on the grounds that it was involved in transactions or attempted transactions in violation of 18 U.S.C. § 1957, or is traceable to such property.

### THIRD CLAIM FOR FORFEITURE

147.    All statements and averments made in paragraphs 1 through 133 are re-alleged and incorporated, herein, by reference.

148.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 . . . of [title 18, United States Code], or any property traceable to such property," is subject to forfeiture to the United States.

149.    18 U.S.C. § 1956(a)(1) imposes a criminal penalty on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
> . . .
>
> (B) knowing that the transaction is designed in whole or in part –
>
> > (i)    to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

150.    For purposes of Section 1956, the term "specified unlawful activity" has the same meaning as set forth in paragraphs 136 through 137 above.

151.    As set forth above, the Defendant Aircraft is the subject of or otherwise traceable to financial transactions or attempted financial transactions affecting interstate or foreign commerce involving the proceeds of "specified unlawful activity," that is, extortion, bribery of a

public official, or the misappropriation, theft, or embezzlement of public funds by or for the

benefit of a public official, in violation of the laws of E.G., as set forth above.

152.    Such transactions or attempted transactions were conducted with the knowledge

that the property involved represented the proceeds of some form of unlawful activity, and

knowing that such transactions were designed in whole or in part to conceal or disguise the

source, ownership, or control of the proceeds of specified unlawful activity.

153.    Therefore, the Defendant Aircraft is subject to forfeiture to the United States

pursuant to 18 U.S.C. § 981(a)(1)(A), on the grounds that it was involved in transactions or

attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i), or is traceable to such

property.

**WHEREFORE,** Plaintiff United States of America prays that, pursuant to law, notice be

provided to all interested parties to appear and show cause why forfeiture of the Defendant

Aircraft should not be decreed; that judgment be entered in favor of the United States and against

the Defendant Aircraft; that the Defendant Aircraft be condemned as forfeited to the United

States of America; and for such other relief as this Court may deem just, necessary and proper,

together with the costs and disbursements of this action.

Respectfully submitted,

DATED: June 17 , 2013          JAIKUMAR RAMASWAMY, Chief
                               LINDA SAMUEL, Deputy Chief (D.C. Bar No. 388970)
                               DANIEL H. CLAMAN, Assistant Deputy Chief
                               ASSET FORFEITURE AND MONEY
                                   LAUNDERING SECTION, Criminal Division


                               _____
                               STEPHEN A. GIBBONS (D.C. Bar No. 493719)
                               WOO S. LEE (D.C. Bar No. 486004)
                               Trial Attorney

Criminal Division
United States Department of Justice

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**VERIFICATION**

I, Robert Manzanares, hereby verify and declare under penalty of perjury that I am a

Special Agent with Homeland Security Investigations, that I have read the foregoing Verified

First Amended Complaint for Forfeiture *In Rem* and know the contents thereof, and that the

matters contained in the Verified First Amended Complaint are true to the best of my knowledge

and belief.

The sources of my knowledge and information and the grounds of my belief are official

files and records of the United States, publicly available files and historical information, files and

records compiled by the Senate Permanent Subcommittee on Investigations, information

supplied to me by other law enforcement officers, experts, and other witnesses, as well as my

investigation in this case, together with others, as a Special Agent of Homeland Security

Investigations.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of June 2013, at Miami, Florida.

ROBERT MANZANARES
Special Agent
Homeland Security Investigations

45