# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 11-3582-GW(SSx) | Date | June 20, 2013 |
| Title | *United States of America v. One White Crystal Covered Bad Tour Glove and Other Michael Jackson Memorabilia* | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Wil Wilcox | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:

Woo Lee, US DOJ
Stephen A. Gibbons, USDOJ
Steven R. Welk, AUSA

Attorneys Present for Defendants:

Duane R. Lyons
Brian M. Wheeler

**PROCEEDINGS:**    **CLAIMANTS' MOTION FOR SUMMARY JUDGMENT ON THE LIMITED ISSUE OF PROBABLE CAUSE; OR, IN THE ALTERNATIVE, ORDER FINDING THE GOVERNMENT LACKED PROBABLE CAUSE AT THE TIME IT INSTITUTED THE ACTION FOR FORFEITURE IN REM (filed 03/15/13)**

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. Government will file a supplemental brief by July 11, 2013. Claimants' response will be due on or before July 31, 2013. Government's Reply, if any, will be filed by August 9, 2013. Claimants' motion is continued to **August 19, 2013 at 8:30 a.m.**

: 30

Exhibit 7    Initials of Preparer    JG
Page 55

*United States of America v. One White Crystal Covered Bad Tour Glove and Other Michael Jackson Memorabilia*, Case No. CV-11-3582 – Tentative Ruling on Claimants' Motion for Summary Judgment on the Limited Issue of Probable Cause or, in the Alternative, Order Finding the Government Lacked Probable Cause at the Time It Instituted the Action for Forfeiture *In Rem*

## I. Background

Plaintiff United States of America ("the Government") alleges that Teodoro Nguema Obiang Mangue ("Nguema" or "Claimant"), the son of the president of the West African country of Equatorial Guinea ("EG"), and now a Vice President of that country, has purchased real property and luxury items such as the named defendants in rem herein (collectively the "Defendant Assets"), using funds derived from activities that are illegal under EG law. *See generally* Second Amended Complaint ("SAC"), Docket No. 50. Specifically, the Government alleges that Claimant is a corrupt public official, whose "extortion, bribery and the misappropriation of funds" allowed him to amass "tens of millions of dollars of . . . proceeds" that were "laundered in this district by Nguema through a web of shell companies in American banks." Docket No. 84 at 1:1-5. The Government also alleges that Claimant engaged in bank fraud in this country. *See generally* SAC. As such, the Government has instituted forfeiture in rem proceedings over the Defendant Assets. *See generally* SAC. Nothing before the Court indicates that Nguema has been charged with any crime in EG, nor that he has been convicted of any crime in the United States. Presently before the Court is Claimant's Motion for Summary Judgment on the Limited Issue of Probable Cause or, in the Alternative, Order Finding the Government Lacked Probable Cause at the Time It Instituted the Action for Forfeiture *In Rem* ("Motion"). Docket No. 78. Claimant argues that the Government did not have probable cause to seize his assets at the time the initial complaint in this case was filed, April 28, 2011. *See generally id.*; Compl., Docket No. 1. Because the Court generally agrees, it would GRANT his Motion, except as to the bank fraud issue.

## II. Legal Standard

### A. Summary Judgment

Summary judgment shall be granted when a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In other words, summary judgment should be entered "against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798-99 (9th Cir. 2010) (internal quotation marks omitted).

A moving party without the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and citing *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) (holding that the *Celotex* "showing" can be made by "pointing out – through argument – the absence of evidence to support plaintiff's claim")).

It is not enough for a party opposing summary judgment to "rest on mere allegations or denials of his pleadings." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 259 (1986). Instead, the nonmoving party must go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 325.

"In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.1997). Speculative testimony in affidavits and motion papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). As the Supreme Court has stated, "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

It is not the court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Counsel has an obligation to lay out their supportive evidence clearly. The Court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001)

## B. Forfeiture Actions

In a forfeiture action, the Government has the burden of proving that, at the time it instituted its suit, it had probable cause. *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1169 (9th Cir. 2008); 19 U.S.C. § 1615.

The Ninth Circuit has explained this burden in the following way:

> The government has probable cause to institute a forfeiture action when it has reasonable grounds to believe that the property was related to [a Specified Unlawful Activity ("SUA")], supported by less than prima facie proof but more than mere suspicion. It may be based only upon information gathered before the forfeiture action was instituted.

*United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942, 949 (9th Cir. 2010). "The Government may establish probable cause by relying on 'otherwise inadmissible hearsay' because '[t]he question of probable cause depends not upon the admissibility of the evidence upon which the government relies but only upon the legal sufficiency and reliability of the evidence.'" *United States v. $405,089.23 U.S. Currency*, 122 F.3d 1285, 1289 (9th Cir. 1997) (citation omitted). "Probable cause to believe that the property is involved in some illegal activity is not enough – the government must have probable cause to believe that the property is involved in the activity subject to the specific forfeiture statute it invokes." *Id.* (internal quotation marks and citations omitted). Information from an informant may supply probable cause, "so long as the informant's statement is reasonably corroborated." *Illinois v. Gates*, 462 U.S. 213, 242 (1983). Corroborating information need not be innocent or guilty, because "[i]n making a determination of probable cause the relevant inquiry is . . . the degree of suspicion that attaches to particular types of non-criminal acts. *Id.* at 245 n.13. Probable cause should be determined based on the "totality of the circumstances." *Id.* at 230.

The parties dispute whether the Government is required to show it had probable cause at the time of the initial complaint, filed on April 28, 2011, Docket No. 1, or whether the Government was required to have probable cause at the time it filed the operative complaint, the SAC. However, under the operative statute, "probable cause shall be *first* shown for the institution of such suit or action . . . [emphasis added]." 19 U.S.C. § 1615 ("section 1615" or "§ 1615"). The parties' dispute, thus, turns on when this action was instituted.

It seems that at one point the Government agreed that it ultimately needed to show probable cause at the time this case was initially filed, not at the time it filed the SAC:

3

Exhibit 7
Page 58

> **THE COURT**: If at some point in time in the future it's determined conclusively that they did not have that evidence at the time the matter was initially filed, then I think they will concede that deficiency might tank some or all of their case.
> . . . Does the government disagree that if it did not have the evidence at the time that the forfeiture matter was filed, that they cannot argue it later on?
> **MR. LEE**: No, Your Honor. *There's no dispute as to the 1615 probable cause requirement.* But the case Mr. Lyons has cited is a motion for summary judgment, which is exactly what Your Honor pointed out in the tentative. This should be raised – in that case it was raised at the close of discovery by claimant on a motion for summary judgment. The claimants are free to do that, Your Honor. It's not a pleading stage issue. We're in agreement with the Court.

Reporter's Transcript ("RT") 9/7/12 at 6:10-13, 7:3-13 (emphasis added), Docket No. 69. The Government, though, has changed its position.[1] In deciding whether "section 1615 only requires [the Government] to show probable cause as of the time of trial," the Ninth Circuit interpreted the plain meaning of the statute, and in so doing, though in dicta, addressed the exact issue before the Court:

> Whether probable cause exists to institute proceedings is solely a question of what information is in the government's possession; even if the government were to amend its pleadings to include new evidence, the amendment could not change the historical fact that the government did not have probable cause at the time it brought the case. While a subsequent amendment might cure a violation of the pleading-with-particularity requirement in Supplemental Rule E(2)(a), it would stretch the concept of "relation back" too far to say that an amendment of pleadings can turn back time and make probable cause exist on a date when it did not. Civil forfeiture proceedings are already rooted in one

---

[1] Claimant makes a glancing judicial estoppel argument, without analyzing the below factors, stating that the Government should not now be allowed to change its position. Docket No. 94 at 5:16-26. The Ninth Circuit has emphasized three factors in determining whether judicial estoppel applies: (1) the "party's later position must be clearly inconsistent with its earlier position;" (2) the party "succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782-83 (9th Cir. 2001). Here judicial estoppel is improper. The Government's above statement was made at a motion to dismiss stage, and as the Court pointed out, that was not the stage to engage in fact-finding to determine what facts the Government had and when. *See* Docket No. 68-1 at 12 ("While Claimant cites *$493,850.00* for the notion that after-acquired evidence cannot be used to prove probable cause, determining whether the Government had probable cause to institute this action is a question for trial."). Because the issues are fundamentally different, judicial estoppel is unwarranted. *See Hamilton*, 270 F.3d at 782-83.

legal fiction; there is no justification for adding another, more tenuous legal fiction to the mix.

*United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1068 (9th Cir. 1994).[2] Although Congress later passed the Civil Asset Forfeiture Reform Act ("CAFRA"), the Ninth Circuit has held that CAFRA did not change the requirement that the Government must have probable cause at the time it institutes a forfeiture action. *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1169 (9th Cir. 2008) (holding that "[r]equiring the government to show probable cause before instituting a forfeiture action is consistent with this intent because it provides an additional procedural protection")[3]; *United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942, 949 (9th Cir. 2010).[4] Indeed, "[i]n enacting CAFRA, Congress intended to institute stronger procedural safeguards before the government could forfeit property." *$493,850.00 in U.S. Currency*, 518 F.3d at 1169.

The Government argues that, regarding probable cause, the Court should only look to the facts the Government had at the time the SAC was filed because courts disregard prior pleadings once there is a new operative complaint. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir.

---

[2] The Government attempts to distinguish *$191,910.00 in U.S. Currency*. Docket No. 84 at 8:13-10:17. Principally, the Government argues that the instant case involves no "legal gamesmanship or technical amendments." *Id.* at 9:22. However, it is unclear what legal gamesmanship or technical amendments were involved in *$191,910.00 in U.S. Currency*. Rather, in *$191,910.00 in U.S. Currency* the Ninth Circuit merely stated that its holding would not cause "legal gamesmanship or technical amendments," because "the government must *have* probable cause at the time it institutes forfeiture proceedings, not merely *plead* probable cause." *$191,910.00 in U.S. Currency*, 16 F.3d at 1068 (9th Cir. 1994) (emphasis in original).

[3] The Ninth Circuit in *$493,850.00* distinguished between having enough evidence to establish forfeitability of the seized res at the time of the filing of the action and having sufficient evidence to establish probable cause of forfeitability at that time. Specifically, the Circuit stated:
> CAFRA provides that "[n]o complaint may be dismissed on the ground that the Government did not have *adequate evidence at the time the complaint was filed to establish the forfeitability of the property*." 18 U.S.C. § 983(a)(3)(D) (emphasis added). Post-CAFRA, establishing the forfeitability of property is distinct from having probable cause to institute the forfeiture action. *See* Smith, *supra*, § 11.03[6] (arguing that if Congress meant to eliminate the probable cause requirement, it would have stated, "[n]o complaint may be dismissed on the ground that the government did not have *probable cause at the time the complaint was filed*"). The former requirement describes the government's burden at trial to prove entitlement to the property by presenting proof, by a preponderance of the evidence, of a substantial connection between the property and the offense. 18 U.S.C. § 983(c). The latter requirement describes the government's burden to get in the courthouse door by presenting evidence that, at the time it filed the complaint, it had "'reasonable grounds to believe that the property was related to an illegal drug transaction, supported by less than prima facie proof but more than mere suspicion.'" *United States v. One Parcel of Real Prop.*, 904 F.2d 487, 490-91 (9th Cir. 1990).

518 F.3d at 1167-68.

[4] The Government does not argue that CAFRA changed the probable cause requirement.

1992) ("[A]fter amendment the original pleading no longer performs any function and is treated thereafter as non-existent.") (internal quotation marks and citation omitted). While this general rule is correct as a matter of procedural law as to pleading, it is not applicable to the instant issue, which is when must the Government show it had probable cause, not what complaint is operable. For the reasons discussed, the holdings in *$191,910.00* and *$493,850.00* contravene any notion that the Government can simply get an extension on showing probable cause by filing a new complaint. Indeed, the purpose behind requiring the Government to show that it had probable caused at the time it instituted the action would be turned on its head if probable cause could be measured at the time of a later amended complaint. As the Ninth Circuit stated in *$191,910.00 in U.S. Currency*, its holding meant to deter "government agents [who] might be tempted to bring proceedings (and thereby seize property) on the basis of mere suspicion or even enmity and then engage in a fishing expedition to discover whether probable cause exists." 16 F.3d at 1067.[5]

### III. Analysis

The Court's Tentative Ruling on Claimant's Motion to Dismiss the Second Amended Complaint describes the Government's four bases for forfeiture of the Defendant Assets:

---

[5] The Government claims that other cases have reviewed whether the Government had probable cause at the time of the operable complaint. Principally, the Government relies on *United States v. $6,190.00 in U.S. Currency*, but the claimant in that case did not challenge the forfeiture on probable cause grounds, but on subject matter jurisdiction grounds. 581 F.3d 881 at 885. The discussion of probable cause, in addition to being dicta, is conclusory:

> Second, Lam claims that the indictment in his federal proceeding does not allege a crime under § 1324 and therefore cannot serve as a basis for subject matter jurisdiction in his civil forfeiture proceeding. We do not need to decide whether the indictment is deficient. Jurisdiction over civil forfeiture actions brought under 28 U.S.C. § 1355 is not premised on a federal indictment, but rather on a violation of an Act of Congress. To bring a civil forfeiture proceeding under § 1355, the government is required only to show probable cause that the assets in question are traceable to a violation of an Act of Congress. The district court properly held that the government's complaint, accompanied by the affidavit of Special Agent Watson, met this requirement.

*Id.* at 885. Additionally, the Government relies on *United States v. $13,391.00*, in which the district court seemed to assume that probable cause was measured at the time the operative complaint was filed. No. CV 07-00339DAE-BMK, 2010 U.S. Dist. LEXIS 36831, at *14 (D. Haw. Apr. 14, 2010). That court noted the date of the First Amended Complaint and decided that evidence procured after it could not be used to demonstrate probable cause. *Id.* However, in that case the original complaint was filed on June 20, 2007, and the First Amended Complaint was filed on July 16, 2007. *Id.* at *5. All of the evidence excluded (interrogatory answers from September 2007 and a conviction from 2009) would have been excluded regardless of whether probable cause had to be shown when the first complaint was filed or when the operable complaint was filed. *Id.* at *14. The Government also string cites several other cases, but only two are from within this Circuit. Docket No. 84 at 8:8-12. One of these was a motion to dismiss and the other was a motion for judgment on the pleadings, and neither of them actually analyzed (as opposed to assuming) the timing issue before this Court. *Return of Seized Prop. v. United States*, 625 F. Supp. 2d 949, 952-53 (C.D. Cal. 2009); *United States v. Funds Representing Proceeds of Drug Trafficking in Amount of $75,868.62*, 52 F. Supp. 2d 1160, 1163-64 (C.D. Cal. 1999).

> First, the Government asserts that the Defendant Assets are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), which renders property subject to forfeiture if it "constitutes or is derived from proceeds traceable" to a specified unlawful activity ("SUA"), defined in 18 U.S.C. § 1956(c)(7) to include foreign offenses such as extortion or "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official." *See* SAC ¶¶ 12, 235-240. In other words, the first basis alleges that Nguema committed extortion and misappropriation/theft/embezzlement abroad and the Defendant Assets are traceable to the proceeds of those activities.
>
> The second asserted basis for forfeiture arises under 18 U.S.C. § 981(a)(l)(A), which renders property subject to forfeiture if it is "involved in a transaction" that itself violates 18 U.S.C. § 1957, which prohibits transactions over $10,000 using funds that are the proceeds of foreign acts of extortion, misappropriation/theft/embezzlement, foreign offenses involving bribery of a public official, or domestic bank fraud. *See* ¶¶ 13, 241-257. In other words, the second basis alleges that Nguema committed extortion, is appropriation/theft/embezzlement, foreign offenses involving bribery of a public official, and/or domestic bank fraud, and the Defendant Assets are traceable to transactions using the proceeds of those activities in an amount over $10,000.
>
> The third asserted basis for forfeiture also arises under 18 U.S.C. § 981(a)(l)(A), which renders property subject to forfeiture if it is the subject of a financial transaction that involved the proceeds of an SUA by one knowing that the transaction was designed to mask the source of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B). *See* SAC ¶¶ 14, 248-255. In other words, the third basis alleges that Nguema knew that the purchases of the Defendant Assets were made using proceeds of an SUA and knew that the transactions were structured so as to conceal his identity.
>
> The fourth asserted basis for forfeiture, newly pled in the SAC, also arises under 18 U.S.C. § 981(a)(l)(A), which renders property subject to forfeiture if it is involved in a transaction which itself violates 18 U.S.C. § 1956(a)(1)(A)(i), which prohibits transactions that use the proceeds of unlawful activities with the intent to promote bank fraud. *See* SAC ¶¶ 15, 256-262. In other words, the fourth basis alleges that the Defendant Assets were involved in transactions that constituted bank fraud.

Docket No. 68-1 at 2-3. Thus, the first three bases are premised on Claimant's violating EG law. Although the parties have explained almost nothing about that country's laws, for purposes of this Motion only, the Court will, unless otherwise stated, presume that the Government's view of EG law is correct. Even under such a presumption, though, summary judgment on the first three

bases is still warranted.[6]

### A. The Government's First Three Bases for Forfeiture

Claimant's interrogatories asked the Government:

> State all facts that were in YOUR possession on or before April 28, 2011, which YOU contend support probable cause for forfeiture of each of the DEFENDANT ASSETS, and IDENTIFY (a) the date YOU first became aware of such facts; (b) all sources of such facts; (c) all PERSONS with knowledge of such facts; and (d) all DOCUMENTS that REFER OR RELATE TO such facts.

Wheeler Decl. Ex. 2 at 5:10-13, Docket No. 79. Regarding the first through third bases for forfeiture, the Government's claims rely heavily on evidence that Claimant engaged in various

---

[6] What follows is a brief explanation of the nature of the Court's uncertainty of EG law. The Government provided a copy of the EG statutes that Claimant is accused of violating. SAC, Attachment C, Docket No. 50. Most of these prohibit acts of corruption on the part of public officials. For example, Article 131 of the Penal Code of EG states: "Any public official who, abusing his position, compromises the dignity or the interests of the Spanish Nation in a manner not included in this chapter shall be punished with long-term imprisonment and debarment." *Id.* To American eyes, this language seems clear, and would seem to prohibit, for example, a public official from making sweetheart contractual deals with the government. However, the Government's own evidence indicates that such deals are legal in EG:

> We have no way of judging the actual level, if any, of Teodorin's corruption and note that at least some of the repetitive media and NGO coverage is extremely tendentious . . . . [A]s the IMF recently advised us, much of the corruption in Equatorial Guinea is indeed not outright theft or looting of the country's treasury but rather in murkier transactions such as sweetheart deals, influence peddling, construction contracts and finder's fees — all of which are legal in Equatorial Guinea.

Graff Decl. Ex. 14 ¶ 7, Docket No. 91-18. Much of the EG violations the Government accuses Claimant of would seem to fit into the category the State Department said was legal. *See, e.g.*, Docket No. 84 at 22:11-21 (accusing him of taking kickbacks from timber companies to allow them access to the country's forests); Government's Statement of Genuine Issues ¶ 6, Docket No. 84-1 (asserting that claimant misappropriated funds because he benefitted from Government contracts that he received while being a cabinet minister).

The Court is aware of no good sources of EG law. Moreover, the nature of EG law is murkier because that country has not charged Claimant with violating its laws. Docket No. 68-1 (discussing this concern).

In light of the above, should the Government convince the Court at oral argument that summary judgment is improper, the Court would ask for supplemental briefing according to the following plan. The Government should provide the Court with a chart. That chart should list every fact upon which it believes shows that it had probable cause to institute this action on April 28, 2011. Where relevant, every fact listed should also cite to the specific provision of the EG Penal Code that that the fact evidences a violation. These facts should include a citation to the precise (*i.e.* including page number) location in the record where they can be found, and a citation indicating that the Government possessed the fact as of April 28, 2011. The Government may also file a supplemental brief of ten pages or less, explaining its argument that Claimant violated EG law. Claimant may then file a supplemental opposition of ten pages. Chartering the waters of EG law – something the Court is, frankly, ill-equipped to do – was unanticipated at the motion to dismiss stage. Should Claimant have any argument that, at this stage, this case may be dismissed for any prudential reasons, he may make it in his supplemental opposition. Should he make such an argument, it should be no longer than ten pages – making the total supplemental opposition twenty pages or less. If, and only if, Claimant makes such an argument, the Government may respond with a supplemental reply brief of no more than ten pages. Finally, the parties should represent whether they believe the Court should hold a Fed R. Civ. P. 41.1 hearing in determining the issues of EG law.

acts of political corruption. *See generally* Docket No. 84 at 20:15-22:21. The Court will examine each piece of evidence that the Government had on April 28, 2011 and is mentioned in the Government's Opposition brief in turn.[7]

The Government states that it received information from Italian law enforcement that Claimant "controlled a network of bank accounts that were 'funded with [EG public] revenues stolen by' Claimant and his father through GW [General Work, S.A., an EG construction firm]." Docket No. 84 at 20:15-21:15 (citing Exhibit 24-27 to the Manzanares Declaration, Docket Nos. 87-4, 88-1 – 88-3, but not to any page numbers in the Exhibits, which collectively total 111 pages). The Government's strategy of making a broad, generalized allegation, and then supporting it by dumping a plethora documents on the Court does not come close to meeting its burden on summary judgment. *See Keenan*, 91 F.3d at 1279 (holding that the district court does not have to "scour the record"). Perhaps credible evidence exists in these documents, but it is the Government's job to explain it to the Court.[8]

The Government, then, generally claims that it corroborated Italian law enforcements

---

[7] Cent Dist. L.R. 7-9 required the Government's Opposition brief to include all points on which its argument relies. The Court is not required to "scour the record" to analyze any other evidence. *Keenan*, 91 F.3d at 1279. The Court notes that the Government's Statement of Genuine Issues is generally unhelpful. Docket No. 84-1. The document does not segregate the facts that were learned before April 28, 2011 from those that were learned after. *See generally id.* Additionally, the document almost never cites specific page numbers, with one notable exception: Exhibit 1 to the Manzanares Declaration. Docket No. 86-1. Most importantly, Exhibit 1 includes the Government's response to Claimant's interrogatory concerning the evidence that was in the Government's possession as of April 28, 2011. However, the Government supports its response with unclear citations to vast portions of the record. For example, in the section titled "Nguema's Abuse and Manipulation of Public Infrastructure Contracts to Misappropriate Public Funds," the Government purports to quote from various evidence, but only provides a string cite at the end of the section. Manzanares Decl. Ex. 1 at 48:10-50:14, Docket No. 86-1. Based on the pagination cited, the Government appears to cite to hundreds of pages from the record. *Id.* at 50:9-14. What's more, it is unclear what exhibits the pages refer to. *See id.* In this case, the Government submitted over a hundred exhibits, with more than sixty being attached to the Manzanares Declaration. Again, the Court is not required to "scour the record" on the Government's behalf. *Keenan*, 91 F.3d at 1279. Making the Government's Statement of Genuine Issues even less valuable is that they are not cited in its opposition brief. *See generally* Docket No. 84.

[8] By contrast, there is some indication that Italian authorities did not provide the Government with credible evidence. For example, the Government states that, "Italy's analysis of that evidence concluded that 45% of GW's construction revenue was diverted as kickbacks to Nguema's bank accounts in Switzerland, Luxembourg and Monaco." Docket No. 84 at 21: 4-6. The Government provides no citation after this sentence, but the next sentence, which is related in subject matter, cites to Exhibits 25A and 25 of the Manzanares declaration. Exhibit 25A is an English translation of Exhibit 25, and is 63 pages. Manzanares Decl. ¶¶ 29-30, Ex. 25-A, Docket No. 88-1. By contrast, Claimant cites to a precise page number from a report of the agents who traveled to meet with Italian law enforcement. Contrary to the Government's unsupported statement discussed above, the report states: "GDF [Italian law enforcement] *speculates* that Obiang received forty-five percent of all general contracting projects which were preformed [sic] by GW." Manzanares Decl. Ex. 24 at 317, Docket No. 87-4. Additionally, it appears that the 45% figure came from a newspaper article, and no party has specifically cited to any evidence that either Italian or American law enforcement corroborated this article's allegations. *Id.* Ex. 25A at 3857.

findings, and cites another 5 exhibits, without page numbers for this proposition. Docket No. 84 at 21:8-12 (citing Graff Decl. Exs 5-6B (though 5A does not appear to have been submitted), Docket Nos. 91-5 – 91-8. These corroborating exhibits total another 27 pages. Again, it is not the Court's duty to perform document review for the Government. *See Keenan*, 91 F.3d at 1279. The Government, then, cites something specific – a letter purportedly from a regional Vice President of Gulfstream indicating that Claimant wanted to purchase a Gulfstream 550 jet, but that he was interested in assigning the Sales Agreement to Ocean Energy in Houston, Texas. Graf Decl. Ex. 6A, Docket No. 91-7. The letter, then, states that, "in return, the [EG] Government would issue a Credit Memorandum to Ocean Energy." *Id.* There are two problems with this evidence. First, the Government's report of its meeting with the Gulfstream Vice President indicates that Claimant's suggestion to use Ocean Energy was a "react[ion] to Gulfstream's pressure [to provide payment, and Claimant] was grasping for a solution." Graff Decl. Ex. 6A at 126. The Gulfstream V.P. never contacted Ocean Energy, and he "concluded the transfer was a legitimate transaction and nothing in the transaction has given him any cause for alarm." *Id.* at 125. Second, as the Government concedes, the Ocean Energy was never used to purchase the Gulfstream jet. Docket No. 84 at 21:17-22:2. At best, then, the Government has presented evidence of an attempted misuse of EG assets. As the Tentative for Claimant's second motion to dismiss noted, evidence of an attempted misuse goes some distance to establish probable cause, but by itself it cannot. Docket No. 68-1 at 5-6 n.5. For similar reasons, the Government's purported evidence that Claimant's "attempt to extort a U.K. company that planned to build a hotel in EG" also is insufficient. Docket No. 84 at 22:5-11.

    The Government cites a State Department cable for the proposition that Claimant earned a "windfall" by permitting an Malaysian company to "clear-cut, transport[] and ship[] whole logs to Asian markets." Docket No. 84 at 22:17-19 (citing, but without any page numbers, Graff Decl. Ex. 15, Docket No. 91-19). The Government quotes selectively from this document, as the State Department indicated that Claimant's actions were legal. Graff Decl. Ex. 15 ¶ 9 (noting that such actions were later made illegal).

    The Government also cites page 1058 of Exhibit 16 from the Graft Declaration as evidencing that timber companies bribed Claimant "in order to be able to operate." Docket No. 84 at 22:11-13; Docket No. 91-20. Exhibit 16 is a report by Global Witness, an organization the Court has been told nothing about. Global Witness claims that an unnamed U.S. intelligence

officer stated that Claimant took bribes, and the organization also states that the Department of Justice's documents corroborated this officer's account. Graft Decl. Ex. 16 at 1058. Global Witness does not cite which DOJ documents corroborate the unnamed individual, nor does the Government provide these documents to the Court. *See id.* An unknown informant's information cannot be corroborated by unknown means. *See Gates*, 462 U.S. at 242 (holding that an informant's information may help establish probable cause "so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.")[9]

The Government also presents evidence that Walter International, an oil company, paid for $50,000 in expenses that Claimant incurred while at Pepperdine in 1991. (Docket No. 84 at 22:20-21 (citing, without providing a page number, Manzanares Decl. Ex. 4, Docket No. 86-4). However, it does not appear Claimant was a public official at this time. The SAC's first mention of him taking public office is in 1998. SAC ¶ 45. Thus, it is unclear how this act could relate to him breaking any of the EG laws that the Government accuses him of breaking. The Government provides no explanation. Illegality aside, it is difficult to understand how this $50,000, from 1991 has any nexus to the items seized twenty years later. *$405,089.23 U.S. Currency*, 122 F.3d at 1289 (9th Cir. 1997) (citation omitted) ("Probable cause to believe that the property is involved in some illegal activity is not enough – the government must have probable cause to believe that the property is involved in the activity subject to the specific forfeiture statute it invokes."); *see also United States v. Grant*, 682 F.3d 827, 835 (9th Cir. 2012) (finding there was no probable cause on staleness grounds where a nine-month gap between offense and warrant application failed to show "the property to be seized was known to be at the place to be searched so recently as to justify the belief that the property is still there at the time of the issuance of the search warrant").

The Government suggests that the fact that law enforcement in France was investigating Claimant for laundering public funds helps establish probable cause. Docket No. 84 at 25:3-14. However, the Government has given the Court no information about the French investigation, aside from its conclusion that Claimant engaged in money laundering. *See* Manzanares Decl., Ex. 1 at 101:3-25, Docket No. 86-1. However, probable cause is a fact-oriented inquiry. *See*

---

[9] For this same reason, the Government's reliance on a news article, written by an individual who has not submitted an affidavit before the court and claiming some anonymous timber executives stated that Claimant "would call meetings of other timber company managers and collect extortion money from them," is insufficient. Docket No. 84 at 22:13-14 (citing Graff Decl. Ex. 27, Docket No. 91-32) It is unclear what the Government, or even the reporter, did to confirm this anonymous informant's information. Graff Decl. Ex. 27 at 840-41.

*Gates*, 462 U.S. at 230 (holding that probable cause requires a "totality of the circumstances" analysis). Additionally, the Government has not provided a copy of any French investigative report, or at least the Government has not cited to one. The lack of factual details about the French investigation separates this case from the Ninth Circuit precedent the Government relies on, *i.e. $493,850.00* 518, F.3d at 1169-70. In that case another agency's investigation was given weight in establishing probable cause because of the facts that it provided law enforcement with. *See id.* at 1169 (emphasizing that the other investigation provided evidence that the "the truck at issue during that investigation" was "link[ed] . . . with cocaine traffickers.")

The other purported evidence that Claimant engaged in SUAs in EG would only have been meaningful if the Government's direct evidence of corruption, discussed above, were not defective. The Government purports to provide evidence that Claimant failed to explain the source of his wealth, that he had shell companies to conceal assets, and that he had large sums of cash – each of which will be discussed individually in the following paragraphs. *See generally* Docket No. 84 at 22:22-25:14. In *$493,850.00* the Ninth Circuit found circumstantial evidence to support probable cause in a forfeiture case. 518 F.3d at 1169-70. However, the circumstantial evidence in that case was much stronger. *See id.*[10] Here, the Government's presentation of circumstantial evidence may suggest that Claimant possibly engaged in illegal activities. However, it scarcely indicates that he was involved in the type of political corruption that is the basis of this forfeiture action. "Probable cause to believe that the property is involved in some illegal activity is not enough – the government must have probable cause to believe that the property is involved in the activity subject to the specific forfeiture statute it invokes." *$405,089.23 U.S. Currency*, 122 F.3d at 1289 (citation omitted).

Citing a district court's order, the Government argues that Claimant's failure to explain the source of his wealth "speaks volumes." Docket No. 84 at 24:12-14 (quoting *United States v. $223,178.00 in Bank Account Funds*, No. SACV06-444 DOC, 2008 U.S. Dist. LEXIS 37978, at

---

[10] The Government had evidence that:
    (1) Camacho was driving a 1993 Ford F–350 truck with Florida license plates in Arizona; (2) Camacho and Bruno provided slightly inconsistent stories; (3) the truck smelled strongly of air freshener; and (4) in McFarland's experience, suspects often used strong air freshener to cover the smell of narcotics. Prior to November 26, 2003, the government also legally gathered evidence that: (1) Camacho was the subject of an ongoing DEA investigation in Miami and (2) DEA agents had observed the truck at issue during that investigation.

*Id.* at 1169. The Miami investigation also "link[ed] Camacho and his truck with cocaine traffickers." *Id.*

*20 (C.D. Cal. Apr. 30, 2008). However, that case dealt with a claimant who failed to provide evidence that the court's tentative explicitly called for. *Id.* By contrast, in this case, the Government only purports to provide evidence that Claimant did not offer information about his wealth to non-court entities that requested it. Regardless, the Government has not met its evidentiary burden on summary judgment. It cites 26-pages of evidence for its claim that Claimant refused to provide various information to banks about the source of his wealth. The Government should have cited to specific pages, and the Court will not "scour the record" on its behalf. *See Keenan*, 91 F.3d at 1279. Regardless, one of the exhibits the Government cites is a declaration from Claimant stating that one of his two companies was the source of his funds. Manzanares Decl. Ex. 56 ¶ 3, Docket No. 89-11. The Government does not specifically cite, with a page number, to any pre-April 28, 2011 evidence indicating that the declaration is false. *See* Docket No. 84 at 24:9-19. The closest the Government comes to specifically citing evidence is in its argument that Claimant failed to provide information about the source of his wealth to a U.S. Senate Subcommittee. Docket No. 84 at 24:17-19 (citing Manzanares Decl. Ex. 1 at 21, Docket No. 86-1; Ex. 2 at 124609, Docket No. 86-2). But the Subcommittee report only states: "Subcommittee staff then met with Mr., Obiang's attorney who promised to provide information as to the source of Mr. Obiang's funds." *Id.* Ex. 2 at 124609. The Government's interrogatory states that Claimant never provided this information, but it is unclear how the Government would know that, and the Government does not specifically cite to any evidence for that proposition. *Id.* Ex. 1 at 21.

The Government also argues that Claimant told inconsistent stories about his wealth. But, again the evidence does not hold up. In 2007, Claimant opened a bank account and stated that it would have an average balance of $200,000, considerably less than his total multi-million dollar net worth. Manzanares Decl. Ex. 33 at 27, Docket No. 88-9. He claimed that the sources of his account's funds were inheritance and automobile sales. *Id.* Two years later he told the U.S. State Department that he made much of his money in logging. Graff Decl. Ex. 15 ¶ 9, Docket No. 91-19. Two years later he stated that profited from government infrastructure contracts. *Id.* Ex. 14, Docket No. 91-18. However, the Government does not cite any evidence to show these stories conflict. Although "innocent explanations" do not foreclose probable cause, the facts must still point to "suspicious" activity. *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009). Because the Government has not cited to any evidence

13

Exhibit 7
Page 68

indicating that Claimant did not earn money from selling cars in 2007, did not earn money from logging in 2009, and did not earn money from infrastructure contracts in 2011, there is no reason for the Court to view Claimant's explanations skeptically because there is no reason to believe the stories are inconsistent. The Government's contrary authority is unavailing. *See $493,850.00*, 518 F.3d at 1169 (citing "slightly inconsistent stories" as one factor that helped establish probable cause, but not explaining the inconsistencies); *United States v. $127,000 in U.S. Currency*, No. C 11-06605 LB, 2012 U.S. Dist. LEXIS 99864, at *36-37 (N.D. Cal. July 17, 2012) ("undisputed" conflicting information "minimally" supported finding of probable cause); *United States v. $16,000.00 in U.S. Currency*, 1:09-CV-00154, 2009 U.S. Dist. LEXIS 37154, at *3, 9. (N.D. Ohio Apr. 1, 2009) (citing story told to one trooper during a stop that money belonged to one person and telling a different trooper during that stop that it belonged to another as evidence supporting probable cause).

The Government also argues that Claimant's possession of large quantities of bulk cash is probative of probable cause. Docket No. 84 at 25:5-14. Cases have found that large quantities of cash are probative of drug-related crimes, but Claimant has cited none that have found it probative of large-scale political corruption. *United States v. Padilla*, 888 F.2d 642, 644 (9th Cir. 1989) (holding that an "extremely large amount of money found in the household itself is strong evidence that the money was furnished or intended to be furnished in return for drugs") (internal quotation marks and citation omitted); *$127,000 in U.S. Currency*, 2012 U.S. Dist. LEXIS 99864, at *35 (holding that "bundles of cash in various denominations wrapped in rubber bands has been found to be indicative of a drug organization bundling money") (internal quotation marks, alterations, and citation omitted). While drug dealers are widely known to transact in cash, it is less clear that corrupt public officials, who are accused of illegally extracting hundreds of millions of dollars, would do the same. Regardless, even in the context of forfeiture in a narcotics trafficking case, the probable cause test "requires more than the mere existence of a large amount of cash to establish a connection between that cash and illegal drug transactions." *Padilla*, 888 F.2d at 644.

The Government has stated that Claimant concealed his name by purchasing Defendant Assets in the name of shell companies. The Court has already dealt with this issue, and Claimant has given the Court no reason to reconsider:

> Moreover, many of the facts pled to support this third basis for forfeiture, such as Nguema's use of shell companies and corporations . . . to purchase luxury items, are commonplace financial arrangements and do not readily, *without further allegations*, support the reasonable belief that the Government will be able to meet its burden of proof at trial with regards to the money laundering allegations.

Docket No. 47 at 6 (emphasis added).

The Government argues that they can establish probable cause under the net worth doctrine. Under this doctrine, "[s]ummary judgment in a forfeiture case *may* be appropriate where the evidence of a claimant's legitimate income is insufficient to explain the large amount of property seized and the claimant fails to substantiate evidence supporting any other source of legitimate income." *United States v. $223,178.00 in Bank Account Funds*, 2008 U.S. Dist. LEXIS 37978, at *14-15 (C.D. Cal. Apr. 30, 2008) (emphasis added). The Government states: "[E]ven as of the date the original complaint was filed, the Government was aware that Nguema acquired more than $100 million in assets – an amount equivalent to nearly 1,000 times Nguema's official income." Docket No. 84 at 15 n.7. The Government cites its interrogatory response for this proposition. However, that interrogatory's answer relies on unclear authority – as it cites to various page numbers, without clarifying which exhibits it corresponds to. Manzanares Decl. Ex. 1 at 16, Docket No. 86-1. The Government submitted 65 exhibits to the Manzanares Declaration alone, and the Court is under no obligation to "scour the record" on the Government's behalf. *See Keenan*, 91 F.3d at 1279. Additionally, the Court is skeptical that Defendant is required to prove the source of his income, as the Government and some cases suggest. *See, e.g.*, *$223,178.00 in Bank Account Funds*, 2008 U.S. Dist. LEXIS 37978 at *14-15. After all, it is the Government burden to prove probable cause. *$493,850.00 in U.S. Currency*, 518 F.3d at 1169. Particularly complicating the issue is that the Government's evidence indicates that Claimant earned substantial sums of money in logging. Graff Decl. Ex. 14 ¶ 9, Docket No. 91-18. Indeed, this evidence indicates that Claimant's logging activities were substantial, as they attracted sufficient attention that they were *later* made illegal. *Id.* Another district court in another forfeiture action involving Claimant at least suggested that it would be the Government's burden to show that Claimant's other business activity could not be the source of his wealth:

> The government itself has alleged that Nguema owns or controls a number of companies. Yet nothing is known about what income Nguema derives

> from them. Thus, without knowing what Nguema's means are, the court is hard-pressed to infer that he lives beyond them. Absent other details, the court cannot infer how Nguema's wealth may have been derived, nor from what sources, nor the legality of those sources. Although the government alleges that Nguema lives far beyond his means, the court cannot leap to the conclusion that his largesse is evidence of criminal activity.

*United States v. One Gulfstream G-V Jet*, No. 11-cv-1874-RC, Docket No. 22 at 22.

The Court need not resolve the above burden issue, because, as all of the circuit and in-circuit district court opinions the Government's net-worth-doctrine relies upon indicate, courts that have applied the net worth doctrine have also relied on significant evidence that connects the claimant to the SUAs. *See generally* Docket No. 84 at 13:18-18:8 (citing the cases discussed in this footnote).[11] Unlike these cases, and for the reasons discussed, the only evidence the

---

[11] *$223,178.00 in Bank Account Funds*, 2008 U.S. Dist. LEXIS 37978 at *2-3 (stating that claimant lived with ex-husband, had joint bank accounts with him, and took celebratory anniversary pictures with him while married to someone else in a fraudulent-marriage based forfeiture); *United States v. $87,118.00 in U.S. Currency*, 95 F.3d 511, 519 (7th Cir. 1996) (noting in a drug forfeiture case that defendant was previously convicted of drug importation, possessed nearly $90,000 in small denominations that was hidden in a shoebox, and cash found in a sparse apartment that was described as a "stash pad"); *United States v. $20,280.00 in U.S. Currency*, CV 10-9193 CAS EX, 2011 U.S. Dist. LEXIS 115395, at *13-14 (C.D. Cal. Sept. 13, 2011) (noting in a narcotics-related forfeiture that "Violante was alone in his car at 1:30 a.m.; Violante attempted to hide from Deputy Banks's detection by leaning his head into the backseat of his car; the area in which the seizure took place is a high-crime area known for, among other things, drug-related crimes; Violante lied about why he was there, claiming he had been waiting to pick up his wife from the train despite the fact that the train ceased operations an hour earlier; Violante failed to articulate a legitimate source for the money; the money was bound by rubber bands, bundled in $6,000 increments, and wrapped in paper that stated "6,000"; $6,000 is consistent with the amount required to purchase one pound of marijuana; Violante attempted to hide one bundle of currency in his sweater when Deputy Banks approached; Violante admitted he was unemployed, and even when he was employed he earned only $5,000–$10,000 per year; the narcotics canine gave a positive alert to a bag containing the currency; and Violante is a parolee") *United States v. Approximately $1.67 Million (US) in Cash, Stock & Other Valuable Assets Held by or at 1) Total Aviation Ldt.*, 513 F.3d 991, 1000 (9th Cir. 2008) (holding that "circumstantial evidence," which included "prior previous drug trafficking convictions, the statements of his associates linking him to continuous drug smuggling, and his use of an alias and false identification while establishing foreign bank accounts[,] all support probable cause"); *United States v. Parcels of Land*, 903 F.2d 36, 40 (1st Cir. 1990) (noting that a corroborated informant attested that claimant purchased cocaine in Florida for resale in Massachusetts and that he saw claimant returning from Florida with cocaine, and stating that a DEA agent discussed purchasing cocaine from claimant); *United States v. Thomas*, 913 F.2d 1111, 1115 (4th Cir. 1990) (holding that probable cause existed in a narcotics forfeiture case where claimant made large purchases in cash, and that he "made regular unexplained trips by plane from Charleston, South Carolina, to Miami, Florida, and by rental car from Miami to Charleston, that he had a history of drug related arrests and convictions both in Florida and South Carolina, and that he was implicated in undercover drug buys at the business he owned and operated"); *United States v. Chagra*, 669 F.2d 241, 257 (5th Cir. 1982) (looking to expenditures and acquisitions to prove the element of a crime—that defendant "obtained substantial income or resources from his operation of a continuing criminal enterprise," which is a different issue than the instant case presents); *United States v. Jackson-Randolph*, 282 F.3d 369, 378 (6th Cir. 2002) (holding affluence-related lifestyle evidence is admissible for inference that a defendant committed the crime only so long as *"there is other credible evidence, direct or circumstantial, of the illegal activity*; (2) the money spent was not available to the defendant from a legitimate source") (emphasis added); *United States v. $79,010.00 in U.S. Currency*, CV-10-0244-PHX-DGC, 2012 U.S. Dist. LEXIS 48148, at *19-20 (D. Ariz. Apr. 5, 2012) (noting in narcotics forfeiture case that "(1)

Government has is: Claimant, who is not accused of being a drug dealer, had significant amounts of cash; Claimant, who potentially had a remunerative timber business, had a substantial net worth; Claimant suggested, but did not go through with, an attempt to buy a Gulfstream jet in the name of another company, although there were various mitigating facts; and Claimant owned companies that owned some of the Defendant Assets. This is not equivalent to the type of evidence discussed in the preceding footnote. It is insufficient evidence to support probable cause that Claimant's assets were the product of his alleged political corruption, which is the Government's burden to bear. *See $405,089.23 U.S. Currency*, 122 F.3d at 1289.

### B. The Domestic Bank Fraud Basis For Forfeiture

The domestic bank fraud issue, though, is different. The elements of 18 U.S.C. § 1344(1) are: "(1) that the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial institution was insured by the FDIC [Federal Deposit Insurance Corporation]." *United States v. Rizik*, 660 F.3d 1125, 1135 (9th Cir. 2011) (quoting *United States v. Warshak*, 631 F.3d 266, 312 (6th Cir. 2010)). Claimant argues that because allegations of bank fraud were "absent from its initiating complaint, it is implausible that they were bases upon which the Government relied for probable cause at the time it instituted the action." Docket No. 78 at 12 n.9. Claimant conflates the issue of what the Government knew at the time it filed the initial complaint with the issue of what was pled in that initial complaint. In a passage quoted earlier, the Ninth Circuit noted that in forfeiture actions, subsequent complaints can fix original pleading defects because "[w]hether probable cause exists to institute proceedings is solely a question of what information

---

more than $79,000 in cash [was] found in Gray's trailer; (2) the money was packaged in rubber bands, four layers of plastic bags, a sock, and a duffle bag; (3) the money was found in a secret compartment clearly designed for transporting contraband; (4) the compartment included vacuum seal bags typically used in drug trafficking; (5) a drug-sniffing dog alerted to the scent of illegal drugs in the compartment; (6) Gray had been involved in two recent instances of drug trafficking activity; (7) Gray has been convicted on drug trafficking charges; (8) Gray provided a highly implausible explanation to Officer Bentley of his reasons for travelling a long distance with an empty trailer; and (9) Gray immediately disclaimed any interest in the money after it was found"); *United States v. $11,500.00 in U.S. Currency*, CV. 10-97-MA, 2010 U.S. Dist. LEXIS 76868, at *5-6 (D. Or. Dec. 8, 2010) (reciting the following facts "(1) the seized $11,500.00 was used for posting bail for . . . Guerrero's wife who was accused of distributing heroin; (2) the individual posting the bail (Wood) provided inconsistent answers as to the source of the money; (3) a canine search of the $11,500.00 was positive for the odor of narcotics; (4) Guerrero was recently released from the ODOC and was in possession of a large sum of U.S. Currency and pills; (5) a bag located in Wood's vehicle, in which Guerrero was a passenger, contained heroin and personal items associated with Guerrero and his wife; (6) Wood stated that Guerrero is unemployed, always seems to have money, and is known to associate with persons believed to be drug dealers").

17

Exhibit 7
Page 72

is in the government's possession." *$191,910.00 in U.S. Currency*, 16 F.3d at 1068. Thus, Claimant's argument is irrelevant.[12]

Claimant also argues that: "Because the government cannot show that Claimant had a specific intent to defraud any federally-insured bank under its bank fraud theory, the bank fraud allegations are a non-starter." Docket No. 78 at 12 n.9. This conclusory statement is insufficient for Claimant to meet his burden on summary judgment. Claimant "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102. Claimant must meet this burden by pointing to discovery requests that specifically indicate the Government does not have sufficient evidence to carry its burden of proof on the intent to commit bank fraud issue. *See Haywood v. Nye*, 999 F. Supp. 1451, 1463 (D. Utah 1998); *Anderson v. Radisson Hotel Corp.*, 834 F. Supp. 1364, 1369 n.3 (S.D. Ga. 1993). No evidence is cited in Plaintiff's statement of uncontroverted facts or brief on the intent issue. *See generally* SUF, Docket Nos. 78, 81.[13] The Court will not "scour the record" to see if Claimant's conclusory argument is evidentiarily supported. *Keenan*, 91 F.3d at 1279. To the extent other arguments were made and new evidence was cited in Claimant's reply brief, they should not be considered. *See Zamani v.*

---

[12] Claimant also argues that the Government's currency reporting violations cannot be the basis for forfeiture because they were never pled as one. Docket No. 78 at 12 n.9. It is unclear what currency reporting violations Claimant is referencing, as he provides no citations. However, the Government may not claim that currency reporting violations are SUAs that gives rise to forfeiture. As discussed, the SAC provides four bases for forfeiture and currency reporting is not one of them. At this stage, amending the Government's pleadings would be improper. *See Aidnik v. California Dept. of Corr. & Rehab.*, No. CIV S-09-0154 FCD, 2010 U.S. Dist. LEXIS 128441, at *7 (E.D. Cal. Dec. 6, 2010) ("Plaintiff cannot use his opposition to a motion for summary judgment, filed long after the answers were filed in this case, as a vehicle to amend his complaint to raise additional claims."). While the Court may retain discretion to allow such an amendment, since the Government's opposition does not address Claimant's currency reporting argument, the Court would decline to do so. *See generally* Docket No. 84.

[13] Claimant's SUF purports to provide evidence that the Government did not have evidence as of April 28, 2011 that the Defendant Assets were "derived from" bank fraud. SUF ¶¶ A 20, B 6, C 6. However, this argument was never made in Claimant's Memorandum of Points and Authorities. *See generally* Docket No. 78. Claimant recognizes as much in his Reply Brief, which only cites page 1 and page 12 note 9 of his original brief to support the contention that he moved for summary judgment on the bank fraud issue. *See* Docket No. 94 at 23:26-27. However, page 1 does not discuss bank fraud, and Claimant's arguments on page 12 note 9 have already been discussed. Local Rule 7-5 required Plaintiff's Memorandum of Points and Authorities to provide a "brief but complete memorandum [that includes] the points and authorities on which the moving party will rely." And Local Rule 7-4 states that the "Court may decline to consider a motion unless it meets the requirements of L.R. [7-5] . . ." The Court so declines to hear any of Claimant's arguments that were not included in the memorandum. The Court does so because granting summary judgment on a matter that was not even briefed violates basic considerations of fairness and justice.

18

Exhibit 7
Page 73

*Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (affirming district court's decision to reject points raised for the first time in reply).

## IV. Conclusion

For the reasons stated herein, the Court would GRANT Claimant's Motion, except as to the bank fraud issue. Although much of this order focuses on the Government's failure to specifically cite to evidence, such a requirement is not only legally justified, *see Keenan*, 91 F.3d at 1279, it is a practical necessity given the volume of records before this Court. In light of the Court's ruling, it need not respond to Claimant's request for judicial notice or Claimants objections. Docket Nos. 96, 80.