## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                    )
                                             )
        Plaintiff,                           )
                                             )
        v.                                   )
                                             )    Civil Action No.: 1:11-cv-01874-RC
ONE GULFSTREAM G-V JET AIRCRAFT              )
DISPLAYING TAIL NUMBER VPCES, ITS            )
TOOLS AND APPURTENANCES,                     )
                                             )
        Defendant.                           )
                                             )
                                             )
                                             )

## THE UNITED STATES' MEMORANDUM IN OPPOSITION TO CLAIMANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT FOR FORFEITURE *IN REM*

# TABLE OF CONTENTS

**Page**

I.      Preliminary Statement ………………………………………………………1

II.     Factual Background …………………….…………………………………...5

    A.  Nguema Extorted Payments and Solicited Bribes from Businesses in E.G. …..……..6

    B.  Nguema Misappropriated, Stole, and Embezzled Public Funds ……………..……....7

    C.  Nguema Purchased the Gulfstream Jet With the Proceeds of Corruption …..…..…..8

III.    Procedural Background …………………….…………………………………9

IV.     Legal Standard ……………………………………………………………10

V.      Argument …………………………………………………………….……12

    A.  The Allegations Detailing Nguema's Corrupt Acts Satisfy Rule G(2)'s
        Reasonable Belief Standard and this Court's Prior Order …………………….....12

    B.  The Allegations in the FAC Support a Reasonable Belief that the
        Government Will Be Able to Prove, At Trial, that the Gulfstream Jet Is
        Traceable to or Derived from Nguema's Illicit Activity …………………….…...22

    C.  The Net Worth Doctrine Further Supports a Reasonable Belief that
        the Government Will Meet Its Burden at Trial …………………………..…..31

    D.  The Allegations in the FAC Support a Reasonable Belief that Nguema's
        Purchase of the Gulfstream Jet was Designed to Conceal SUA Proceeds ………....33

VI.     Claimants' Motion to Dismiss in the Parallel Case was Denied and Summary
    Summary Judgment was Granted Without Regard to the Evidence the
    Government Relied on in its Amended Complaint ………………………………..37

V.      Conclusion ……………………………………………………………..41

## I.    PRELIMINARY STATEMENT

Plaintiff United States of America, through its undersigned attorneys, respectfully submits this memorandum of points and authorities in opposition to the Motion to Dismiss the Verified First Amended Complaint for Forfeiture *In Rem* (the "FAC") filed by Teodoro Nguema Obiang Mangue ("Nguema")[1] and Ebony Shine International, Ltd. ("Ebony Shine" and collectively, the "Claimants").  As set forth below, the FAC addresses each of the deficiencies highlighted in this Court's April 19, 2013 Memorandum Opinion Granting the Claimants' Motion to Dismiss Without Prejudice; Granting Leave to Amend, ECF No. 22, ("Order Memo").  In doing so, the FAC also meets the pleading requirement to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Fed. R. Civ. P. Supp. R. G(2) ("Supp. Rule").  As specifically alleged in the FAC, the defendant *in rem*, a Gulfstream G-V jet aircraft (the "Gulfstream Jet"), constitutes the fruit of multiple corruption and money laundering schemes orchestrated by Nguema to: (a) extort payments and accept bribes from individuals and companies doing business in Equatorial Guinea ("E.G."); (b) misappropriate hundreds of millions of dollars in E.G. public funds; and then (c) hide, spend, and launder the resulting criminal proceeds through a web of shell companies, eventually using those monies to purchase the Gulfstream Jet for $38.5 million.

In dismissing the Verified Complaint for Forfeiture *In Rem* (the "Initial Complaint"), this Court held that although the Government "paint[ed] a troubling picture of endemic corruption in Equatorial Guinea," it did not identify how Nguema *himself* was involved in each corrupt scheme.  *See* Order Memo at 20.  It also stated that the Government did not sufficiently link the

---

[1] Nguema is currently the Second Vice President of Equatorial Guinea.  He is also the former Minister of Forestry and Infrastructure and the oldest son of the President of E.G.

monies used by Nguema to purchase the $38.5 million Gulfstream Jet to his illicit activity. *See* Order Memo at 1, 23. On the other hand, the Court made clear that it had "little doubt" that the Government could cure these deficiencies by amending its complaint to add additional facts. *Id.* at 23. In the forty-four page FAC, the Government does just that.

As directed by the Court, the FAC contains allegations describing how Nguema enriched himself through various schemes to extort and take bribes from businesses and individuals working in E.G. and by misappropriating, embezzling, and stealing E.G. public funds. *See* Order Memo at 20; FAC ¶¶ 44-96. The allegations in the FAC detail how each of Nguema's schemes worked, specify many of the companies and individuals that were victimized, identify the time period during which the corrupt acts were carried out, and, in certain cases, enumerate exactly to whom the monies were paid (Nguema or one of his shell companies) and into which E.G. banks they were deposited. For example, the FAC alleges:

- Nguema demanded and received personal payments of in or around ten percent of the value of wood harvested for export, in exchange for timber export licenses. FAC ¶¶ 47-49. One company – Tromad Forestal – paid this illegal tariff with suitcases of cash or with checks paid to one of Nguema's shell companies. *Id.* ¶ 49.

- Nguema demanded and received personal fees from timber companies to gain access to E.G.'s forests. *Id.* ¶ 55. One company, Isoroy, paid Nguema personally to engage in logging in E.G. and for a timber concession, while another company, Shimmer International Guinea Equatorial Ltd. ("Shimmer"), was provided with unregulated access to E.G.'s forests in exchange for paying Nguema $50 per cubic meter of timber harvested. *Id.* ¶¶ 57-58.

- Nguema demanded that timber companies make personal payments to him in order to continue operating in E.G., *id.* ¶¶ 60-63, and he retaliated against companies and individuals that refused to pay.  *Id.* ¶¶ 64-68, 70, 73.

- Nguema misappropriated millions of dollars from the E.G. government by requiring a construction company in E.G. to submit inflated bids to the E.G. government and to pay Nguema's companies as subcontractors for work they did not perform.  *Id.* ¶¶ 80-82.

- Nguema misappropriated $167 million of E.G. public funds through his shell company, Somagui Forestal ("Somagui"), by engineering the award of a $200 million highway-construction to Somagui.  Although Somagui received money, it performed no work.  *Id.* ¶¶ 84-86.

The allegations in the FAC also create a reasonable belief that the monies used by Nguema to purchase the Gulfstream Jet were derived from or traceable to his illicit activities. For example:

- The FAC draws a strong temporal nexus between Nguema's illicit acts and his purchase of the $38.5 million aircraft.  It describes how Nguema supplemented his official government salary with corrupt proceeds as far back as 1993, *id.* ¶¶ 57, 61, and how his illegitimate income spiked in the years leading up to and including 2006 – the year he purchased the Gulfstream Jet.  *Id.* ¶¶ 80-87.

- The FAC describes how Nguema's only legitimate income – his official government salary of less than $100,000 per year – could not afford him the means by which to purchase a Gulfstream Jet for $38.5 million.  *Id* ¶ 43.

- The FAC describes how the companies that Nguema controls have no significant business operations and lack any legitimate income. *Id.* ¶¶ 98-100. Further, it alleges that even if these companies were legitimate going concerns, their reported incomes were still not commensurate with Nguema's purchase of the Gulfstream Jet, among other expenditures. *Id.* ¶¶ 100-05.

- The FAC describes how Nguema acquired the Gulfstream Jet with the proceeds of corruption, *id.* ¶¶ 117-33, and how he sought to conceal the source of those proceeds by, among other things, refusing to disclose their origin and acquiring the Gulfstream Jet in the name of an offshore shell company. *Id.* ¶¶ 127, 129. The FAC also describes Nguema's practice of using intermediaries and shell companies to transfer the proceeds of corruption into the United States. *Id.* ¶¶ 104, 113-16, 118-20, 127.

These allegations of Nguema's illegal behavior, coupled with the allegations of his wealth that far exceeds his legitimate income are sufficient to, at a minimum, give rise to a reasonable belief that the monies he used to purchase the Gulfstream Jet were the proceeds of his corrupt acts. *See* Order Memo at 21-22 ("When viewed in tandem with other details suggesting illegal behavior, Nguema's wealth might allow an inference of illegal activity – but standing alone, it does not.").

Despite these and other additional factual allegations, Claimants assert that the Government must present at the pleading stage even more details in its complaint. For instance, Claimants contend that the Government must identify all of the businesses associated with Nguema's corrupt activities, allege how each of the businesses paid the demanded money, provide the precise date of the demands and payments, describe the exact connection between the payments and the purchase of the assets, and link the monies used by Nguema to purchase

the Gulfstream Jet to a specific corrupt act. This is not the law. The law simply requires that the complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial," Supp. Rule G(2)(f), and all facts are taken as true and construed in the light most favorable to the plaintiff. Accordingly, Claimants' efforts to impose their own novel legal standard must be rejected.

Equally baseless are Claimants' assertions that the FAC does not support a reasonable belief that the Government will prevail on its "net worth" theory at trial and that it has not alleged facts to support its money laundering concealment theory of forfeiture. Therefore, the motion to dismiss should be denied in its entirety.

## II.    FACTUAL BACKGROUND

Between 2004 and 2011, Nguema embarked on a $300-million international spending binge fueled by his corrupt activities. FAC ¶¶ 103-04. Nguema acquired real property, a private aircraft, luxury automobiles, jewelry, and fine art on four different continents. Despite making less than $100,000 per year as E.G.'s Minister of Forestry and Agriculture, Nguema spent $68 million in the United States on two assets –the defendant $38.5 million Gulfstream Jet and a $30 million mansion in Malibu, California – in a period of less than three months in 2006. *Id.* ¶ 103. Nguema also acquired more than $125 million in assets in France, where he is the subject of a criminal investigation for money laundering, misappropriation and embezzlement of public funds, and misappropriation of corporate funds, and where a warrant has been issued for his arrest. *Id.* ¶¶ 104(vi), 112.

**A.    Nguema Extorted Payments and Solicited Bribes from Businesses in E.G.**

To obtain the proceeds used to purchase the Gulfstream Jet, Nguema demanded that timber companies in E.G. pay him personally to obtain licenses to export their merchandise, gain access to E.G.'s forests, and to continue to operate in E.G. FAC ¶¶ 45-73. For example, timber companies paid Nguema personally in or around ten percent of the value of their timber exports in order to obtain timber export licenses, which one company – Tromad Forestal – paid in suitcases of cash. *Id.* ¶¶ 48-49. Additionally, Nguema demanded that timber companies pay him to gain access to E.G.'s forests, *id.* ¶¶ 55-59, in exchange for which companies like Shimmer obtained not only logging rights, but also unrestricted access to E.G.'s forests and were exempted from E.G.'s environmental and forest management regulations. *Id.* ¶ 58. All told, the FAC alleges the identity of eleven companies and four individuals who either made or were asked to make millions of dollars in corrupt payments to Nguema. *Id.* ¶¶ 48-49, 57-58, 60-68, 70, 72-73, 80, 88-89.

For instance, in or around May 1996, Nguema demanded that all timber companies in E.G. pay him a retroactive "tax" of approximately $10 per cubic meter of timber ever harvested by that company. *Id.* ¶ 62. ABM, a Spanish company that had been active in E.G. since the 1970's, was asked to pay Nguema $1,560,000 within four days of this "tax" being levied. *Id.* ¶ 63. When ABM could not come up with these funds, Nguema expelled ABM and its personnel from E.G. *Id.* ¶ 69.

The FAC also provides details of Nguema's scheme to extort companies outside of the timber industry. For example, in or around 2003, when Nguema served as Infrastructure Minister, he demanded that Tromad Constructions, a local road contractor, pay him personally fifteen percent of the value of its government contracts. *Id.* ¶ 72. Similarly, between 2004 and

2007, Nguema's Forestry Ministry demanded that GSF, an oil and gas services company, provide Nguema personally with money or gifts.  *Id.* ¶ 73.

**B.    Nguema Misappropriated, Stole, and Embezzled Public Funds**

Nguema also obtained proceeds used to purchase the Gulfstream Jet by stealing millions of dollars of public funds by, among other things, engaging in government contract fraud and by directly diverting public revenue from the Forestry Ministry.  *Id.* ¶¶ 75-96.  For instance, Nguema misappropriated public funds by submitting and receiving payment for fraudulently inflated government infrastructure contracts.  *Id.* ¶¶ 76-82.  Specifically, Nguema misappropriated millions of dollars from the E.G. government by requiring companies such as General Work S.A. ("General Work") – one of the largest contractors in E.G. – to submit inflated bids to the E.G. government that included Nguema's shell companies (Somagui and Socage) as subcontractors, then paying those subcontractors for work they did not perform.  *Id.* ¶ 82.  In a similar scheme, Somagui was awarded a $200 million contract by the government of E.G. to build a 45-mile highway in E.G. in 2004.  *Id.* ¶ 84.  Although Nguema's company never performed on the contract, he nonetheless reaped an illicit profit of $167 million.  *Id.* ¶ 86.  In fact, Somagui and another of Nguema's shell companies, Grupo Sofona ("Sofona"), were merely paper companies with no significant commercial operations or personnel of any kind.  *Id.* ¶¶ 86, 91, 100.  Although Nguema claims that his shell company, Somagui, actually did a significant amount of work in E.G., *id.* ¶ 99, major international financial institutions, development workers, non-governmental organizations, American civil servants and business persons all say that they had never heard of Somagui or Sofona or that the companies did not exist.  *Id.* ¶¶ 100-02.

### C.    Nguema Purchased the Gulfstream Jet With The Proceeds of Corruption

Nguema initially attempted to purchase a personal aircraft by misappropriating more than

$105 million in public funds from the E.G. Government.  FAC ¶¶ 118, 120.  In February of

2004, Nguema approached Ocean Energy and asked the company to purchase a $65 million C-

130 Hercules aircraft on his behalf.  *Id.* ¶ 118.  Nguema, in turn, promised that he would pay

Ocean Energy back by diverting an equal amount from G.E. Petrol, E.G.'s state-owned oil

company.  *Id.*  During the same time frame, Nguema approached Gulfstream Aerospace to

purchase an aircraft but requested that Ocean Energy be permitted to make the purchase

payments on his behalf.  *Id.* ¶ 120.  Nguema assured Gulfstream Aerospace that he would re-pay

Ocean Energy by having the E.G. Government provide Ocean Energy with a credit toward any

debts owed by Ocean Energy to the E.G. Government.  *Id.*  Gulfstream Aerospace, however,

refused to go along with Nguema's scheme to use state resources to acquire personal assets.  *Id.* [2]

After these failed attempts to purchase an aircraft directly from Gulfstream Aerospace,

Nguema formed an offshore shell company, Ebony Shine, and approached a private seller to

purchase a different luxury plane, the defendant Gulfstream Jet.  FAC ¶¶ 119, 125, 127.

However, after making a $15 million down payment on the aircraft, the closing agent, McAfee &

Taft, terminated the deal when Nguema refused to disclose the source of his funds and provide

incorporation documents and a list of Ebony Shine's corporate officers and principals.  *Id.* ¶ 129.

Nguema was ultimately able to complete the purchase by using a closing agent that did not

---

[2] In and around the time that Nguema acquired the Gulfstream Jet, he was also misappropriating
funds from the Forestry Ministry that he headed.  Since as early as 2005, the Forestry Ministry's
revenue has been maintained by Nguema in an account at a private bank in E.G.  Other than
Nguema's Ministry, no other E.G. agency had an account like this one.  FAC ¶¶ 92-93.  Instead
of depositing Ministry funds (like other E.G. agencies) into E.G.'s central bank, Nguema
maintained these public funds in a private bank in which he was the account's sole signatory.  *Id.*
¶ 94.  No other E.G. official oversaw how those funds were used.  *Id.*

require him to identify the source of his wealth and by wiring almost the entire purchase amount from a personal bank account in E.G. *Id.* ¶ 132. Not only did the Gulfstream Jet cost Nguema over 400 times his annual salary as a public servant, but the transaction took place in or around the time that he was reaping a personal windfall by extorting companies doing business in E.G., accepting bribes, and embezzling, misappropriating, and stealing public funds. *Id.* ¶ 133.

## III.  PROCEDURAL BACKGROUND

On October 24, 2011, the Government filed its Initial Complaint against the Gulfstream Jet. Two days later, on October 26, 2011, Judge Amy Berman Jackson issued a Warrant of Arrest *In Rem* for the aircraft. That warrant directs United States law enforcement to arrest the plane.[3] When the Initial Complaint was filed, the Gulfstream Jet was located in E.G. As of the date of this filing, the Gulfstream Jet is not in the United States' custody.

On December 10, 2011, Nguema and Ebony Shine filed Verified Claims in this matter and on January 23, 2012, Claimants moved to dismiss the Government's Initial Complaint. Approximately two months later, the Government filed its opposition to Claimants' motion, and, on April 19, 2013, this Court dismissed the Initial Complaint without prejudice, giving the Government leave to amend.

On June 17, 2013, the Government filed its FAC, which is the subject of Claimants' most recent Motion to Dismiss and accompanying Memorandum of Points and Authorities ("Cls.' MTD Brief"). The FAC asserts three distinct counts for forfeiture. Each count alleges that the Gulfstream Jet is subject to forfeiture because it constitutes the proceeds of "specified unlawful

---

[3] After this Court dismissed the Initial Complaint, the Government and Claimants filed a joint stipulation relieving this Court of the need to issue a second Warrant of Arrest *In Rem* in connection with the FAC. The parties agreed that the warrant issued in October 2011 remained in force. *See* Joint Stipulation Regarding the Warrant of Arrest *In Rem,* ECF No. 28.

activity" ("SUA"), as defined in 18 U.S.C. § 1956(c)(7), or because it constitutes property involved in a money laundering transaction involving the proceeds of an SUA.

Count I alleges that the Gulfstream Jet constitutes the proceeds of an SUA, namely – offenses against a foreign nation involving (i) "extortion" and (ii) the "misappropriation, theft or embezzlement" of public funds, and therefore, is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) (property which constitutes the proceeds of an SUA, as defined in 18 U.S.C. §§ 1956(c)(7)(B)(ii) and (iv), is subject to civil forfeiture).

Count II alleges that the Gulfstream Jet was involved in a money laundering transaction – specifically, a monetary transaction or attempted transaction "in criminally derived property of a value greater than $10,000" in violation of 18 U.S.C. § 1957 – and, therefore, is also subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) (property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957 is subject to civil forfeiture).

Count III also alleges that the Gulfstream Jet was involved in a money laundering transaction – namely, it was the subject of a financial transaction or attempted transaction which "involve[d] the proceeds of [an SUA]" knowing that the transaction was designed in whole or in part to conceal or disguise the source, ownership, or control of criminal proceeds in violation of 18 U.S.C. § 1956(a)(1), and, therefore, is also subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) (property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 is subject to civil forfeiture).

## IV.    LEGAL STANDARD

As set forth in the Court's April 19, 2013 ruling, the pleading standard for a civil forfeiture complaint is governed by the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions, which impose a heightened pleading standard that "is

somewhat more exacting than the liberal notice pleading standard contemplated by Rule 8(a)(2)"
of the Federal Rules of Civil Procedure.  Order Memo at 18.  As the Court explained, "[a]t the
pleading stage, it suffices for the government to simply allege enough facts so that the claimant
may understand the theory of forfeiture, file a responsive pleading, and undertake an adequate
investigation."  *Id.* at 19; *see also* advisory comm. note Supp. Rule G (stating Rule G(2)(f)
should be read consistent with *United States v. Mondragon*, 313 F.3d 862 (4th Cir. 2002)).
Moreover, although the Government's burden at trial is to "establish [forfeitability] by a
preponderance of the evidence," 18 U.S.C. § 983(c)(1), "a court may not dismiss the complaint
'on the ground that the Government did not have adequate evidence at the time the complaint
was filed to establish the forfeitability of the property.'" Order Memo at 19 (citing 18 U.S.C. §
983(a)(3)(D)).[4]

    In considering a motion to dismiss a forfeiture complaint, "the plaintiff's factual
allegations must be presumed true and should be liberally construed in his or her favor."  Order
Memo at 19.  "Likewise, the plaintiff must be afforded every favorable inference that may be
drawn from the allegations of fact set forth in the complaint."  *Id.*; *see also, Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009) ("for the purposes of a motion to dismiss we must take all of the
factual allegations in the complaint as true"); *City of Harper Woods Emps. Ret. Sys. v. Oliver*,
589 F.3d 1292, 1298 (D.C. Cir. 2009) ("Reviewing a motion to dismiss, this court accepts as true

---

[4] In denying a motion to dismiss the Second Amended Complaint in the Government's civil
forfeiture action pending before the Central District of California against a $30 million Malibu
mansion and other assets held for the benefit of Nguema, that court appropriately observed that
while civil forfeiture complaints are subject to a heightened pleading standard, "the Rule G(2)(F)
standard is not as stringent as that required for fraud causes of action under Fed. R. Civ. P. 9(b)."
*United States v. One White Crystal Covered Bad Tour Glove*, cv-11-3582-GW, ECF Doc. No.
68-1 at 5 (C.D. Cal. Sept. 7, 2012) (Tentative Ruling on Motion to Dismiss Second Amended
Verified Complaint for Forfeiture *in Rem*, entered as final on day it was issued) (attached hereto
as Exhibit "A").

all of the factual allegations contained in the complaint and draws all inferences in favor of the

nonmoving party."); *United States v. $79,321*, 522 F. Supp. 2d 64, 68 (D.D.C. 2007) ("plaintiff's

factual allegations must be presumed true and should be liberally construed in his or her favor").

## V.    ARGUMENT

### A.    The Allegations Detailing Nguema's Corrupt Acts Satisfy Rule G(2)'s Reasonable Belief Standard and this Court's Prior Order

The FAC specifies the various corrupt schemes that Nguema used to enrich himself,

identifies the means he used to conceal his criminal conduct, and dispels any notion that Nguema

had legitimate income sufficient to purchase the $38.5 million Gulfstream Jet.  The FAC then

describes his purchase of that aircraft with facts sufficient to establish a reasonable belief that the

monies he used were proceeds of corruption.  The detailed factual allegations in the FAC

include, among other things, the names of companies and individuals that were victimized, time

frames in which Nguema and his shell companies demanded and received payments, how they

received those payments (*e.g.*, in cash or by check), the amounts of the payments, the E.G. laws

that were violated, and adequately set forth the Government's bases for forfeiture.  These

allegations – which the court must accept as true for the purposes of a facial challenge to the

sufficiency of the FAC under Fed. R. Civ. P. 12(b)(6) – are pled with ample specificity to allow

Claimants to initiate an investigation and frame a responsive pleading.  *See* Order Memo at 19;

*Mondragon*, 313 F.3d at 864.

### 1.    The Facts of Nguema's Extortion and Bribery Schemes Satisfy Rule G(2)'s Reasonable Belief Standard and this Court's Prior Order

Under 18 U.S.C. § 1956(c)(7)(B) "[a]n offense against a foreign nation involving . . .

extortion [or] . . . bribery of a public official. . ." is a specified unlawful activity whose proceeds

are subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C) and money laundering forfeiture

under 18 U.S.C. § 981(a)(1)(A). The statutory terms "extortion" and "bribery," as they are used

in 18 U.S.C. § 1956(c)(7)(B), are "generally presumed to have [their] common-law meaning."

*Evans v. United States*, 504 U.S. 255, 260 (1992). "At common law, extortion was an offense

committed by a public official who took by color of his office money that was not due to him for

the performance of his official duties." *Id.* at 260 (quotation marks omitted). Similarly, "[a]t

common law and under most statutes, bribery is limited to a payment given [or received] in

exchange for the exercise of governmental power." *United States v. Angelilli*, 660 F.2d 23, 32

(2d Cir. 1981); *see also Perrin v. United States*, 444 U.S. 37 (1979) (common law bribery

included "the corruption of any public official" and "included the giver as well as the receiver of

the bribe").[5]

In detailing Nguema's extortion and bribery schemes, the Government has responded to

the Court's admonition to enumerate specific facts, and, in the FAC, sets forth allegations that

more than satisfy Supplemental Rule G(2)'s "reasonable belief" standard. *See* Order Memo at

20. The allegations in the FAC show how Nguema, himself, forced companies and individuals

to pay him personally in order to: (1) obtain timber export licenses in E.G., FAC ¶¶ 47-48; (2)

import goods and equipment, *id.* ¶¶ 52-53; (3) gain access to E.G.'s forests, *id.* ¶¶ 55-56; and (4)

continue operating in the country. *Id.* ¶ 60. Moreover, the FAC details Nguema's direct

involvement in these schemes, *id.* ¶¶ 45-73; specifically identifies their victims, *id.* ¶¶ 48-49, 56-

58, 60-61, 63-73; describes how Nguema's extortionate payments were calculated, *id.* ¶¶ 48, 50,

58, 61-62; identifies the currency in which these illegal taxes were paid and the manner of

payment, *id.* ¶¶ 49-50, 57-58, 61-63; provides the amount of payments demanded by and/or

---

[5] As alleged in the FAC, extortion and bribery are also crimes under E.G. law. FAC ¶¶ 44, 74;
Attachment A to the FAC, ECF No. 24-1 (listing relevant provisions of the Penal Code of
Equatorial Guinea.

made to Nguema, *id.* ¶¶ 49, 57, 61, 63, 70; and identifies which of Nguema's shell companies received the extortionate payments and the E.G. bank into which the money was deposited. *Id.* ¶ 49.

The Government's recitation of Tromad Forestal's ordeal in E.G. is just one example of the detail with which Nguema's extortion and bribery schemes are pled. *Id.* ¶¶ 47-49. Between 1998 and 2003, Tromad Forestal was made to pay Nguema in or around ten percent of the value of the wood it harvested in E.G. *Id.* ¶ 48. These payments were made by check or with suitcases of cash that the owner of Tromad Forestal, German Pedro Tomo,[6] deposited into the account of Somagui at CCEI Bank. *Id.* ¶ 49. Only after these payments were received, did Nguema personally sign the export licenses that Tromad Forestal needed to ship its harvested wood out of the country. *Id* The total payments were in or around the equivalent of $700,000 in CFA Francs (CFAs). *Id.* Additionally, the FAC explicitly alleges how much Nguema charged other timber companies (approximately $27 per log, depending on the quality of the wood) to obtain timber export licenses, how Nguema abused his office by using Ministry staff to calculate these extortionate personal "taxes," and how he retaliated against companies that refused to pay. *Id.* ¶¶ 50-51, 65-66.

The allegations in the FAC are equally detailed with respect to the payments demanded by and made to Nguema by companies seeking to continue operating in E.G. and to access

---

[6] Claimants' attack on Mr. Tomo's credibility raises an issue reserved for the trier of fact, not one to be determined at the motion to dismiss stage. *Saddler v. D'Ambrosio*, 759 F. Supp. 4, 8 (D.D.C. 1990) (partially denying a motion to dismiss and holding that "evaluation of the credibility of witnesses [is] something not available to the Court in the posture of a motion to dismiss, or a motion for summary judgment"); *see also United States v. Van Wyhe*, 965 F.2d 528, 531 (7th Cir. 1992) ("The credibility of a witness is a matter inherently within the province of the trier of fact."); *Lewy v. Skypeople Fruit Juice, Inc.*, No. 11 Civ. 2700, 2012 U.S. Dist. LEXIS 128416, at *40-41 (S.D.N.Y. 2012) ("A motion to dismiss is not the proper vehicle to test the credibility of witnesses or the manner in which plaintiffs will attempt to prove their allegations.").

E.G.'s national forests.  *See, e.g.*, *id.* ¶¶ 55-73.  For instance, Nguema demanded, and the timber company Isoroy paid, approximately $100,000 every one to two months between 1993 and 1996 to continue its forestry operations in E.G.  *Id.* ¶¶ 56-61.  Likewise, in 1998, Shimmer's E.G. general manager acquiesced to Nguema's demand that he personally receive 30,000 CFAs (approximately $50) per cubic meter of timber that Shimmer harvested in E.G.  In return, Nguema granted that company unregulated access to E.G.'s forests, including its protected national forests.  *Id.* ¶¶ 58-59; *see id.* ¶ 28 ("the National Forestry Reserve is permanent, inalienable, and part of the public domain").

2.  **The Facts Detailing Nguema's Misappropriation, Embezzlement, and Theft of E.G. Public Funds Satisfies Rule G(2)'s Reasonable Belief Standard and this Court's Prior Order**

Under 18 U.S.C. § 1956(c)(7)(B)(ii), "[a]n offense against a foreign nation involving . . . the misappropriation, theft or embezzlement of public funds . . ." is a specified unlawful activity whose proceeds are subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C) and to money laundering forfeiture under 18 U.S.C. § 981(a)(1)(A).  "Misappropriation is defined as '[t]he application of another's property or money dishonestly to one's own use.'"  *United States v. Stone*, 215 Fed. Appx. 601, 603-04 (9th Cir. 2006); *see also Camico Mut. Ins. v. Heffler, Radetich & Saitta, LLP*, No. 11-4753, 2013 U.S. Dist. LEXIS 91649, at *11 (E.D. Pa. June 27, 2013) (same).  "Embezzlement" occurs "when, being in lawful possession of the property of another, [a defendant] fraudulently appropriates or converts such property to his own use with the intent permanently to deprive."  *United States v. Taylor*, 867 F.2d 700, 702 (D.C. App. 1989).  "Theft" is defined as the "taking and removing of personal property with *intent to deprive the rightful owner of it.*"  *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1243 (D.C. App. 2008) (italics in original); *see also Carrillo-Jaime v. Holder*, 572 F.3d 747, 750 (9th Cir.

2009) (defining theft as the "taking of property or an exercise of control over property without consent with the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent").[7]

The FAC alleges ample facts regarding Nguema's corrupt schemes to misappropriate, embezzle, and steal E.G. public funds to satisfy this Court's order and Supplemental Rule G(2)'s "reasonable belief" standard. In dismissing the Government's Initial Complaint, this Court held that the Government's allegations relating to Nguema's misappropriation, embezzlement, and theft of public funds "implicated [him] by association only." Order Memo at 20. The allegations in the FAC, however, are far different in that they identify specific schemes and conduct undertaken by Nguema himself to orchestrate the theft of public funds from the E.G. public treasury. *See* FAC ¶¶ 75-97.

For instance, the allegations in the FAC detail how Nguema himself – not unnamed members of the Inner Circle –directed executives at General Work to facilitate his misappropriation, embezzlement, and theft of public funds. *Id.* ¶¶ 80-81. Beginning in 2003, Nguema, who was then the Minister of Forestry and Infrastructure, began directing executives at General Work, one of E.G.'s largest construction companies, to submit bids to the E.G. government that included fraudulently inflated line items. *Id.* Once the contracts were awarded to General Work, a portion of the inflated contract price was kicked back by General Work to one of Nguema's shell companies, Somagui or Socage, and deposited into accounts at CCEI bank. *Id.* ¶ 81. Neither Somagui nor Socage performed any work under the contracts. *Id.* ¶ 82. Between 2003 and 2007, General Work made hundreds of these payments for Nguema's benefit.

---

[7] Misappropriation, theft, and embezzlement of public funds are also illegal under E.G. law. FAC ¶¶ 75, 97; Attachment A to the FAC, ECF No. 24-1 (listing the relevant provisions of the E.G. Penal Code).

*Id.* ¶ 81.  As pled in the FAC, this kickback scheme was in violation of E.G. law and illicitly

enriched Nguema to the tune of millions of dollars in personal profit.  *Id.* ¶¶ 79, 81.  Allegations

such as these – where the Government has described Nguema's scheme, the time frame during

which it took place, his direct involvement in it, and the companies and financial institutions he

used to carry it out – are clearly sufficient to meet the "reasonable belief" standard.

In the same vein, the FAC alleges that Nguema, working through his shell companies,

Somagui and Socage, took hundreds of millions of dollars in payments from the E.G.

government for work that his companies never performed around the time that he purchased the

Gulfstream Jet.  *See* FAC ¶¶ 76-91.  On or about November 13, 2004, Nguema's shell company,

Somagui, was awarded a $200 million contract by the government of E.G. to build a 45-mile

stretch of highway connecting the E.G. towns of Mongomo and Ebebiyin (the "Ebebiyin-

Mongomo Highway").  *Id.* ¶ 84.  Somagui was then given an advance payment of $182 million

by the government.  *Id.* ¶ 86.  Somagui, however, was simply a shell company used by Nguema

to disguise his criminal conduct, to conceal the source of his income, and to claim falsely to

financial institutions and foreign governments that his income was derived from legitimate

commercial activity in E.G.  *Id.* ¶ 98.  In fact, Somagui was not engaged in any significant

business operations in E.G., had few, if any, employees, and earned no legitimate income.  *Id.* ¶

100.  In this way, and as detailed in the FAC, Nguema's shell company, Somagui: (1) obtained

an E.G. government infrastructure contract for $200 million, *id.* ¶ 85; (2) subcontracted that work

to General Work for $44 million, *id.* ¶¶ 86, 100; (3) paid only $15 million causing General Work

to stop work, *id.* ¶ 86; and (4) never repaid any funds to the Government of E.G. – all at a time

when Nguema was serving as E.G.'s Ministry of Forestry and Infrastructure.  *Id.* ¶ 87; *see also*

*id.* ¶ 79 ("self-dealing by a public official is illegal in E.G."); *id* at Attachment A (citing to

Article 198 of the Penal Code of Equatorial Guinea (taking advantage of official position to exercise a profession or involve oneself in a business directly related to scope of official duties)).[8]  These allegations, and others like them in the FAC, more than create a reasonable belief that Nguema profited illegally through schemes to misappropriate, embezzle, and steal millions of dollars of E.G. public funds.

In response to the FAC's specific allegations of misappropriation through Nguema's receipt of millions of dollars for infrastructure contracts his companies never performed, Claimants assert that the Government fails to plead that this scheme was in violation of E.G. law.  *See* Cls.' MTD Brief at 18.  This is incorrect.  Paragraph 97 of the FAC alleges that these schemes to misappropriate, embezzle, and steal, violated E.G. law and enumerates particular E.G. law violations.  Likewise, the Government plainly states that "[c]ontrary to Nguema's recitation of the law, such self-dealing by a public official is illegal in E.G," *id.* ¶ 79, and that Nguema's scheme to reap a personal profit of $186 million from the E.G. government, despite his company's failure to perform the contract, violated E.G. law.  *Id.* ¶¶ 83, 97.

### 3.    Claimants' Misstate Supplemental Rule G(2)'s Reasonable Belief Standard

In arguing that the allegations in the FAC do not meet the "reasonable belief" standard, Claimants conflate the Government's burden at the pleading stage with its ultimate burden at trial and suggest that this Court and others have adopted a "particularity-in-pleading"

---

[8] Nguema then supplemented Somagui's illicit profit by charging China Road and Bridge Corporation a $19 million "finder's fee" to assume the contract that Somagui was awarded but never performed.  FAC ¶¶ 88-89.  This payment was made to Somagui in installments deposited into a bank account at Société Générale de Banques en Guinée which, as pled in the FAC, is the same bank that Nguema wired funds from to purchase the Gulfstream Jet.  *Id.* ¶¶ 89, 133.  Although these payments from the China Road and Bridge Corporation to Somagui did not begin until 2009, it is highly relevant that Nguema used the same bank to purchase the Gulfstream Jet as he did to carry out this illicit scheme.

requirement akin to that set forth in Fed. R. Civ. P. 9(b).  *See, e.g.*, Cls.' MTD Brief at 3-5.  This

is simply not the law.  The law requires that the complaint "state sufficiently detailed facts to

support a reasonable belief that the government will be able to meet its burden of proof at trial,"

Supp. Rule G(2)(f), and all facts are taken as true and construed in the light most favorable to the

plaintiff.  Similarly, as stated by this Court, "the plaintiff must be afforded every favorable

inference that may be drawn from the allegations of facts set forth in the complaint."  Order

Memo. at 19.

 As support for the novel pleading standard that they ask this Court to adopt, Claimants

point to the holding in *United States v. One Partially Assembled Drag Racer*, 899 F. Supp. 1334,

1341 (D.N.J. 1995), and its explanation of the Government's two-step *trial* burden in civil

forfeiture cases brought under 18 U.S.C. § 981(a)(1)(C).  First, the Government must prove the

predicate criminal acts.  *Id.*  Second, it must show the "direct or indirect connection between the

property and the act."  *Id.*  At the pleading stage, however, *Drag Racer* makes clear the

Government need not actually *prove* that those predicate acts took place, nor must it *prove* the

connection between the property and those acts.  *Id.*  It need only *plead* allegations giving rise to

a reasonable belief that it will be able to do those things at trial.

 Claimants also look to *United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d

365 (S.D.N.Y. 2008) – a case cited by this Court – for analogy.  Cls.' MTD Brief at 5; Order

Memo at 22-23.  Given the detailed allegations that the Government now pleads in the FAC, that

case is no longer applicable.  In *$1,399,313.74*, the court dismissed the Government's forfeiture

complaint because it alleged only that the defendant funds "constituted criminally derived

property from narcotics trafficking," were sent "from Latvia . . . a notorious money laundering

haven," and not a single fact more. *Id.* at 374.[9]  In this case, the Government does far more in

the FAC than allege only that Nguema's vast fortune is the product of corruption and that his

country is a haven for money laundering.  As stated above, the FAC alleges exactly how

Nguema's corrupt schemes worked, how he used shell companies to execute them, and how he

purchased the Gulfstream Jet with the proceeds.

A case that *is* instructive is *United States v. $79,321*, 522 F. Supp. 2d 64 (D.D.C. 2007).

There, the claimant moved to dismiss a civil forfeiture case because, among other things, the

government had failed to affirmatively claim that the claimant knowingly or intentionally

violated the statutes upon which forfeiture was based.  In rejecting the claimant's argument, this

Court clarified that although the allegations must satisfy Supplemental Rule E(2)(a), "there is no

requirement that *all* of the facts and evidence at the government's disposal be pled in the

complaint" *Id.* at 71 (quoting *United States v. All Funds on Deposit in Dime Savs. Bank of

Williamsburg*, 255 F. Supp. 2d 56, 69 (E.D.N.Y. 2003) (emphasis in original)); *see also* Ex. A. at

7 ("However, again, the Government is not obligated at the pleading stage to set forth every

detail of the SUA.").  Likewise, it observed that while CAFRA raised the Government's burden

of proof *at trial*, it relaxed the Government's burden in responding to a 12(b)(6) motion.  *Id.*

Accordingly, the Court found no fault in the Government's failure to affirmatively allege an

_____

[9] Claimants also rely on a 25-year-old Tenth Circuit case, *United States v. $39,000*, 801 F.2d
1210, 1220 (10th Cir. 1985), for the proposition that the Government is required to allege
transaction-specific details, including "dates, locations, dollar amounts, and [] specific
participants" to withstand a motion to dismiss.  *See* Cls. MTD Brief at 8.  But neither
Supplemental Rule G nor the Tenth Circuit have ever adopted such a demanding standard.  As
one court explained when discussing the Tenth Circuit's decision in *$39,000*, "[t]he
supplemental rule does not require the complaint to allege dates, times or locations of past or
future purported or intended drug transactions, dollar amounts of 'imagined exchanges,'
'speculation' about specific kinds of drugs or reference to likely participants . . . .  If the Tenth
Circuit desired to make such specific pleading requirements, it easily could have done so."
*United States v. $600,000*, 869 F. Supp. 836, 838 (D. Kan. 1994).

element of the crime underlying the forfeiture, namely intent, because it alleged "specific facts" supporting an inference of the requisite intent. *Id.* at 72.

Claimants' piecemeal approach to each individual allegation in isolation should also be rejected by this Court. Not only is such approach contrary to the law, but it underscores how detailed the allegations in the FAC actually are. *See United States v. Funds in the Amount of $30,670.00*, 403 F.3d 448, 469 (7th Cir. 2005) (affirming grant of summary judgment for the government, holding "[w]e decline, however, to implement [the claimant's] divide-and-conquer approach with respect to the factors present in this case. Instead, we consider the totality of the evidence as a whole and in the appropriate context."); *United States v. $242,484*, 389 F.3d 1149, 1160 (11th Cir. 2004) ("In evaluating the evidence of proceeds traceable to drug transactions, we have eschewed clinical detachment and endorsed a common sense view to the realities of normal life applied to the totality of the circumstances.").

As just one example, Claimants argue that the Government's allegations relating to Nguema's relationship with Shimmer are deficient absent the *exact amount* actually paid to Nguema and the *exact dates* of each payment. Cls.' MTD Brief at 11. Not only is this level of detail not required under Rule G, but the argument ignores that the FAC includes the years that Nguema took payments from Shimmer (1998 and 2003), the metric by which the payments were calculated ($50 per cubic meter of harvested timber), identify the Shimmer executive that struck this quid pro quo agreement with Nguema (the E.G. general manager), that Shimmer's payments were made to Nguema (not the E.G. Government), and that these fees were of a "personal" nature. FAC ¶ 58.[10]

---

[10] Claimants assert that Shimmer's "agreement" to pay Nguema personally for access to E.G.'s forests does not mean that the payments were actually made, nor does it mean that the payments were the product of extortion. Cls.' MTD Brief at 11. This position is inconsistent with a

**B.    The Allegations in the FAC Support a Reasonable Belief that the Government Will Be Able to Prove, at Trial, that the Gulfstream Jet Is Traceable to or Derived from Nguema's Illicit Activity**

First, the Government pleads facts in the FAC that draw a temporal nexus between the various illegal and corrupt acts that Nguema undertook and his purchase of the $38.5 million Gulfstream Jet.  Second, the FAC alleges that each of these schemes resulted in Nguema enriching himself well beyond the less than $100,000 per year he earned as an E.G. public servant.  Third, it makes clear that the companies that Nguema controls are merely shells with no legitimate income and even if they are not, Nguema's spending habits – including the purchase of the Gulfstream Jet – outpaced their stated incomes.  And fourth, it describes his failed attempts to divert E.G. public funds to buy an aircraft and his eventual acquisition of the Gulfstream Jet in the name of an offshore shell company.

Indeed, the use of circumstantial evidence such as this to prove that monies used to purchase an asset were "derived from or traceable to" corruption is readily accepted in the law. This is made clear in *United States v. $22,173*, No. 9 Civ. 7386, 2010 U.S. Dist. LEXIS 33494, at *8 (S.D.N.Y. Apr. 5, 2010) – a case that this Court cites in its Memorandum Order.  *See* Order Memo at 5.  In denying the claimants' motion to dismiss, the court in *$22,173* held that the government may prove "based on a totality of the circumstances, that the property is substantially connected to narcotics trafficking."  *$22,173*, 2010 U.S. Dist. LEXIS 33494, at *8; *see also United States v. Wright*, 341 Fed. Appx. 709, 713 (2d Cir. 2009) (circumstantial

common sense reading of the FAC.  The logical inference to be drawn from the allegation that Shimmer paid Nguema "in exchange for" an all-access pass to E.G.'s protected forests is that these payments were, in fact, made.  FAC ¶ 58; *see also City of Harper Woods Emps. Ret. Sys.*, 589 F.3d at 1298 (the court must draw all inferences in favor of the nonmoving party at the motion to dismiss stage).  Moreover, bribery and extortion criminalize corrupt agreements and solicitations, even where an extortion victim refuses to pay.

evidence that the defendant was a drug dealer, carried large amounts of cash, and had no legitimate sources of income was sufficient to prove that the money he used to lease a car was the proceeds of crime); *United States v. Misher*, 99 F.3d 664, 668-69 (5th Cir. 1996) (circumstantial evidence that the defendant dealt in narcotics, paid for a car with small bills, and titled that vehicle in a different name was sufficient to convict on concealment money laundering charges).

Moreover, the very cases on which Claimants rely demonstrate that circumstantial evidence is sufficient to support a reasonable belief that monies used to purchase an asset were derived from or traceable to underlying crimes. In *Drag Racer*, 899 F. Supp. 1334, for example, the court dismissed the complaint because the sole basis for the United States' forfeiture case was that the owner of the defendant asset engaged in illegal drug trafficking. *Id.* at 1341. In doing so, however, the court explained that if the Government had alleged circumstantial details regarding: (i) when the defendant assets were purchased; (ii) the price of the assets; (iii) whether the claimant purchased these assets with cash; (iv) whether the claimant purchased the assets under an alias or in any other suspicious matter; and (v) whether the claimant had any sources of income other than his criminal conduct, there would have been a reasonable belief that the assets were derived from or traceable to some drug activity. *Id.* Similarly, in *United States v. Wynn*, 61 F.3d 921 (D.C. App. 1995), the court held that the defendant's convoluted method of payment for a car, his attempt to disguise the true purchaser's identity, and his presentation of checks from different banks "certainly support[ed] an inference that the cash had an illegal source." *Wynn*, 61 F.3d at 926; Cls.' MTD Brief at 26. As explained herein, in this case, the FAC has alleged circumstantial evidence of Nguema's corruption and its tie to his purchase of the Gulfstream Jet

– including many of the types of facts identified by the court in *Drag Racer* – sufficient to meet the pleading standard.[11]

Considering the totality of the facts set forth in the FAC, there is a reasonable belief that the Government will show, at trial, that the Gulfstream is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C), as property traceable to or derived from the proceeds of Nguema's corrupt acts, or property involved in money laundering transactions with such proceeds pursuant to 18 U.S.C. § 981(a)(1)(A).

### 1. Nguema's Corrupt Schemes Resulted in Hundreds of Millions of Dollars in Illicit Personal Payments in the Years Leading Immediately Up to His Purchase of the Gulfstream Jet

The allegations in the FAC demonstrate a temporal nexus between monies obtained by Nguema through his corrupt schemes and the purchase of the Gulfstream Jet.  *See* FAC ¶¶ 44-97. Starting in 2003 – just three years prior to his purchase of the $38.5 million plane  – Nguema began misappropriating, embezzling, and stealing public funds in violation of E.G. law.  *Id.* ¶¶ 75-91.  As described above, in 2003 Nguema, through his shell companies Somagui and Socage, began taking kickback payments from General Work in connection with fraudulently inflated contracts that were awarded to that company by the government of E.G.  *Id.* ¶¶ 80-81.  Similarly,

---

[11] Claimants also rely on *United States v. 125,938.62*, 537 F.3d 1287, 1288-89 (11th Cir. 2008). In that case, the Eleventh Circuit court was faced not with adjudicating the sufficiency of the government's pleading, but with the sufficiency of its proof at trial.  *See* Cls.' MTD Brief at 6-7, 21.  After *denying* the claimants' motion to dismiss, *see United States v. $125,938.62*, 370 F.3d 1325, 1328 (11th Cir. 2004), the district court found that the government had proven by a preponderance of the evidence that seven certificates of deposit were derived from or traceable to funds stolen from the Nicaraguan treasury.  *125,938.62*, 537 F.3d at 1288-89.  The claimants challenged the verdict on appeal, alleging, among other things, that *at trial* the government had not sufficiently linked the certificates of deposit at issue to the stolen funds.  *Id.* at 1288. Although the Eleventh Circuit reversed the trial court as to five of the seven certificates of deposit, it recognized that the government *could* have met its trial burden (not to mention its burden at the pleading stage) had it presented circumstantial evidence demonstrating that the certificates were derived from or traceable to the stolen funds.  *Id.* at 1294.

in November 2004, Somagui was awarded a $200 million contract by the government of E.G. to build the Ebebiyin-Mongomo Highway. *Id.* ¶ 84. Although Nguema's company never performed on the contract, Somagui nonetheless reaped an illicit profit of $167 million. *Id.* ¶ 86; *see also id.* ¶ 91 (alleging that Somagui was awarded another infrastructure contract in 2003 for $23.4 million that was not completed as of 2010). Even without considering the illegal payments that Nguema received prior to 2003, such as those from companies like Tromad Forestal, Shimmer, Isoroy, ABM, and Agroforestal, these above-described schemes alone netted Nguema and his shell companies hundreds of millions of dollars in illegal payments in or around the time he spent $38.5 million on the Gulfstream Jet.

### 2. Nguema's Purchase of the Gulfstream Jet Was Not Commensurate with His Personal Earnings, Nor the Stated Earnings of His Shell Companies

In the FAC, the Government has alleged that Nguema was engaged in a series of corrupt schemes spanning an almost thirteen-year time period, which became more lucrative in the years immediately preceding his purchase of the Gulfstream Jet. FAC ¶¶ 44-97; *see also id.* ¶¶ 83-87 (detailing Nguema's scheme to misappropriate government funds in connection with the Ebebiyin-Mongomo Highway contract that was awarded to Somagui in 2004). The FAC also clearly establishes that Nguema's $38.5 million purchase of the Gulfstream Jet was only a fraction of the $187 million in personal expenditures he made during the three-year period leading up to the purchase of the aircraft. *Id.* ¶ 104(viii). The Government also details Nguema's vague and inconsistent explanations as to the true sources of his wealth, *id.* ¶¶ 106-16, and further demonstrates that Nguema's purchases, including the purchase of the Gulfstream Jet, were well in excess of his official salary as an E.G. public official and the stated incomes of the companies that he controls. *Id.* ¶¶ 103-05. Through these well-pled facts, the FAC creates a

reasonable belief that the Government will be able to prove, by a preponderance of the evidence, that the Gulfstream Jet was purchased with the proceeds of Nguema's corruption.

It is undisputed that Nguema's official government salary of approximately $6,799 per month, or less than $100,000 per year, would not support the purchase of a $38.5 million Gulfstream Jet. FAC ¶ 43. Rather than simply allege that his spending is not commensurate with his official salary, the FAC directly addressed this Court's concern that "Nguema owns or controls a number of companies. Yet nothing is known about what income Nguema derives from them." Order Memo at 22. In contrast to the Initial Complaint, the FAC sets forth specific factual allegations that Nguema's shell companies Somagui and Sofona also could not account for sufficient legitimate income to warrant his purchase of the Gulfstream Jet. The FAC identifies the companies, FAC ¶¶ 19, 38, 68-71, describes how they perform no actual operations, that they are merely shells to disguise Nguema's criminal conduct, *id.* ¶¶ 100-01, explains that various financial institutions and individuals working in E.G. could not verify their existence, *id.* ¶¶ 101-02, details how Nguema used them to conceal the source of his income, *id.* ¶¶ 49-50, 68, 80-82, 84-91, 98-101, and how he used them to claim falsely that his income was derived from legitimate sources. *Id.* ¶¶ 106-16. Further, even if these companies were going concerns, Nguema's enormous personal expenditures vastly outpaced and were not commensurate with the companies' stated incomes in the years leading up to and including 2006 when he purchased the Gulfstream Jet. *Id.* ¶¶ 103-05.

In fact, for the period 2004-2006, Nguema's personal expenditures totaled approximately $187 million. *Id.* ¶ 104(viii). These expenditures ranged from his purchase in 2004 of an $80 million Paris estate just steps from the Arc de Triomphe, to his purchase in 2005 of two 50-foot, high-performance racing boats for $2 million, and finally, to his purchases in 2006 of a $30

million Malibu mansion and the $38.5 million Gulfstream Jet.  *Id.* ¶ 104(vi-viii).  Nguema's

expenditure of $187 million in the three years leading up to and including the year he purchased

the Gulfstream Jet equaled almost 91 percent of the *gross* income his company, Somagui, had

purportedly generated since it came into existence in 1996.  *Id.* ¶ 104(viii).  Accordingly, even if

his companies were not shells, the legitimate income that Nguema claims they generated would

still not have afforded him the means to purchase the Gulfstream Jet even if every penny of

income was net revenue and the company had no expenses.  *Id.* ¶ 104.

### 3. Nguema Took Steps to Conceal His Involvement in the Purchase of the Gulfstream Jet

As described in the FAC and also below in additional detail, Nguema took a number of

steps to conceal his involvement in the purchase of the Gulfstream Jet in 2006.  First, he refused

to disclose the source of the monies he sought to use to purchase the aircraft to an Oklahoma-

based closing agent causing that closing agent to terminate the transaction.  *Id.* ¶ 129.  Second,

he created the offshore shell company, Ebony Shine, to serve as the nominal buyer and to take

title to the aircraft.  *Id.* ¶ 127.  Third, he registered the aircraft in the Cayman Islands as opposed

to E.G. where he served as a government minister.  *Id.*  ¶¶ 7, 132.

These steps taken by Nguema to conceal the source of the funds used to buy the

Gulfstream Jet are also consistent with his demonstrated pattern and practice of concealing other

monies that he brought into the United States.  For example, Nguema used two California

attorneys, Michael J. Berger and George Nagler, to create numerous shell companies for him in

order to defraud U.S. financial institutions by hiding Nguema's relationship with the companies'

accounts and assets.  *Id.* ¶ 114.  Similarly, Nguema wire transferred funds to bank accounts

controlled by intermediaries, including the attorney client trust accounts of Berger and Nagler

who – unbeknownst to the banks – then used Nguema's money to pay for his personal expenses in the United States.  *Id.* ¶ 125.

Nguema's acts of refusing to disclose the source of the monies he used to buy the Gulfstream Jet, using multiple closing agents, acquiring that jet in the name of an offshore shell company, and his demonstrated pattern and practice of concealing his relationship with monies that he sends into the United States is one more circumstantial detail that gives rise to a reasonable belief that the Gulfstream Jet was derived from or traceable to his illicit schemes.

### 4.  Claimants' Argument that the Government Must Trace the Monies Used by Nguema to Purchase the Gulfstream Jet to a Specific Illicit Act is Misplaced

As described above, the Government has taken the Court's directive in the FAC by providing "specific indication that the Jet is derived from or traceable to illicit activity."  Order Memo at 23.  Claimants again, however, ask this Court to adopt new and novel standards of pleading and proof on this point.  They suggest that the Government must: (1) allege a "direct connection" between the Gulfstream Jet and a specific illegal act; (2) that the Government must be able to, at trial, "trace the proceeds of claimant's alleged activity to his purchase of the Property" to support its theory of forfeiture under 981(a)(1)(C); and (3) that Rule G requires the Government to establish a substantial connection between the Gulfstream Jet and Nguema's corrupt acts at the pleading stage.  *See* Cls.' MTD Brief at 5-6.  Claimants are mistaken on all three points.

First, the Government need only plead facts giving rise to a reasonable belief that the Gulfstream Jet was purchased with the proceeds of Nguema's corrupt schemes; it need not identify a particular corrupt act.  In fact, Claimants' appear to concede this point in their brief.  Cls.' MTD Brief at 5 ("the government may not need to do direct tracing at the pleading stage").  To the extent that they do not, the holding in *United States v. $3,294.00 in U.S. Currency*, No.

2:05-CV-998, 2006 U.S. Dist. LEXIS 47597 (D. Utah July 13, 2006), is also instructive on the

issue. There, the court denied a claimant's motion to dismiss the United States' civil forfeiture

case against monies seized during a drug arrest. *Id.* at *2. In its amended complaint, the

government alleged that the claimant sold drugs on five separate occasions, that he made false

representations as to the source of the seized funds, and that his legitimate income was not

commensurate with his assets. *Id.* at *9-10. The United States did not, however, link the seized

funds with a particular drug transaction. *Id.* at *12. Rather, it alleged in its pleading that the

claimant was involved in drug dealing. *Id.* Based on those facts, the court in *$3,294.00* denied

the claimant's motion to dismiss, observing that the complaint alleged facts sufficient to allow

the claimant to commence an investigation and frame a responsive pleading without moving for

a more definite statement. *Id.* at *11 (citing Supp. R. E(2)(a)); *see also United States v.$38,885*,

no. 1:11-cv-00143, 2011 U.S. Dist. LEXIS 144477, at *11 (E.D. Cal. Dec. 15, 2011) ("need not

show a relationship between the proceeds [of a crime] and a specific [criminal] transaction");

*United States v. Real Prop. & Premises Located at 216 Kenmore Ave.*, 657 F. Supp. 2d 1060,

1067 (D. Minn. 2009) (denying a motion to dismiss where the government alleged that a

company's income was "almost entirely" derived from fraud, that monies in the company's bank

account were the proceeds of fraud, and that those proceeds were used to renovate and pay taxes

on the defendant property).

Second, even at trial, the Government need not directly trace the monies used by Nguema

to purchase the Gulfstream Jet to a specific corrupt act. Arguments to the contrary have been

rejected by the courts. *See, e.g., United States v. Shafer*, 608 F.3d 1056, 1067 (8th Cir. 2010)

(affirming a criminal conviction and holding that "[T]he government is not required to trace

funds to prove a violation of § 1957"); *United States v. $87,060*, 23 F.3d 1352, 1354 (8th Cir.

1994) ("government need not trace the property to a specific drug transaction"); *United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432, 1435 n.4 (9th Cir. 1985) ("There is no need to tie the houseboats to proceeds of a *particular identifiable* illicit drug transaction") (emphasis in original); *United States v. $149,442.43*, 965 F.2d 868, 878 (10th Cir. 1992) (affirming forfeiture even though "government did not tie the vehicle to a specific drug transaction"); *$242,484*, 389 F.3d at 1160 (Government "does not need to show a relationship between the property and a particular drug transaction – only that the property was related to some illegal drug transaction"); *United States v. $1,700,000*, 545 F. Supp. 2d 645, 649 (E.D. Mich. 2008) ("*direct* evidence tracing . . . is not required") (emphasis in original).

And third, when one of the Government's theories of forfeiture is that the property was "involved in" the commission of a criminal offense, as it is in the government's second and third claims for forfeiture, the Government must show, *at trial*, that there is a substantial connection between the property and money laundering. *See* 18 U.S.C. § 983(c)(3). At the pleading stage, however, the Government need only allege facts that give rise to a reasonable belief that such a connection exists. Claimants' assertions to the contrary are belied by the holding in *$22,173*, 2010 U.S. Dist. LEXIS 33494, at *8 which the Court cites in its Memorandum Order. *See* Order Memo at 5. The court in that case described the Government's burden, *at trial*, to link a claimant's illicit acts to the proceeds of his crimes. In denying the claimants' motion to dismiss, it stated that the Government "need not prove that there is a substantial connection between the property and any specific drug transaction. Instead, the Government may prove more generally, based on a totality of the circumstances, that the property is substantially connected to narcotics trafficking." *Id.* at *8. Accordingly, if the Government need not trace the proceeds of illegal conduct to a specific instance of illegal conduct at trial, then it certainly need not do so at the

pleading stage.  *See also United States v. $118,170*, 69 Fed. Appx. 714, 717 n.1 (6th Cir. 2003)

("Government need not prove a substantial connection between a specific drug transaction");

*United States v. $185,000*, 455 F. Supp. 2d 145, 149 (E.D.N.Y. 2006) (same); *see also* Ex. A, at

10 (The Government need not show tracing at the pleading stage).

**C.  The Net Worth Doctrine Further Supports a Reasonable Belief that the Government Will Meet Its Burden at Trial**

Under the Net Worth Doctrine the Government may satisfy its burden of proof at trial by

proving the underlying specified unlawful activities to a preponderance of the evidence and then

demonstrating a large discrepancy between a claimant's legitimate income and his expenditures.

Although in this case, the Government also has alleged additional facts, such as a strong

temporal nexus between Nguema's corruption and the purchase of the Gulfstream Jet, his

misleading use of shell corporations, the concealment of his identity, and his inconsistent

statements as to the sources of his wealth, this circumstantial evidence alone is sufficient to

support a nexus between the defendant asset and the underlying corruption.   *See United States v.*

*Brock*, 747 F.2d 761 (D.C. Cir. 1984) (Government satisfied its civil forfeiture trial burden by

showing that (i) claimant engaged in illegal activity; (ii) lacked a legitimate source of income;

and (iii) had acquired over 100 pieces of valuable jewelry); *United States v. Funds from*

*Prudential Sec.*, 362 F. Supp. 2d 75, 81 (D.D.C. 2005) (Government met its forfeiture trial

burden by showing, among other things, that value of the defendant assets "far exceeded the

claimant's legitimate income").  "Evidence that [] expenditures by [a defendant] . . . hugely

exceeded any verifiable income suggest that the money was derived illegally."  *United States v.*

*Thomas*, 913 F.2d 1111, 1114 (4th Cir. 1990).  "Such [net worth] evidence is usually enough to

show probable cause to believe that all of the [claimant's] more valuable property is subject to

forfeiture."  *United States v. 2323 Charms Rd.*, 726 F. Supp. 164, 169 (E.D. Mich. 1989); *see*

*also United States v. Edwards*,  885 F.2d 377, 390 (7th Cir. 1989)  (stating in a forfeiture case that "where a defendant's verifiable income cannot possibly account for the level of wealth displayed and where there is strong evidence that the defendant is a drug trafficker, then there is probable cause to believe that the wealth is either a direct product of the illicit activity or that it is traceable to the activity as proceeds"); *United States v. 3714 Cancun Loop*, No. 1:98CV00011, 2002 U.S. Dist. LEXIS 9996, at *12 (M.D.N.C. May 17, 2002) ("Under the 'net worth' theory, a court is allowed to presume that a claimant's expenditures in excess of legitimate sources of income are from illegitimate sources of income, in the absence of any explanation reasonably susceptible of being checked.").

Indeed, "[t]he sheer magnitude of [Claimant's] expenditures [may] support an inference that [the Defendant Assets] were funded with the proceeds of [crime]."  *United States v. Parcels of Land*, 903 F.2d 36, 40 (1st Cir. 1990); *United States v. Jackson-Randolph*, 282 F.3d 369, 377 (6th Cir. 2002) ("evidence of extreme wealth or extravagant spending" relevant under the Net Worth Doctrine).   "[I]n terms applicable to the forfeiture context, where a defendant's verifiable income cannot possibly account for the level of wealth displayed and where there is strong evidence that the defendant [engaged in criminal activity], then there is probable cause to believe that the wealth is either a direct product of the illicit activity or that it is traceable to the activity as proceeds."  *United States v. $87,118*, 95 F.3d 511, 520 (7th Cir. 1996).  Indeed, as the Seventh Circuit explained, the absence of an apparent, verifiable, or legitimate source of substantial income is probative of nexus.  *Id*.

The FAC describes in detail Nguema's acquisition of more than $300 million in assets between 1999 and 2006 while earning less than $100,000 per year as a public official.  FAC ¶¶

103-05.  These facts, combined with the overwhelming evidence of corruption detailed in the

FAC, are more than sufficient to satisfy Supplemental Rule G's "reasonable belief" standard.

**D.    The Allegations in the FAC Support a Reasonable Belief that Nguema's Purchase of the Gulfstream Jet was Designed to Conceal SUA Proceeds**

Despite Claimants' arguments to the contrary, *see* Cls.' MTD Brief at 25, the facts in the

FAC support a reasonable belief that the Gulfstream Jet was purchased in a financial transaction

"designed in whole or in part to conceal or disguise the nature, the location, the source, the

ownership, or the control of the proceeds of specified unlawful activity."  18 U.S.C. §

1956(a)(1)(B)(i).  Notably, under Section 1956(a)(1)(B)(i), the Government need only allege that

*one* purpose of the money laundering transaction was "to conceal or disguise" the proceeds of

Nguema's corrupt acts.  *See, e.g., United States v. Hall*, 434 F.3d 42, 50 (1st Cir. 2006) ("at least

*one purpose* for the expenditure must be to conceal or disguise the assets") (emphasis added);

*United States v. Real Property Known as Unit 5B,* No. 12:10-CV-5390, 2012 U.S. Dist. LEXIS

72646, at *16 n.2 (S.D.N.Y. May 21, 2012) ("[W]hile [Section 1956] 'requires proof that the

purpose – not merely effect – of the transportation was to conceal or disguise a listed attribute,'

that need not be the sole purpose.") (quoting *Regalado Cuellar v. United States,* 553 U.S. 550

(2008)).

**1.    Nguema's Unsuccessful Attempts to Purchase a Private Jet Evidence His Intent to Conceal the Source of His Proceeds**

The FAC alleges that in 2004 Nguema personally contacted a U.S. energy company

executive and attempted to broker a convoluted transaction whereby he would divert $65 million

of E.G. public funds to that company in return for a Hercules C-130 transport plane.  FAC ¶ 118.

It also alleges that Nguema negotiated directly with Gulfstream Aerospace in 2004 when he

attempted to purchase a different aircraft.  *Id.* ¶ 119.  In those negotiations, Nguema advised

Gulfstream that he could and would have Ocean Energy acquire the aircraft on his behalf. *Id.* at 120. Gulfstream, fearing potential criminal and/or civil liability, refused to go along with the schemes. *Id.* And although these attempts were unsuccessful, they evidence Nguema's intent to conceal the source and nature of the monies he sought to use to purchase an aircraft. *Cf. United States v. Hartog*, 513 F.3d 991, 999-1000 (9th Cir. 2008) (the government's allegations regarding a claimant's failed drug delivery were highly probative for purposes of assessing "reasonable belief"); *United States v.$97,667*, 538 F. Supp. 2d 1246, 1253 (C.D. Cal. 2007) (consideration of an "unconsummated" criminal transaction was still relevant in assessing "reasonable belief").[12]

## 2.    Nguema's Creation and Use of Ebony Shine to Purchase and Take Title to the Gulfstream Jet is Sufficient to Allege Concealment

After these failed attempts to purchase an aircraft directly from Gulfstream Aerospace, Nguema worked with a private seller to purchase the Gulfstream Jet. FAC ¶¶ 119, 125. He also formed the offshore shell company, Ebony Shine. Ebony Shine then served as the nominal buyer and took title to the Gulfstream Jet. *Id.* ¶¶ 125, 127. Nguema's creation and use of a shell company for this purpose gives rise to a reasonable belief that the Government will be able to prove that the jet is forfeitable under its money laundering concealment theory. *Id.* ¶ 127; *see e.g., United States v. Bolden*, 325 F.3d 471, 490 (4th Cir. 2003) ("The creation and use of sham businesses is highly relevant to the proof of concealment money laundering."); *United States v. Golb*, 69 F.3d 1417, 1422 (9th Cir. 1995) (evidence of concealment where the defendant titled the plane in the name of his air-taxi service); *United States v. Garcia-Emanuel,* 14 F.3d 1469, 1476-77 (10th Cir. 1994) (use of a legitimate corporation as the nominal purchaser "not only

---

[12] *Compare* 18 U.S.C. § 201(b)(2) ("being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity" is guilty of a crime).

created the false impression that the [legitimate business] was [the] source of wealth, but it created documentary evidence in support of that deception that could have mislead an investigator").

Claimants suggest, however, that the use of the shell company, Ebony Shine, does not support the Government's concealment theory. Cls.' MTD Brief at 26-27. They argue that the use of shell companies and corporations to purchase luxury items is a commonplace financial arrangement. *Id.* at 26. Indeed, having a shell company take title to an asset may not, standing alone, be dispositive *at trial*, but it is sufficient to allege concealment money laundering at the pleading stage particularly when coupled with other allegations of concealment as exist here. Moreover, "the fact that transactions are 'regular corporate activities' does not mean they cannot be money laundering transactions. Indeed, the money laundering statute defines 'financial transaction' in a way that includes all manner of 'regular corporate activities,' but it is the concealment of specified unlawful activity that transforms these run of the mill transactions into laundering transactions." *In re 650 Fifth Ave. and Related Properties,* 777 F. Supp. 2d 529, 560 (S.D.N.Y. 2011).

### 3. Nguema's Refusal to Disclose to a Closing Agent the Source of the $38.5 Million He Used to Purchase the Gulfstream Jet Is Sufficient to Allege Concealment

During the transaction, Nguema also refused to comply with the closing agent McAfee & Taft's requirement that he identify the source of his funds, provide incorporation documents for Ebony Shine, and list its corporate officers and principals. FAC ¶¶ 128-29. Rather than complete the transaction without this information, McAfee & Taft terminated the deal and wired approximately $15 million in deposit money back to Nguema. *Id.* ¶ 130. Undeterred, Nguema used another closing agent to handle the transaction. *Id.* ¶ 131. Unlike McAfee & Taft, this

closing agent did not require Nguema to disclose the source of the $38.5 million that he used to purchase the Gulfstream Jet.  *Id.*  Like the allegations in the FAC relating to Nguema's use of Ebony Shine, his refusal to disclose the source of his massive wealth also supports a reasonable belief that the transaction was designed to conceal the ownership and source of his funds.  *Hall*, 434 F.3d at 51 (affirming a conviction for money laundering when defendant concealed the illegal origin of his funds by saying he obtained the money from family inheritance); *United States v. Wilson,* 77 F.3d 105, 109 (5th Cir. 1996) (same); *United States v. Lovett,* 964 F.2d 1029, 1035 (10th Cir. 1992) (affirming a money laundering conviction because the defendant made numerous conflicting statements regarding the source of his funds).

### 4. Because Claimants Mistake Facts Alleged in the FAC, the Tenth Circuit's Holding in *Sanders* Has Limited Applicability

Claimants argue that because Nguema "personally negotiated the purchase of the Defendant Aircraft and openly used it," there was no intent to conceal.  Cls.' MTD at 26.  This is factually incorrect and legally irrelevant.  Nowhere in the FAC does the Government allege that Nguema "personally negotiated" the purchase of the Gulfstream Jet.  The FAC specifically alleges that Nguema used a third party, Ebony Shine, to purchase the Gulfstream Jet and that Nguema used two separate closing agents to complete transaction.  FAC ¶ 127.  The FAC also does not allege that Nguema "openly used" the plane.  In fact, the Gulfstream Jet was titled in the name of Ebony Shine and it was registered, not in Nguema's home country of E.G., but in the Cayman Islands.  *Id.*  ¶¶ 7, 132.  The inference to be drawn from these facts is that Nguema did not openly use the Gulfstream Jet but took steps to conceal his association with it.

As such, the Tenth Circuit's holding in *United States v. Sanders,* 929 F.2d 1466 (10th Cir. 1991) does not apply.  There, the court reversed a defendant's conviction on concealment money laundering charges.  *Id.* at 1470.  It held that the Government had not put sufficient

evidence on *at trial* to support a finding that purchases of two automobiles were designed to conceal drug proceeds. *Id*. In doing so, it relied on evidence that the defendant did not use a third party to purchase the cars, was personally present when they were bought, and made conspicuous use of them after the purchase. *Id*. at 1472.[13] Here, unlike the defendants in *Sanders*, Nguema took steps to conceal the source and nature of the funds by using a third party to purchase the Gulfstream Jet and using intermediaries to complete that purchase. FAC ¶¶ 7, 127-32. The FAC also raises the inference that Nguema did not make conspicuous use of the Gulfstream Jet after he purchased it. *See id*. ¶¶ 7, 127, 132.

## VI.   CLAIMANTS' MOTION TO DISMISS IN THE PARALLEL CASE WAS DENIED AND SUMMARY JUDGMENT WAS GRANTED WITHOUT REGARD TO THE EVIDENCE THE GOVERNMENT RELIED ON IN ITS AMENDED COMPLAINT

In attempting to summarize the California forfeiture action, Claimants neglect to mention that Judge Wu did exactly what the Government is asking the Court to do here, he *denied* their motion to dismiss the Government's Second Amended Complaint. Ex. A; *see also* Cls.' MTD Brief at 2. Judge Wu held that "the [Second Amended Complaint] states sufficient facts to support a reasonable belief that the Government will be able to bear its burden of proof at trial as

---

[13] *Sanders* does not stand for the proposition that one *must* conceal his or her identity in order to support a conviction under Section 1956. As the same Circuit explained one year later in *United States v. Lovett,* 864 F.2d 1029, 1034 (10th Cir. 1992), there is no requirement in Section 1956 that an individual must conceal his or her identity in order to prove the element of concealment. *See also United States v. Davis,* 690 F.3d 912, 921 (8th Cir. 2012) (affirming conviction for concealment money laundering even though drug dealer selected the vehicle, negotiated its purchase, made most of the payments, and exclusively drove it for two months); *Hall,* 434 F.3d at 50-51 ("The statute criminalizes conduct designed to conceal or disguise the source of the drug proceeds even if the defendant does not conceal his own identity in the process."); *United States v. Kinzler,* 55 F.3d 70, 73 (2d Cir. 1995) ("§ 1956(a)(1)(B)(i) does not require an attempt to conceal the identity of the defendant"); *United States v. Warshak,* 631 F.3d 266, 320 (6th Cir. 2010) ("The fact that a defendant personally engages in a transaction without trying to disguise his or her identity, however, does not negate the effect of other evidence pointing to an intent to conceal.") (internal citations omitted).

to the allegation that extortion occurred."  Ex. A at 5.  And although it "present[ed] a close

question . . . the Government has alleged sufficient facts to support a reasonable belief that [it]

will bear its burden of proof a trial as to Nguema's participation in extortion and

misappropriation/embezzlement/theft schemes."  *Id.* at 7.[14]

Claimants also fail to explain that in later granting partial summary judgment, Judge Wu

was bound by Ninth Circuit law, which still looks to provisions 19 U.S.C. § 1615 in deciding

civil forfeiture cases.  Under the Ninth Circuit's unique interpretation of the law, the Government

is required to demonstrate the probable cause it had to institute its forfeiture action.  Section

1615's "probable cause" requirement has no bearing here, however, as it was legislatively

superseded by CAFRA.  18 U.S.C. § 983(c)(1) ("the burden of proof is on the Government to

establish by a preponderance of the evidence, that the property is subject to forfeiture"); 18

U.S.C. § 983(h)(i)(2)(A) (stating, in sum, that 19 U.S.C. § 1615 no longer applies to civil

forfeiture cases).  Not surprisingly, courts in the First, Second, Fourth, Eighth, Tenth, and

Eleventh Circuits have recognized that while CAFRA raised the Government's trial burden in

civil forfeiture cases from mere probable cause to a preponderance of the evidence standard, it

abolished 19 U.S.C. § 1615's requirement that probable cause need be demonstrated at the

institution of the civil forfeiture action.  *See, e.g.*, *United States v. Lopez-Burgos*, 435 F.3d 1, 2

(1st Cir. 2006) (because CAFRA states that "no civil forfeiture complaint may be dismissed

because the government lacked sufficient evidence of forfeitability at the time of filing," and

---

[14] The question is not nearly as close here.  Although the Government's allegations in the Second Amended Complaint filed in California are similar in many respects to those in the FAC, the FAC alleges additional facts relating to Nguema's participation in schemes to misappropriate, embezzle, and steal public funds from the E.G. government.  In particular, paragraph 81 of the FAC contains additional detail relating to kickbacks paid to Nguema by General Work.  Additionally, the allegations in paragraphs 83-91 of the FAC are new and were not pled in the Second Amended Complaint filed in California.

because it permits the government to "use evidence gathered after filing to meet its burden of proof," the pleading requirement 19 U.S.C. § 1615 no longer applies); *United States v. $557,933.89*, 287 F.3d 66, 77 (2d Cir. 2002) (Sotomayor, J);  *Mondragon*, 313 F.3d at 865; *United States v. $85,688*, 740 F. Supp. 2d 1284, 1286-87 (D. Utah 2010) ("The Court, therefore, agrees with the United States, and other courts that have considered the issue, that CAFRA supersedes 19 U.S.C. § 1615."); *United States v. $9,950*, No. 07-2067, 2007 U.S. Dist. LEXIS 79979, at *10-11 (W.D. Ark. Oct. 29, 2007); *United States v. $200,255*, No. 7:05-cv-272006 U.S. Dist. LEXIS 40049, at *25-27 (M.D. Ga. June 16, 2006).  Only the Ninth Circuit, alone among the circuits, holds that the probable cause standard still applies.

Thus, the statements that Claimants rely on from the California court such as, the "specified unlawful activities [alleged by the government] are not sufficiently supported by probable cause," *see* Cls.' MTD Brief at 2 (citing to *Id.* at Ex. 5), must be qualified by the fact that Judge Wu was: (1) following Ninth Circuit precedent in making a probable cause determination at the pleading stage – a step that CAFRA explicitly removed from civil forfeiture cases; and (2) making that determination based solely on the evidence that the Government had upon filing its initial complaint in that case in April 2011, not the more robust volume of evidence it had acquired by the time it amended its complaint, nearly fourteen months later. Although arguably consistent with Ninth Circuit law, the California court's decision runs counter to the provisions of CAFRA and the great weight of the law in other circuits.  *See* 18 U.S.C. § 983(c)(2) ("the Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of evidence, that property is subject to forfeiture"); *see, e.g., $557,933.89*, 287 F.3d 66 at 89 ("For purposes of establishing probable cause for forfeiture, the government may rely upon any evidence it has lawfully obtained up to the time of

the forfeiture trial."); *United States v. One 1974 Learjet 24D*, 191 F.3d 668, 673-74 (6th Cir.

1999) (holding that the Government does not have to establish forfeitability until the time of

trial).[15]

Finally, the California court's grant of partial summary judgment does not prevent the

Government from continuing to seek the forfeiture of Nguema's $30 million Malibu mansion,

his Ferrari 599 GTO, and assorted items of Michael Jackson memorabilia that the Government

alleges were purchased with the proceeds of corruption.  In his decision, Judge Wu explained

that for the court to consider evidence the Government acquired after the April 2011 filing of its

initial complaint, the proper procedural mechanism is not to amend, but to file a new civil

forfeiture action against the assets.  *See* Cls.' MTD Brief at Ex. 8, pg. 6 n.5 ("a dismissal for lack

of probable cause in the instant suit would not likely bar the Government from instituting another

action based on new evidence").

---

[15] Accordingly, the Government opposes Claimants' request for expedited discovery on the
limited issue of probable cause if this Court denies their motion to dismiss.  *See* Cls' MTD Brief
at 2 n.1.  The Government need not make its probable cause showing at the pleading stage, and if
and when it does need to make that showing, the law is clear that it "may rely upon any evidence
it has lawfully obtained up to the time of the forfeiture trial."  *$557,933.89*, 287 F.3d at 89.
Indeed, even Judge Wu concluded explicitly that under Ninth Circuit law, "determining whether
the Government had probable cause to institute this action is a question for *trial*, not the motion
to dismiss stage . . . ."  Ex. A at 12 (emphasis added).

## VII.  CONCLUSION

For the reasons stated above, the United States respectfully requests that this Court deny

Claimants' Motion to Dismiss.


                            Respectfully submitted,

DATED: November 22, 2013        JAIKUMAR RAMASWAMY, Chief
                            ASSET FORFEITURE AND MONEY
                                LAUNDERING SECTION, Criminal Division

                            */S/ Stephen A. Gibbons*_____
                            DANIEL H. CLAMAN, Assistant Deputy Chief
                            WOO S. LEE, Trial Attorney (D.C. Bar No. 486004)
                            STEPHEN A. GIBBONS, Trial Attorney
                                (D.C. Bar No. 493719)
                            United States Department of Justice
                            (AFMLS) Criminal Division
                            1400 New York Avenue, N.W., Suite 10100
                            Washington, D.C. 20005
                            (202) 598-2523
                            stephen.gibbons@usdoj.gov

                            Attorneys for Plaintiff
                            UNITED STATES OF AMERICA