# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 11-3582-GW(SSx) | Date | September 7, 2012 |
| Title | United States of America v. One White Crystal Covered Bad Tour Glove and Other Michael Jackson Memorabilia | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Isabel Martinez | Theresa Lanza | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:            Attorneys Present for Defendants:

Steven R. Welk, AUSA                              Duane R. Lyons
Woo Lee, US DOJ                                    Brian M. Wheeler

**PROCEEDINGS:** **CLAIMANTS VICE PRESIDENT TEODORO NGUEMA OBIANG MANGUE'S AND SWEETWATER MALIBU, LLC'S MOTION TO DISMISS SECOND AMENDED VERIFIED COMPLAINT FOR FORFEITURE IN REM AND REQUEST FOR HEARING ON FOREIGN LAW (filed 07/18/12)**

Court hears oral argument. The tentative circulated and attached hereto, is adopted as the Court's final ruling. Claimant has until September 20, 2012 to propound discovery. The government has 30 days to respond. Discovery is stayed.

A Status Conference is set for October 29, 2012 at 8:30 a.m.

: 50

Initials of Preparer   IM

<u>*U.S. v. One White Crystal-Covered "Bad Tour" Glove and Other Michael Jackson Memorabilia, et al.*</u>, Case No. CV-11-3582
Tentative Ruling on Motion to Dismiss Second Amended Verified Complaint for Forfeiture in Rem

I. **Background**

The United States government ("the Government"), in its Second Amended Verified Complaint (the "SAC", Docket No. 50), alleges that Teodoro Nguema Obiang Mangue ("Nguema" or "Claimant"), the son of the president of the West African country of Equatorial Guinea ("EG"), and now a Vice President[1] of that country, has purchased luxury items and real property, the named defendants in rem[2] (collectively the "Defendant Assets"), using funds derived from activities that are illegal under EG law. As such, the Government has instituted forfeiture in rem proceedings, and intends to seize the Defendant Assets. Nguema has not been charged with any crime in EG, and has not been convicted of any crime in the United States.

The facts pled in the Government's FAC included allegations that Nguema was part of an "Inner Circle" of corrupt politicians in EG, who illegally derived enormous wealth from the country's natural resources, including timber, oil and minerals, while the average EG citizen remains mired in poverty. *Id.* ¶¶ 23-25, 29. Nguema was appointed by his father to be a forestry minister in the EG government. The FAC alleged that Mangue abused this position to hoard profits for himself by means of bribery and corruption, in violation of EG law. *Id.* ¶ 35. Nguema moved to the United States in 1991, and has allegedly spent a veritable fortune on purchases such as yachts, cars, clothes, real property and celebrity memorabilia, including the Defendant Assets. *Id.* ¶¶ 33, 36, 42-48.

On April 12, 2012, the Court granted a motion to dismiss[3] the FAC, primarily on the grounds that the Government had not alleged "particular illegal acts committed by Nguema" and generally lacked sufficient detail to meet the pleading standard applied to forfeiture in rem actions, namely Fed. R. Civ. P. Supp. R. G(2)(F), which requires the Government to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."

The Government duly filed the SAC, weighing in at 105 pages, 60 pages longer than the

---

[1] At the time the FAC was filed, Claimant's title was Minister of Forests and Infrastructure (which title had previously been called Minister of Forestry and Environment or Minister of Forestry and Agriculture), a position he held from 1998-2012. In May of 2012, Claimant was appointed to the position of Second Vice President for National Defense and State Security. SAC ¶¶ 24, 45-46.

[2] The defendants in rem consist of: 1) one white crystal-covered "Bad Tour" glove and other Michael Jackson memorabilia; 2) real property located on Sweetwater Mesa Road in Malibu, CA, and 3) one 2011 Ferrari 599 GTO automobile. FAC ¶¶ 2-4.

[3] Nguema timely filed a verified claim and statement of interest (*see* Docket No. 19), both on an individual basis and on behalf of Sweetwater Malibu LLC (for which he is principal agent), and thus has standing to contest the forfeiture. *See* Fed. R. Civ. P. Supp. R. G(8)(b)(I).

FAC, seeking to set forth sufficient allegations to overcome the deficiencies the Court identified in the FAC. Before the Court now is Nguema's motion to dismiss the SAC.

## II. Legal Standard

Under Rule 12(b)(6), a court is to (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all reasonable inferences to be drawn from them. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). In its consideration of the motion, the Court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading[.]" *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir.), *cert. denied*, 512 U.S. 1219 (1994), *overruled on other grounds in Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *see also Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (indicating that a court may consider a document "on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion"). However, the Court need not accept as true "legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

A complaint for forfeiture in rem is subject to a heightened pleading standard, and must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2)(f) ("Rule G(2)(f)"). In addition, forfeiture in rem complaints must also meet the familiar *Iqbal/Twombly* plausibility standard: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007)). "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III. Analysis

The SAC asserts four separate bases for forfeiture:

First, the Government asserts that the Defendant Assets are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), which renders property subject to forfeiture if it "constitutes or is derived from proceeds traceable" to a specified unlawful activity ("SUA"), defined in 18 U.S.C. § 1956(c)(7) to include foreign offenses such as extortion or "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official." *See* SAC ¶¶ 12, 235-240. In other words, the first basis alleges that Nguema committed extortion and misappropriation/theft/embezzlement abroad and the Defendant Assets are traceable to the proceeds of those activities.

The second asserted basis for forfeiture arises under 18 U.S.C. § 981(a)(1)(A), which

renders property subject to forfeiture if it is "involved in a transaction" that itself violates 18 U.S.C. § 1957, which prohibits transactions over $10,000 using funds that are the proceeds of foreign acts of extortion, misappropriation/theft/embezzlement, foreign offenses involving bribery of a public official, or domestic bank fraud. *See* SAC ¶¶ 13, 241-257. In other words, the second basis alleges that Nguema committed extortion, misappropriation/theft/embezzlement, foreign offenses involving bribery of a public official, and/or domestic bank fraud, and the Defendant Assets are traceable to transactions using the proceeds of those activities in an amount over $10,000.

The third asserted basis for forfeiture also arises under 18 U.S.C. § 981(a)(1)(A), which renders property subject to forfeiture if it is the subject of a financial transaction that involved the proceeds of an SUA by one knowing that the transaction was designed to mask the source of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B). *See* SAC ¶¶ 14, 248-255. In other words, the third basis alleges that Nguema knew that the purchases of the Defendant Assets were made using proceeds of an SUA and knew that the transactions were structured so as to conceal his identity.

The fourth asserted basis for forfeiture, newly pled in the SAC, also arises under 18 U.S.C. § 981(a)(1)(A), which renders property subject to forfeiture if it is involved in a transaction which itself violates 18 U.S.C. § 1956(a)(1)(A)(i), which prohibits transactions that use the proceeds of unlawful activities with the intent to promote bank fraud. *See* SAC ¶¶ 15, 256-262. In other words, the fourth basis alleges that the Defendant Assets were involved in transactions that constituted bank fraud.

Two themes emerge from these four asserted bases. First, to prevail on any of these theories, the Government must sufficiently allege that Nguema committed an SUA, namely either (1) extortion or misappropriation/theft/embezzlement, (2) bank fraud, or (3) money laundering. Second, to prevail on any of these theories, the Government must show that the Defendant Assets are linked in some way to a sufficiently alleged SUA. The Court would thus assess to what extent the SAC remedies the deficiencies of the FAC in these two regards, and then analyze whether any or all of the four bases for forfeiture asserted in the SAC survive dismissal.

### A. The Government has pled sufficient allegations concerning extortion and/or misappropriation/embezzlement/theft.

Previously, the Court held that the Government's allegations of extortion and/or misappropriation/embezzlement/theft were insufficient because they did not allege specific details of particular instances of these crimes being committed by Nguema, instead relying on generalized allegations concerning the Inner Circle, defined in both the FAC and the SAC as "small number of individuals who hold critical positions of political and economic power in EG." FAC ¶ 17, SAC ¶ 18. Docket No. 47 at 4-5. Now, however, it appears that this deficiency has been remedied, in that the SAC contains particularized allegations of Nguema's acts of extortion and/or misappropriation, theft, or embezzlement.

#### a. Extortion

The Government alleges, *inter alia*, the following facts in support of the notion that Nguema engaged in extortion and bribery schemes that are illegal under EG laws. *See* SAC ¶ 48,

78. As to alleged extortion with regard to timber, the FAC had alleged merely that, as a general matter, Nguema refuses to approve timber exports until the exporter paid a "tax" (*i.e.* bribe), and that companies who sought logging concessions from Nguema were forced to pay him a "personal fee." The FAC then alleged particular incidents involving unnamed firms and the Inner Circle (not Nguema specifically). *See* FAC ¶¶ 52-53. Now, the SAC alleges, *inter alia*, that:

> [b]etween or around 1998 and 2003, German Pedro Tomo, the owner of Tromad Forestal and an EG national, paid Nguema his personal fees regularly either in suitcases of cash or with personal checks that Tomo deposited directly into a bank account in the name of Somagui at Caisse Commune d'Epargne et d'Investissement ("CCEI Bank"). Tromad Forestal paid Nguema in or around the equivalent of $700,000 in CFA Francs ("CFAs") per year between 1998 and 2003 in order to export its products . . . .
>
> In 1993 Nguema demanded that Isoroy pay him personally 15 million CFAs (approximately $21,000) to engage in logging in EG. Isoroy obtained a concession to harvest timber from 57,053 hectares of wilderness in EG on September 3, 1995.
>
> Similarly, between in or around 1998 and 2003, Shimmer International Guinea Equatorial Ltd. ("Shimmer"), the EG subsidiary of a Malaysian company, was permitted by Nguema to harvest timber . . . . Nguema demanded, and Shimmer's EG general manager agreed, that in exchange for paying Nguema 30,000 CFAs (approx. $50) per cubic meter of timber . . . Shimmer would be provided unfettered access to EG's forests, including national forests, and would not be required to adhere to EG's forestry law and its environmental and forest management regulations . . . .
>
> Nguema did not require concessionaires, including himself, his company Sofana, or his mother . . . to comply with these rules . . . .
>
> Isoroy, for instance, paid Nguema in or around the equivalent of $104,000 every one or two months in order to be able to continue to operate in EG from 1993 to 1996. This fee was calculated based upon the weight of the timber harvested by Isoroy during that time period.

SAC ¶¶ 53-62. The SAC goes on to list similarly detailed allegations concerning timber-related extortion. SAC ¶¶ 63-73. The SAC then alleges that extortion and bribery are illegal under EG law, citing specific provisions and attaching their text as Attachment C, which *appear* to support their argument that these activities violate EG law. SAC ¶ 78, Exh. C. Clearly, the SAC offers substantially more particularized factual allegations as to extortion than did the FAC, and the Government avers that the SAC meets the heightened pleading requirements of Rule G(2)(F).

Claimant faults the SAC for failing to "identify all of the unnamed business" and failing to provide details of the payments made pursuant to Nguema's demands, such as the date or amount of such payments. However, Claimant has identified no caselaw requiring that the Government set forth every detail of the alleged SUA at the pleading stage, the standard is simply whether the Government has pled sufficient facts to support a reasonable belief that the Government will be able to meet its burden of proof at trial. As noted by the Government, the Rule G(2)(F) standard is not as stringent as that required for fraud causes of action under Fed. R. Civ. P. 9(b). *See United States v. All Funds on Deposit*, 225 F. Supp. 2d 56, 68, n.18 (E.D.N.Y. 2003). Thus, Claimant's argument that the SAC remains too generalized is now unavailing, given the expanded allegations.

Claimant next argues that as to timber *export* fees, the Government cannot rely on allegations concerning German Pedro Tomo, because it alleges he "is in fact an EG opposition party politician who tried to overthrow the Government of EG in a thwarted cout d'état . . . [and] was convicted and sentenced to twenty years in prison for his prominent role in the coup plot." Docket No. 54 at 10. In support of this contention, Claimant submits for judicial notice documents evidencing his prosecution, conviction and sentencing. *See* Docket No. 55, Exh. 4. However, as the Government notes, this argument goes to the weight of the evidence, an improper inquiry at the motion to dismiss stage. While a finder of fact may well decide that Mr. Tomo's testimony is not credible, at the pleading stage the Court is limited to allegations on the face of the complaint, and as such, the allegations concerning Mr. Tomo support the reasonable belief that the Government will be able to meet its burden of proof at trial.

As concerns fees allegedly demanded for *access* to EG's forests, Nguema argues that the SAC only alleges what demands Nguema made, and insufficient pleads the details of payments actually made. But at least as regards to Shimmer, the SAC appears to adequately allege that payments were made, and Claimant has cited no authority for the proposition that every detail of every payment must be set forth at the pleading stage under Rule G(2)(F). As concerns demands for payments to *operate* in EG, Claimant raises similar arguments that the SAC is not detailed enough or recounts companies' refusals to pay fees, but the cited portions of the SAC above indicate otherwise, at least as concerns Isoroy.[4]

In sum, it is clear that the SAC states sufficient facts to support a reasonable belief that the Government will be able to bear its burden of proof at trial as to the allegation that extortion occurred[5].

---

[4]Claimant also addresses a portion of the SAC alleging that Nguema granted several infrastructure contracts to a french company Bougyes, and then had Bouygues build him a mansion and refused to pay for it. SAC ¶ 72. He argues that this mansion is the subject of litigation in EG, and Nguema refused to pay for it because of irregularities in its construction, submitting for judicial notice documents evidencing this litigation. Docket No. 55, Exh. 3. Again, the Court is limited to the face of the complaint at the pleading stage; while the existence of the litigation is properly judicially noticeable, the truth of the matters asserted therein is not, and the mere fact that Nguema is suing Bougyes does little work for Claimant in attacking the plausibility of the Government's allegations in that regard.

[5]As to both the alleged extortion and misappropriation/embezzlement/theft schemes, the Court would note that Claimant correctly faults the SAC for containing allegations of *attempted* extortion, without citing any authority that a forfeiture in rem claim can be supported by attempted extortion (or misappropriation, embezzlement or theft). However, given that the SAC also contains allegations of that these crimes were completed in some instances, it

### b. Misappropriation, embezzlement, and/or theft.

The FAC's allegations of misappropriation largely concerned a Washington D.C. bank convicted of similar crimes, Riggs Bank, and activities of members of the Inner Circle; the FAC had also detailed only acts of *attempted* misappropriation on the part of Nguema himself. *See* FAC ¶¶ 61-66. In contrast, the SAC alleges, *inter alia*:

> Between 2003 and 2007 . . . Nguema demanded that executives at Company B, one of the largest construction firms in EG, submit fraudulently inflated construction bids and contracts to G.E. Proyectores, an agency of the EG Government in charge of awarding public contracts. A portion of these inflated bids was then paid to Nguema . . . . Executives at Company B believed that if they had not acquiesced to Nguema's demands, their company would have been expelled from EG . . . .
>
> After G. E. Proyectores awarded the contract to Company B, the Banque des Etats de l'Afrique Centrale ("BEAC"), EG's central bank, wired the contract amount to Company B's account in EG. Company B, in turn, paid Nguema or one of his companies.
>
> Nguema asked that his companies, Somagui and Socage either (i) be listed as a subcontractor on Company B's bids, so that G.E. Proyectores would know that Nguema was associated with the bid, or (ii) sign a sub-contract with Company B . . . . Company B made hundreds of these types of payments to Nguema between 2003-2007.
>
> After [one] $10 million contract was awarded to Company B, the company paid Nguema a kickback of $8 million.

SAC ¶¶ 80-83. As to the diversion of public funds for his personal use, the SAC alleges:

> Since as early as 2005, Nguema has maintained public funds and revenue collected by his Forestry Ministry in a separate account . . . in contrast with the management of other EG Government funds, which are maintained by EG's Treasurer at BEAC
>
> The funds in this account include surface taxes paid by all persons who hold forestry concessions in EG, fees charged to timber companies who harvested logs from such concessions, and official timber export duties collected by the Forestry Ministry. Instead of depositing this revenue into BEAC like other public agencies,

---

seems that the allegations concerning attempts to commit them are relevant to the alleged factual backdrop as a whole. *See United States v. $97,667*, 538 F. Supp. 2d 1246, 1253 (C.D. Cal. 2003) ("Claimants assert that . . . [the Government presents facts of only] an *unconsummated* drug sale . . . . However [those facts suggested] that [Claimant's] drug dealing was an ongoing concern"). Claimant's point is well-taken, however, that the Government still appears to rely heavily on allegations of attempted extortion, which (while not fatal given the other allegations in the SAC) still would not independently support a forfeiture action.

> Nguema diverted and maintained these public funds in his Forestry Account.
>
> As the sole signatory on this Forestry Account, Nguema possesses exclusive authority and control over how the funds . . . are used.

SAC ¶¶ 87-90. The SAC goes on to cite the provisions of EG law criminalizing these activities, the text of which is again contained in the exhibit to the Government's opposition brief. SAC ¶¶ 92-93, Docket No. 58, Exh. A. Again, the SAC offers substantially more particularized factual allegations as to misappropriation, embezzlement and theft than did the FAC.

Claimant again argues that the SAC lacks sufficient detail. The Court would find that this presents a closer call than the extortion allegations, since Claimant is correct in noting that only one specific transaction is referenced. However, again, the Government is not obligated at the pleading stage to set forth every detail of the SUA. *See United States v. $493,8500.00 in U.S. Currency*, 518 F.3d 1159, 1169-70 (9th Cir. 2008) (finding the Government to have alleged sufficient facts to support a forfeiture action related to drug sales even though no details of any specific sale were alleged, due to the presence of other circumstantial evidence[6] of drug activity). Claimant faults the SAC for failing to identify "Company B," indicating that such failure "hamstrings Claimant's ability to defend himself." Docket No. 54 at 17-18. While the Government cites ample cases indicating that it is not required at the pleading stage to identify every player, the Court would ask the Government why it resists identifying Company B, seeing as it relies on the allegations concerning this company heavily in its misappropriation claim. Claimant is correct in noting that a forfeiture in rem complaint must allege sufficient facts that the claimant may "commence an investigation of the facts and . . . frame a responsive pleading." *United States v. Mondragon*, 313 F.3d 862, 864 (4th Cir. 2002). Yet, the Government routinely pleads forfeiture cases using unidentified sources and witnesses. *See, e.g., United States v. Real Property Located in Orange Cnty., Calif.*, No. CV 06-6758-R (PLAx), 2010 U.S. Dist. LEXIS 12024, at *3 (C.D. Cal. Feb. 9, 2010); *$97,667*, 538 F. Supp. 2d at 1247. Claimant has cited no cases indicating that the failure to name sources is a defect warranting dismissal of a forfeiture complaint. In sum, it appears the Government has now sufficiently pled its misappropriation/ embezzlement/theft allegations.

All in all, while it presents a close question, the Court would find that the Government has alleged sufficient facts to support a reasonable belief that the Government will bear its burden of proof at trial as to Nguema's participation in extortion and misappropriation/embezzlement/theft schemes.

### B. The Government's allegations re bank fraud

The SAC presents in exhaustive detail (39 pages of detail, in fact, *see* SAC ¶¶ 102-209)

---

[6]This evidence consisted of the fact that (1) claimants were driving in a 1993 Ford F-350 truck with Florida license plates in Arizona; (2) claimants were provided slightly inconsistent stories; (3) claimant's truck smelled strongly of air freshener; and (4) in the experience of the highway patrol officer who seized the property, suspects often used strong air freshener to cover the smell of narcotics; (5) one claimant was the subject of an ongoing DEA investigation, and (6) DEA agents had observed the same Ford truck during that investigation. *$493,8500*, 518 F.3d at 1169.

Nguema's alleged "scheme to fraudulently open and use bank accounts at financial institutions in California in order to funnel millions of dollars into the United States from EG, while concealing his association with the accounts, the source of the funds, and his status as an E.G. Minister and the son of EG's President." SAC ¶ 102. While the Court will not run through all of the details of the bank fraud allegations, the SAC alleges generally that two California lawyers, Michael Berger and George Nagler, created companies in which Nguema's assets were placed, and did not disclose his identity as an owner. The SAC details how Nagler and/or Berger created companies for Nguema and opened accounts for those companies at numerous banks throughout California, all while concealing Nguema's identity and participation from the banks. This was necessary, the SAC alleges, because banks are obligated pursuant to 31 U.S.C. § 5311 (and other statutes) to implement internal due diligence and controls for account of "politically exposed persons" and "senior foreign public officials" - Nguema falls into both categories, and as such, alleges the SAC, "U.S. financial institutions have been unwilling to deal with Nguema because of concerns that his funds were derived from corruption in EG." SAC ¶ 107. Thus, Nguema was forced to conceal his identity in order to move his assets from EG to the United States, alleges the SAC, and Nagler and/or Berger assisted him in doing so.

The SUA charged by these activities is bank fraud in violation of 18 U.S.C. § 1344. Claimant does not challenge the level of detail offered in support of the bank fraud claim. Instead, he argues that the SAC does not allege, as it must, that any of the various financial institutions involved, or any third party, suffered a loss. In essence, Claimant argues that the alleged schemes were victimless and thus the allegations, even if taken as true, cannot constitute a violation under either provision of 18 U.S.C. § 1344.

The elements of 18 U.S.C. § 1344(1) are: "(1) that the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial institution was insured by the FDIC [Federal Deposit Insurance Corporation]." *United States v. Rizik*, 660 F.3d 1125, 1135 (9th Cir. 2011) (quoting *United States v. Warshak*, 631 F.3d 266, 312 (6th Cir. 2010)). Claimant argues that the SAC does not allege any "intent to defraud" any financial institution. Other circuits have held that exposing the bank to "risk of loss" renders the intent to defraud element met. *See, e.g., United States v. Brandon*, 298 F.3d 307, 311-12 (4th Cir. 2002) ("it is sufficient for the government to show that a financial institution [was] exposed to an actual or potential risk of loss"); *United States v. McCauley*, 253 F.3d 815, 820 (5th Cir. 2001); *United States v. Akers*, 215 F.3d 1089, 1101 (10th Cir. 2000) (fact that "bank was put [at] potential risk by the scheme to defraud" was sufficient), *United States v. De La Mata*, 266 F.3d 1275, 1298 (11th Cir. 2001). However, the Ninth Circuit has not expressly addressed the issue. The Government acknowledges that it has only sufficiently pled bank fraud under § 1344(1) if the Court finds allegations of risk of loss sufficient, and cites cases indicating that the Ninth Circuit has not definitively disavowed the sufficiency of risk of loss allegations as concerns the intent to defraud element of bank fraud. *See* Docket No. 58 at 28-29 (citing, *inter alia*, *United States v. Wolfswinkel*, 44 F.3d 782, 783 (9th Cir. 1995); *United States v. Mason*, 902 F.2d 1434, 1442 (9th Cir. 1990)). Yet Claimant notes that in all of the cited cases, there was some victim alleged; in none of the bank fraud cases brought under §1344(1) was there alleged a victimless crime, as here. Unless the Court were to reject out of hand the risk of loss approach (which it is not

inclined to do at this point), the Government may be able to establish a cause of action under section 1344(1).

The Government argues that it has pled sufficient facts to support a claim for bank fraud pursuant to 18 U.S.C. § 1344(2), which prohibits any "a scheme . . . to obtain any [property] . . . owned by or under the custody or control of a federally insured financial institution by means of false or fraudulent pretenses, representations or promises." The SAC's allegations concerning bank fraud consist of Nguema's alleged opening of multiple bank accounts in names other than his own using fraudulent information. There is no allegation that Nguema's actions were an attempt to obtain any money other than his own. Thus, § 1344(2) on its face appears inapplicable, since there is no allegation that Nguema attempted to obtain funds owned by any of the banks involved. The Government cites *United States v. McNeil*, 320 F.3d 1034, 1037 (9th Cir. 2003), where deception towards the bank alone was held to be bank fraud. In that case, however, the scheme was implemented so that the perpetrator could receive an IRS refund check that was not in fact due to him. Thus, there was indeed an intent to defraud someone, even if it was not the bank.

In sum, the Court would want further argument from the parties on this issue, especially as to the risk of loss contention and whether the Government has any additional viable theory as to this controversy.

### C. The Government may not have sufficiently alleged money laundering.

"A conviction for money laundering under 18 U.S.C. § 1957 requires the government to show: (1) the defendant knowingly engaged in a monetary transaction; (2) he knew the transaction involved criminal property; (3) the property's value exceeded $10,000; and (4) the property was derived from a specified unlawful activity." *U.S. v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003). Given the above analysis, bank fraud may not be sufficient to provide the predicate unlawful activity that might support allegations of money laundering here. Thus, the Government may have to allege, in order to support its asserted basis for forfeiture resting on money laundering, that the allegedly laundered money was derived from the SUA of extortion or misappropriation/embezzlement/theft. Neither party addresses directly whether or not the SAC does, can or should support a forfeiture claim based on money laundering by linking the money laundering transactions to the SUA's of extortion or misappropriation/embezzlement/theft. The Court would ask the parties as to their views on this point at the hearing.

### D. The Government may not have sufficiently alleged a nexus between any SUA and the Defendant Assets.

The parties continue to dispute how much of a connection the Government must show as between any allegedly illegally-procured funds and the Defendant Assets. The Court notes as an initial matter that after detailing at length the American bank accounts Nguema opened while purportedly concealing his identity as the owner of the funds therein, the SAC alleges that the Defendant Assets were not purchased using funds from those American bank accounts, but were instead purchased using money wired from Nguema's accounts in EG. *See* SAC ¶¶ 215, 219, 221, 230, 232. However, one payment of $900,000 (for the Malibu real property) appears to have been made from "West Coast Escrow," an American entity, though not one insured by the

FDIC (as is a requirement for bank fraud). SAC ¶ 229. In addition, those funds appear to have come from Gulfstream Aerospace Corporation, from whom Nguema had attempted to buy a jet; when the sale collapsed Gulfstream apparently released $20 million (plus interest) back to Nguema, including sending $900,000 to West Coast Escrow as part of the purchase of the Malibu real property. *Id.*

While not alleging, then, that any of the Defendant Assets were purchased using funds from any of the allegedly fraudulently-created American bank accounts, nor directly using any proceeds of the alleged extortion, the Government alleges that the Defendant Assets were maintained using funds from the American bank accounts. *See, e.g.,* SAC ¶ 164 (security services, electricity bills, phone bills and property taxes on the Defendant Asset real property paid for using funds in allegedly fraudulent Union Bank account); SAC ¶ 179 (security services, electricity and water bills, aquarium costs, landscaping and pool maintenance at the Defendant Asset real property paid for using funds in allegedly fraudulent Citibank account); SAC ¶¶ 196[7], 205 (same); SAC ¶ 208 (insurance for Defendant Asset Ferrari and storage fees for Defendant Asset Michael Jackson memorabilia paid for using funds in allegedly fraudulent J.P. Morgan Chase account).

While the parties now appear to agree that the Government need not, at the pleading stage, trace the Defendant Assets to an SUA, its burden is to show that it will be able to do so at trial. *See* Docket No. 54 at 19-20. The Government's theory as to this point runs as follows. The SAC alleges that between 2004 and 2011, Nguema spent more than $300 million. SAC ¶ 100. Meanwhile, his official salary was under $100,000 per year. SAC ¶ 101. The SAC also provides detailed allegations as to the earnings of two companies owned by Nguema, Sofona and Somagui; the *gross* earnings of those two companies allegedly totaled only $47 million. SAC ¶¶ 94-98. The Defendant Asset real property cost Nguema $30 million in 2006. SAC ¶ 223. The Defendant Asset Michael Jackson memorabilia cost Nguema over $1 million in 2011. The Defendant Asset Ferrari cost Nguema $532,984.12. SAC ¶232. The Government attests that alleging spending like this "despite a relatively modest government salary" (SAC ¶ 233) and no other legitimate source of income is sufficient to meet their burden at the pleading stage as to the nexus between the SUA and the Defendant Assets.

Claimant cites to two out of circuit district court cases from the 1990s in arguing that the Government must show tracing at the pleading stage. The Government need not show so much, as noted in this Court's previous Order. *See* Docket No. 47 at 4. However, the Government does need to plead sufficient facts to support a reasonable belief that it will be able to bear its burden of proof at trial as to whether the Defendant Assets are connected to an SUA. *See United States v. Approximately $1.67 Million (US) in Cash, Stock and Other Valuable Assets*, 513 F.3d 991, 999 (9th Cir. 2008) ("circumstantial evidence *generally connecting* funds to [criminal acts] suffices to establish probable cause [to institute forfeiture in rem proceedings]") (emphasis added).

The Court has found that the Government has sufficiently alleged Nguema's participation in SUAs (at least as to extortion and misappropriation), but whether or not the SAC gives rise to

---

[7] The City National Bank funds were allegedly used to pay for a "fish physician" employed to care for the Malibu real property's koi pond. SAC ¶ 196.

the reasonable belief that the Government can connect the proceeds of those SUAs to the Defendant Assets remains a close question, and the Court would invite argument as to this point at the hearing. One question that might be helpful to answer is why the Government is attempting to seize these assets in particular, why not, say, his property in Bel Air, either of the Rolls Royce cars he allegedly purchased in California in 2009, or any of the other luxury items he allegedly purchased in his $300 million spending spree. *See* SAC ¶ 101.

### E. Comity

Claimant argues that the Court should decline to hear the case based on the principle of comity and the related act of state doctrine. "'Comity' . . . is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895). The act of state doctrine is based on "notions of sovereign respect and intergovernmental comity" and "reflects the judiciary's reluctance to complicate foreign affairs by validating or invalidating the actions of foreign sovereigns." *Doe I. v. State of Israel*, 400 F. Supp. 2d 86, 113 (D.D.C. 2005). Nguema argues that because the claims here rest on violations of EG law, this Court's adjudication of the matter would infringe on EG's right to administer its own laws. Additionally, Claimant notes that the United States has diplomatic relations with EG, which could be complicated by these proceedings. He also notes that this case constitutes "the first time the Government has sought forfeiture against the assets of a sitting foreign official based on alleged violations of foreign law where the foreign official has not been convicted or even charged with an offense in his own country." Docket No. 54 at 6 n.6.

While these arguments have some conceptual appeal, the Government notes that courts generally decline to hear cases based on comity when there has been a judgment as to the matter in a foreign tribunal, not the case here. *See Hilton*, 159 U.S. at 193; *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 64 (D.C. Cir. 2011). Moreover, the Government cites caselaw indicating that where the U.S. Government, as opposed to a private party, is the plaintiff, the court's concerns about comity should be limited. *See United States v. All Assets Held at Bank Julius Baer*, 772 F. Supp. 2d 205, 212 (D.D.C. 2011) ("declining jurisdiction out of deference to the interests of a foreign nation would be inappropriate" if the Government has instituted forfeiture in rem proceedings). As for the acts of state doctrine, the Government notes the doctrine is typically evoked when "a court "sit[s] in judgment on . . . acts of a *governmental character* done by a *foreign state*." *Bi v. Union Carbide Chem. & Plastics*, 984 F.2d 582, 586 (2d Cir. 1993) (emphasis added).

Claimant responds by noting that the Government has portrayed an overly restrictive view of these doctrines, indicating that the SAC essentially asks this Court to "pass judgment on another country's actions or omissions," which is barred under both comity principles and the act of state doctrine, notwithstanding the fact that no foreign judgment is at issue and no official actions are challenged. While the Court, as expressed from the bench at the last hearing, has continuing unease regarding this case on this score, the Court would find that the way to assuage that unease is not to simply dismiss the case but instead to evaluate the merits of the Government's case carefully to ensure that it does not proceed unless the Government has truly met its burden at each stage of the proceedings.

### F. After-acquired evidence

The Civil Asset Forfeiture Reform Act ("CAFRA") provides that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the *forfeitability* of the property." 18 U.S.C. § 983(a)(3)(D) (emphasis added); *see also* Fed. R. Civ. P. Supp. G(8)(b)(ii). The Ninth Circuit has nonetheless held that the enactment of CAFRA did not relieve the Government of its statutory duty to show *at trial* that it had *probable cause* at the *time* it instituted an action for forfeiture in rem. *U.S. v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1166 (9th Cir. 2008) (emphasis added); 19 U.S.C. § 1615.[8] Claimant extrapolates from these requirements that any evidence acquired after the initial filing of the complaint should be disregarded by the Court *at the pleading stage*,[9] and identifies a number of allegations in the SAC that were the result of post-filing investigation, such as the Government's questioning of Mr. Tomo and seizure of documents from the Malibu real property. *See* Docket No. 54 at 9 n.8; Docket No. 54 at 22 n.20. However, Claimant has cited no case where after-acquired evidence is disregarded simply by virtue of the timing of its discovery, in a forfeiture in rem case. Nor does the caselaw suggest such a result is warranted. The Government must show, at the pleading stage, that it has alleged sufficient facts to support a reasonable belief that it will meet its burden at trial. At trial, the Government must show that at the time it filed the initial complaint, it had probable cause to "believe that the property is involved in the activity subject to the specific forfeiture statute it invokes." *$493,850.00 in U.S. Currency*, 518 F.3d at 1169 (citations and quotations omitted). While Claimant cites *$493,850.00* for the notion that after-acquired evidence cannot be used to prove probable cause, determining whether the Government had probable cause to institute this action is a question for trial, not the motion to dismiss stage, as noted in this Court's previous Order. *See* Docket No. 47 at 3. Thus while Claimant is correct that any after-acquired evidence may not be used at trial to show that the Government had probable cause to institute the action, the after-acquired evidence is properly considered by the Court as to whether the Government will be able to meet its burden of proof at trial as to the forfeiture action more generally.

### G. Claimant's Request for a Hearing on Foreign Law

Claimant requests a hearing on EG law pursuant to Fed. R. Civ. P. 44.1. Clearly, whether Nguema violated the laws of EG will be an important aspect of this case. However, it is not entirely clear that the parties disagree as to this point. The Court would ask Claimant whether he contends that *if* all the allegations in the SAC are true, then Nguema has still violated no EG law. If so, then a hearing on foreign law might eventually be warranted. If not, then it seems the Court need not delve into the intricacies of EG law, since all that really matters is whether or not Nguema acted outside of it. Moreover, the plain text of the EG laws provided as Attachment C

---

[8]In this context, the Ninth Circuit defined probable cause as "reasonable grounds to believe that the property was related to an illegal drug transaction, supported by less than prima facie proof but more than mere suspicion.... Probable cause to believe that the property is involved in some illegal activity is not enough – the government must have probable cause to believe that the property is involved in the activity subject to the specific forfeiture statute it invokes." *$493,850.00 in U.S. Currency*, 518 F.3d at 1169 (citations and quotations omitted).

[9]The Government did not respond to this argument in its briefing.

to the SAC indicates that the alleged acts, if committed, did constitute violations of EG law. Thus it is possible that a hearing is unwarranted, at least at this juncture (as compared with, say, summary judgment). Also, the Government is correct in noting that Claimant has not identified which specific provisions the proposed hearing would address. In sum, the Court would discuss the matter with the parties, but would probably find while a hearing on foreign law is warranted, the appropriate juncture may be in conjunction with a summary judgment hearing.

### H. Requests for Judicial Notice and Objections

Both sides submitted documents for judicial notice, and both sides submitted objections thereto. As for the Government's request, to the extent it seeks this Court to take judicial notice of State Department country reports detailing corruption in EG, Claimant is correct in noting that these are not adjudicative facts properly judicially noticeable. Thus, the Government's request for judicial notice as to Exhibits 2 and 3 to the Declaration of Woo S. Lee is DENIED. While the request is GRANTED as to Exhibit 1, the Court did not rely on this document in any way in the instant Order. *See* Docket Nos. 63, 67. As for Claimant's request for judicial notice, the Government objects that the EG court documents submitted are only judicially noticeable as to their existence, not as to the truth of the matters asserted. The Court would GRANT Claimant's request for judicial notice insofar as it seeks to establish that the litigation events described occurred (for instance, the conviction of Mr. Tomo), but not as to the truth of the factual assertions contained therein.

### IV. Conclusion

The Court would DENY Claimant's motion to dismiss the SAC, but would inquire at the hearing as to what the nexus Government asserts between the Defendant Assets and the SUAs. The Court may decide to dismiss the SAC with leave to amend to better establish such a connection.